UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------- X

    YARON KWELLER,

        Plaintiff,

        -against-

    THE COUNTY OF BROOME et al.

    Defendants.

-------------------------------------------------------------------- X

Case No.  3:24-cv-01328-ECC-ML

---

**PLAINTIFF'S BRIEF IN OPPOSITION TO THE MOTIONS TO DISMISS OF THE COUNTY OF BROOME AND THE BROOME COUNTY DISTRICT ATTORNEY'S OFFICE; THE CITY OF BINGHAMTON, JOSEPH ZIKUSKI, CORY MINOR, AMANDA MILLER, AND THE JOHN DOE OFFICERS; MICHAEL A. KORCHAK AND MARK LOUGHRAN; ALYSSA CONGDON; AND AMANDA CRONIN**

---

## TABLE OF CONTENTS

TABLE OF AUTHORITIES…………………………………………….    ii

INTRODUCTION……………………………………………………    1

STATEMENT OF FACTS…………………………………………..    2

ARGUMENT

    I. Plaintiff Has Adequately Alleged Each Defendant's Personal Involvement, and the Complaint Does Not Rely on Improper Group Pleading
                    ……………    8

    II. Plaintiff Has Adequately Alleged the Absence of Probable Cause for His Arrest
                    ……………    21

    III. Plaintiff's Claims Against the District Attorney Defendants Are Not Barred by Absolute Prosecutorial Immunity Because the Misconduct Alleged is Investigative and Administrative, Not Prosecutorial Advocacy
                    ……………..    34

    IV. Plaintiff's Claims are Not Barred by Qualified Immunity Because the Complaint Alleges Clearly Established Constitutional Violations and Objectively Unreasonable Conduct by City Defendants
                    ……………..    43

    V.   Plaintiff Has Plausibly Alleged His Claims
                    ……………..    47

    VI. Plaintiff's Additional State Claims Are Plausibly Alleged
                    ……………...    74

CONCLUSION…………………………………………………………    79

# TABLE OF AUTHORITIES

**Cases**

*Abdul-Aziz v. City of New York*, 56 A.D.3d 291, 293 (1st Dept. 2008)    27

*Alvarado v. Westchester County*, 22 F.4th 40, 51–52 (2d Cir. 2022)    61

*Alwan v. City of New York*, 311 F. Supp. 3d 570, 587 (E.D.N.Y. 2018)    77

*Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994)    44

*Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)    44

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)    6

*Atuahene v. City of Hartford*, 10 F. App'x 33, 34 (2d Cir. 2001)    17

*Ausco Prods., Inc. v. Axle, Inc.*, No. 6:19-CV-06798 EAW, 2020 WL 7028521, at *2 (W.D.N.Y. Nov. 30, 2020)    17

*Baker v. Willett*, 42 F. Supp. 2d 192, 198 (N.D.N.Y. 1999)    70

*Barrett v. City of Newburgh*, 720 F. App'x 29, 33-34 (2d Cir. 2017)    16

*Bd. of County Comm'rs v. Brown*, 520 U.S. 397, 405 (1997)    69

*Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)    6

*Bermudez v. City of New York*, 790 F.3d 368, 377–78 (2d Cir. 2015).    52

*Bernard v. United States,* 25 F.3d 98, 102 (2d Cir.1994)    48

*Bertuglia v. City of New York*, 839 F.Supp.2d 703 (S.D.N.Y. 2012)    71

*Biswas v. City of New York*, 973 F. Supp. 2d 504, 533-34 (S.D.N.Y. 2013)    71

*Bledsoe v. Carreno*, 53 F.4th 589, 608 (10th Cir. 2022)    17

*Bones v. Cnty. of Monroe*, 22-CV-6072-FPG, 2022 WL 4921985, at *2 (W.D.N.Y. Oct. 4, 2022)    16

*Boyd v. City of New York.*, 336 F.3d 72, 75 (2d Cir. 2003)    49

*Boykin v. KeyCorp.,* 521 F.3d 202, 213 (2d Cir.2008)    7

*Brady v. Maryland*, 373 U.S. 83 (1963)    41

**2**

*Brandon v. City of New York,* 705 F. Supp. 2d 261,276-77 (S.D.N.Y. 2010)    62

*Breton v. City of New York*, 404 F. Supp. 3d 799, 815 (S.D.N.Y. 2019)    17

*Briscoe v. LaHue*, 460 U.S. 325, 342 (1983)    36

*Brown v. Illinois*, 422 U.S. 590 (1975)    22

*Buari v. City of New York,* 530 F. Supp. 3d 356, 390–91 (S.D.N.Y. 2021)    16

*Buckley v. Fitzsimmons,* 509 U.S. 259, 269 (1993)    35

*Burns v. Reed*, 500 U.S. 478, 486 (1991)    35

*Callan v. State,* 73 N.Y.2d 731, 535 N.Y.S.2d 590, 532 N.E.2d 96 (1988)    29

*Canon U.S.A., Inc. v. F&E Trading LLC*, No. 2:15-CV-6015 DRH AYS, 2017 WL 4357339, at *8 (E.D.N.Y. Sept. 29, 2017)    17

*Carbajal v. Vill. of Hempstead*, No. 02-CV-4270 (DLI), 2006 WL 845384, at *5 (E.D.N.Y. Mar. 29, 2006)    26

*Carter v. Inc. Vill. of Ocean Beach*, 759 F.3d 159, 164 (2d Cir. 2014)    62

*Chamberlain Est. of Chamberlain v. City of White Plains*, 960 F.3d 100, 110–11 (2d Cir. 2020)    44

*Cogswell v. County of Suffolk*, 375 F. Supp. 2d 182, 187 (E.D.N.Y. 2005)    33

*Colon v. City of New York*, 60 N.Y.2d 78, 468 N.Y.S.2d 453, 455 N.E.2d 1248, 1250 (1983)    27

*Conkey v. New York*, 74 A.D.2d 998, 427 N.Y.S.2d 330 (App. Div 4th Dep't. 1980)    49

*Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991)    80

*Cortez v. McCauley*, 478 F.3d 1108, 1118 (10th Cir. 2007)    29

*Crawley v. City of Syracuse*, 496 F. Supp. 3d 718, 729 (N.D.N.Y. 2020)    68

*Cruz v. Loc. 32BJ,* No. 22-CV-03068 (JAV) (SDA), 2025 WL 47936, at *2 (S.D.N.Y. Jan. 8, 2025)    80

*Cuffy v. City of New York*, 505 N.E.2d 937 (N.Y. 1987)    76

*Cunninham v. New York City*, No. 04-CV-10232, 2007 WL 2743580, at *6 (S.D.N.Y. Sept. 18, 2007)    49

**3**

*Curley v. Village of Suffern,* 268 F.3d 65, 70 (2d Cir.2001)     29

*Dash v. Montas*, 612 F. Supp. 3d 138, 158 (E.D.N.Y. 2020)     57

*Davis v. Erie Cty. Sheriff's Dep't,* No. 17-CV-955-LJV-MJR, 2018 WL 10335660, at *3, 2018 U.S. Dist. LEXIS 12502 (W.D.N.Y. Jan. 24, 2018), *report and recommendation adopted,* No. 17-CV-955, 2019 WL 4926289 (W.D.N.Y. Oct. 7, 2019)     7

*Davis v. Kelly*, 160 F.3d 917, 921–22 (2d Cir. 1998)     12

*Day v. Morgenthau*, 909 F.2d 75, 77-78 (2d Cir. 1990)     38

*Debrosse v. City of New York,* 739 F. App'x 48, 51 (2d Cir. 2018)     32

*Dettelis v. Sharbaugh,* 919 F.3d 161, 163-64 (2d Cir. 2019)     48

*Devenpeck v. Alford,* 543 U.S. 146, 152-153 (2004)     26

*DiBlasio v. Novello*, 344 F.3d 292, 304–05 (2d Cir. 2003)     21

*Dory v. Ryan*, 25 F.3d 81, 83 (2nd Cir. 1994)     42

*Dunaway v. New York*, 442 U.S. 200, 216 (1979)     22

*Eckman v. Lancaster City,* 742 F. Supp. 2d 638, 653 (E.D. Pa. 2010), aff'd, 515 F. App'x 93 (3d Cir. 2013)     55

*Erickson v. Pardus*, 551 U.S. 89, 94, (2007)     6

*Francis v. City of Schenectady*, No. 1:20-CV-00703 (LEK/TWD), 2022 WL 4619326, at *6 (N.D.N.Y. Sept. 30, 2022)     34

*Galgano v. Cnty. of Putnam*, 16-CV-3572 (KMK), 2020 WL 3618512, at *16 (S.D.N.Y. July 2, 2020)     72

*Gallop v. Cheney*, 642 F.3d 364, 369 (2d Cir. 2011)     71

*Garnett v. Undercover Officer C0039*, 838 F.3d 265, 277 (2d Cir. 2016)     53

*Garvey v. Face of Beauty LLC*, 634 F. Supp. 3d 84, 98 (S.D.N.Y. 2022)     79

*Geisler v. Petrocelli,* 616 F.2d 636, 639 (2d Cir.1980)     6

*Gonzalez v. Bratton*, 147 F. Supp. 2d 180, 194 (S.D.N.Y. 2001), *aff'd,* 48 F. App'x 363 (2d Cir. 2002)     75

**4**

*Green v. Garcia*, No. 18-cv-1745, 2020 WL 1467359, at *5, 2020 U.S. Dist. LEXIS 55164 (S.D.N.Y. Mar. 25, 2020) ..... 20

*Grinols v. Beers*, 532 F. Supp. 3d 95, 108–09 (W.D.N.Y. 2021) ..... 57

*Grullon v. City of New Haven*, 720 F.3d 133, 138-139 (2d Cir. 2013) ..... 10

*Guerriero v. Diocese of Brooklyn,* No. 21-CV-4923 (MKB), 2024 WL 2826097, at *3 (E.D.N.Y. Mar. 28, 2024) ..... 17

*Hao Zhe Wang v. Verizon Commc'ns Inc.,* No. 19-CV-9506, 2020 WL 5982882, at *2 (S.D.N.Y. Oct. 8, 2020) ..... 20

*Harnage v. Lightner*, 916 F.3d 138, 141 (2d Cir. 2019) ..... 17

*Harris v. Tioga Cnty.*, 663 F.Supp.3d 212, 243 (N.D.N.Y. Mar. 23, 2023) ..... 36

*Hayden v. Paterson*, 594 F.3d 150, 160 (2d Cir. 2010) ..... 8

*Henry v. Doyle*, No. 1:23-CV-1124 (BKS/ML), 2024 WL 2784210, at *3 (N.D.N.Y. May 30, 2024) ..... 20

*Hicks v. City of New York*, 232 F. Supp. 3d 480, 496 (S.D.N.Y. 2017), *aff'd in part, vacated in part sub nom. Hicks v. Marchman,* 719 F. App'x 61 (2d Cir. 2018) ..... 57

*Hill v. City of New York*, 45 F.3d 653, 661 (2d Cir. 1995) ..... 36

*Hines v. City of Albany*, 542 F.Supp.2d 218, 228-230 (N.D.N.Y. 2008) ..... 63

*Hope v. Pelzer*, 536 U.S. 730, 741 (2002) ..... 45

*Howard v. City of Rochester*, No. 23-CV-6561, 2025 WL 860306, *5 (W.D.N.Y. March 19, 2025) ..... 35

*Hudak v. Berkley Grp., Inc.*, 3:13-CV-00089-WWE, 2014 WL 354676, at *4 (D. Conn. Jan. 23, 2014) ..... 16

*Iacovangelo v. Corr. Med. Care, Inc.*, 624 F. App'x 10, 13–14 (2d Cir. 2015) ..... 62

*In re Aluminum Warehousing Antitrust Litigation*, 95 F. Supp. 3d 419 (S.D.N.Y. 2015) ..... 79

*Jean v. City of New York,* No. 09 CV 801 RJD, 2011 WL 4529634, at *4 (E.D.N.Y. Sept. 28, 2011) ..... 22

*Jocks v. Tavernier,* 316 F.3d 128, 136 (2d Cir. 2003) ..... 27

**5**

*Johnson v. City of New York*, No. 22-CV-3320 (DG)(PK), 2023 WL 11868258, at *12 (E.D.N.Y. Sept. 15, 2023) ........... 70

*Jones v. Town of E. Haven*, 691 F.3d 72, 81 (2d Cir. 2012) ........... 62

*Kamp v. Goldstein*, 555 U.S. 335, 342 (2009) ........... 37

*Kenton v. City of New York*, No. 24-CV-1630 (LDH) (PK), 2025 WL 510049, at *2 (E.D.N.Y. Feb. 15, 2025) ........... 62

*Korthas v. City of Auburn*, No. 04-CV-537, 2006 WL 1650709, at *5 (N.D.N.Y. June 9, 2006) ........... 26

*LaFrantz v. St. Mary's Roman Cath. Church*, No. 21-CV-4920, 2024 WL 216718, at *3 (E.D.N.Y. Jan. 19, 2024) ........... 18

*Lalonde v. City of Ogdensburg*, 662 F. Supp. 3d 289, 318 (N.D.N.Y. 2023) ........... 70, 73

*Lanning v. City of Glens Falls*, 908 F.3d 19, 25 (2d Cir. 2018) ........... 49

*Leatherman v. Tarrant County*, 507 U.S. 163, 168 (1993) ........... 63

*Leogrande v. State of New York*, No. 08-CV-3088, 2013 WL 1283392, at *8 (E.D.N.Y. Mar. 29, 2013) ........... 26

*Levine v. Gurney,* 149 A.D.2d 473, 539 N.Y.S.2d 967, 968 (N.Y.App. Div.2d Dep't 1989) ........... 75

*Lord v. Tashjian*, 1:23-CV-165, 2023 WL 8105956 (N.D.N.Y. 2023) ........... 12

*Loreley Fin. v. Wells Fargo Secs., LLC*, 797 F.3d 160, 190 (2d Cir. 2015) ........... 80

*Lowery v. Cnty. of Riley,* 04-3101-JTM, 2006 WL 2663480, at *1 (D. Kan. Sept. 15, 2006) ........... 55

*Lowth v. Town of Cheektowaga*, 82 F.3d 563, 571 (2d Cir. 1996) ........... 27

*Lucente v. Cnty. of Suffolk*, 980 F.3d 284, 297 (2d. Cir. 2020) ........... 68

*MacLaren v. Chenango Cnty. Police*, No. 3:24-CV-922 (GTS/MJK), 2024 WL 4728884, at *1 (N.D.N.Y. Nov. 8, 2024) ........... 12

*Mallet v. New York State Dep't of Corr. & Cmty. Supervision,* 126 F.4th 125, 131 (2d Cir. 2025) ........... 7

*Manganiello v. City of New York*, 612 F.3d 149, 161–62 (2d Cir. 2010) ........... 21

**6**

*Martin v. Anderson*, No. 07- CV-2965, 2008 WL 4761734, at *9 n.8 (E.D. Pa. Oct. 29, 2008) ............................................................................................................. 55

*Martin v. City of Albany*, 42 N.Y.2d 13, 396 N.Y.S.2d 612, 364 N.E.2d 1304, 1307 (1977) ....................................................................................................................... 49

*Matusick v. Erie County Water Authority*, 757 F.3d 31, 62 (2d Cir. 2014) .............. 62

*Matzell v. Annucci*, 64 F.4th 425, 434 (2d Cir. 2023) ................................................. 44

*McColley v. Cnty. of Rensselaer*, 740 F.3d 817, 825–26 (2d Cir. 2014) .................... 46

*McCrae v. Town of Brookhaven*, No. 18-CV-07061 (NRM) (LB), 2024 WL 5120016, at *15 (E.D.N.Y. Dec. 16, 2024) ................................................................................ 73

*McCray v. City of New York*, No. 03-CV-10080 (DAB), 2007 WL 4352748, at *23 (S.D.N.Y. Dec. 11, 2007) ...................................................................................... 70

*McDaniel v. City of N.Y.*, 585 F. Supp. 3d 503, 516–17 (S.D.N.Y. 2022) ................. 40

*McDonald v. City of Troy*, 542 F. Supp. 3d 161, 174 (N.D.N.Y. 2021) ..................... 68

*Mejia v. City of New York*, 119 F. Supp. 2d 232, 272-273 (E.D.N.Y. 2000) ............. 9

*Mesiti v. Wegman*, 307 A.D.2d 339, 763 N.Y.S.2d 67, 70 (App. Div. 2003) ............. 49

*Monell v. Dep't of Social Servs.*, 436 U.S. 658 (1978) ................................................ 62

*Moroughan v. Cnty. of Suffolk*, 514 F. Supp. 3d 479, 495 (E.D.N.Y. 2021) .............. 9

*Morris v. Northrop Grumman Corp.*, 37 F. Supp. 2d 556, 565 (E.D.N.Y. 1999) ....... 7

*Morse v. Fusto*, 804 F.3d 538, 547–48 (2d Cir. 2015) ............................................... 40

*Muralles-Osorio v. Town of Riverhead*, No.2:21-CV-3546, 2023 WL 2499070, at *1 (E.D.N.Y. Mar. 14, 2023) ..................................................................................... 7

*National Rifle Association of America v. Cuomo*, 350 F.Supp.3d 94 (2018) ............. 70

*Newton v. City of New York*, 566 F. Supp. 2d 256, 278 (S.D.N.Y. 2008) .................. 54

*Nolan v. W. Reg'l Off Track Betting Corp.*, No. 21-CV-922S, 2024 WL 4555115, at *11 (W.D.N.Y. Oct. 23, 2024) ............................................................................... 9

*Oliver Schools, Inc. v. Foley*, 930 F.2d 248, 253 (2d Cir. 1991) ................................ 79

*Oliveri v. Thompson,* 803 F.2d 1265, 1279 (2d Cir.1986) .......................................... 61

**7**

*Palmer v. City of New York*, 564 F.Supp.3d 221 (E.D.N.Y.2021)     71

*Pembaur v. City of Cincinnati*, 475 U.S. 469, 481 (1986)     69

*People v. Lancaster*, 69 N.Y.2d 20, 503 N.E.2d 990 (1986)     33

*Poventud v. City of New York*, 750 F.3d 121, 133–34 (2d Cir. 2014)     51

*Racer Properties LLC v. Nat'l Grid USA*, No. 5:18-CV-1267, 2024 WL 4863462, at *2
    (N.D.N.Y. Nov. 22, 2024)     6

*Rainsberger v. Benner*, 913 F.3d 640, 652 (7th Cir. 2019)     46

*Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 129 (2d Cir. 1997)     9

*Rich v. Fox News Network, LLC*, 939 F.3d 112, 122 (2d Cir. 2019)     74

*Richards v. City of New York,* 97–CV–7990 (MBM), 2003 WL 21036365, at *17
    (S.D.N.Y. May 7, 2003)     23

*Rivas-Villegas v. Cortesluna*, 142 S.Ct. 4, 6 (2021)     45

*Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008)     6

*Rodriguez v. City of New York,* 623 F. Supp. 3d 225, 259–60 (S.D.N.Y. 2022)     77

*Romero v. Fay,* 45 F.3d 1472, 1478 (10th Cir. 1995)     55

*Rosario v. City of New York*, 2019 WL 4450685, at 7–8 (S.D.N.Y. Sept. 17, 2019)     32

*Rugova v. City of New York*, 132 A.D.3d 220, 16 N.Y.S.3d 233 (2015)     76

*Russo v. City of Bridgeport*, 479 F.3d 196, 208–09 (2d Cir. 2007)     30

*Rutherford v. City of Mount Vernon*, 698 F. Supp. 3d 574, 607 (S.D.N.Y. 2023     57

*Ryder Energy Distribution Corp. v. Merrill Lynch Commodities Inc.*, 748 F.2d 774, 779
    (2d Cir. 1984)     5

*Sabir v. Williams*, 52 F.4th 51, 64 (2d Cir. 2022)     44

*Salmon v. Blesse*r, 802 F.3d 249 (2nd Cir. 2015)     75

*Sankar v. City of New York*, 867 F. Supp. 2d 297, 306–08 (E.D.N.Y. 2012)     24

*Satchell v. Dilworth,* 745 F.2d 781, 786 (2d Cir.1984)     61

**8**

*Savino v. City of New York*, 331 F.3d 63, 75 (2d Cir. 2003)     31

*Selvaggio v. Patterson*, 93 F. Supp. 3d 54, 70-71 (E.D.N.Y. 2015)     23

*Seweid v. Cnty. of Nassau*, 21-CV-03712, 2024 WL 693981, at *15 (E.D.N.Y. Feb. 20, 2024)     45

*Shomo v. City of New York*, 579 F.3d 176, 183 (2d Cir. 2009)     7

*Singer v. Fulton Cnty*, 63 F.3d 110, 119 (2d Cir. 1995)     22

*Smith v. Sawyer*, 435 F. Supp. 3d 417, 441 (N.D.N.Y. 2020)     20

*Solano v. New York,* 9:20-cv-01378, 2021 WL 4134793 (N.D.N.Y. Sept. 10, 2021)     12

*Soto v. Brooklyn Correctional Facility,* 80 F.3d 34, 37 (2d Cir.1996)     61

*Soto v. City of New York*, 132 F. Supp. 3d 424, 449 (E.D.N.Y. 2015)     16

*Southerland v. N.Y.C. Hous. Auth.*, No. 10-CV-5243 (SLT), 2010 WL 4916935, at *2 (E.D.N.Y. Nov. 23, 2010)     17

*Stansbury v. Wertman*, 721 F.3d 84, 94–95 (2d Cir. 2013)     34

*Swierkiewicz* [*v. Sorema,* 534 U.S. 506 (2002)     7

*Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020)     59

*Terebesi v. Torreso*, 764 F.3d 217, 243 (2d Cir. 2014)     44

*Torraco v. Port Auth. of N.Y. & N.J.*, 615 F.3d 129, 140 (2d Cir. 2010)     62

*Turner v. Manhattan Bowery Mgmt. Corp*., 49 Misc. 3d 1220(A), 28 N.Y.S.3d 651 (N.Y. Sup. Ct. 2015)     75

*United States v. Coppa*, 267 F.3d 132, 140 (2d Cir. 2001)     50

*United States v. Lanier*, 520 U.S. 259, 270-271 (1997)     45

*Van de Kamp v. Goldstein,* 555 U.S. 335, 342 (2009)     37

*Walker v. City of New York*, 974 F.2d 293, 299–300 (2d Cir. 1992)     52

*Walker v. Vill. of Freeport*, No. 15-CV-4646, 2016 WL 4133137, at *5, 2016 U.S. Dist. LEXIS 77582, at *13 (E.D.N.Y. June 13, 2016)     34

**9**

*Ward v. City of New York*, No. 08 CIV 7380 RJH, 2010 WL 3629536, at *1 (S.D.N.Y. 2010)    22

*Ware for DP v. Doe*, 1:24-cv-140, 2024 WSL 3874773 (N.D.N.Y. August 20, 2024)    13

*Warney v. Monroe County*, 587 F.3d 113, 124 (2d Cir. 2009)    39

*Werkheiser v. Cnty. of Broome*, 655 F. Supp. 3d 88, 101–02 (N.D.N.Y. 2023)    35

*Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996)    21

*Whren v. United States,* 517 U.S. 806, 813 (1996); *United States v. $557,933.89, More or Less, in U.S. Funds,* 287 F.3d 66, 85 (2d Cir. 2002)    26

*Wilson v. Lawrence County, Mo.*, 260 F.3d 946, 956 n.8 (8th Cir. 2001)    54

*Wray v. City of New York*, 490 F.3d 189, 195 (2d Cir. 2007)    62

*Zahrey v. Coffey*, 221 F.3d 342, 347 (2d Cir. 2000)    40

**Statutes**

42 U.S.C. §1983    19

**Rules**

Fed.R.Civ.P. 8(a)(2)    6

Fed.R.Civ.P 12(b)(6)    5

**10**

## INTRODUCTION

Defendants treat Mr. Kweller's complaint as though it is devoid of detail, legal substance, or factual support. But just like the prosecution they orchestrated against him, that portrayal collapses under scrutiny. Mr. Kweller's complaint (the "Complaint") describes in vivid, well-supported terms how the police and prosecutor defendants coordinated a baseless arrest—not because they had probable cause, but to obtain additional evidence they did not know how to obtain legally. The Complaint lays out in great detail how key actors suppressed or ignored exculpatory evidence, directed witnesses to destroy records, and pursued violent felony charges they knew lacked probable cause. Mr. Kweller has more than met his burden at this stage: the Complaint gives each defendant clear notice of the constitutional violations alleged against them and the specific role they played in causing them. Their outrageous conduct in the face of exculpatory evidence is such that it breaks through the wall of qualified and absolute immunity. The motions to dismiss should be denied in full. Alternatively, Mr. Kweller should be granted leave to amend under Rule 15(a) of Federal Civil Procedure to address any deficiency the Court identifies.

## STATEMENT OF FACTS

Plaintiff Yaron Kweller is a law-abiding citizen and a well-known business owner in Binghamton, New York. ECF 1 ¶ 1. At the time of these events, Mr. Kweller co-owned several successful establishments, including The Colonial, Dos Rios Cantina, and The Stone Fox. *Id*. ¶¶ 10, 24. He had no criminal history, and his businesses were central to the revitalization of Binghamton's downtown area. *Id*. ¶¶ 10–11.

1

On the evening of November 26, 2021, Mr. Kweller gathered with his brother, Leor Kweller, and his friend and business partner, Jordan Rindgen, to celebrate Yaron's birthday. *Id*. ¶ 23. That night, the group visited multiple venues, including those owned by Mr. Kweller. *Id*. ¶¶ 24–27. At a bar called Dillinger's, they encountered Defendant Samantha Herceg, who initiated contact with them, bought them drinks, and eventually returned with them to Mr. Kweller's private office space. *Id*. ¶¶ 27–30. A short time later, Defendant Hailey Demkovich, a friend of Herceg's, also joined the group at the office. *Id*. ¶¶ 32–34.

After a period of drinking and socializing at the office, the group returned to The Colonial. *Id*. ¶¶ 35–36. Video surveillance from inside The Colonial captured both Herceg and Demkovich voluntarily engaging in flirtatious, sexual, and physical contact— not only with each other, but also with Mr. Kweller and others. *Id*. ¶¶ 36–40. At no point on the video did either woman appear impaired, confused, or incapacitated. *Id*. ¶ 85. They were alert, laughing, dancing, and initiating contact. *Id*. Mr. Kweller and the others eventually returned to his private office, where Defendants Herceg and Demkovich again voluntarily initiated and engaged in sexual activity—both with each other and with members of the group. *Id*. ¶¶ 45–50. Mr. Kweller did not have sexual intercourse with either woman. *Id*. ¶¶ 54–55. Everyone parted company amicably. ¶¶ 50–52

The next day, the situation dramatically changed. Defendant Demkovich's boyfriend, Dylan Wesco, contacted The Colonial and falsely claimed that Defendant Demkovich had been drugged and raped. *Id*. ¶ 57. A criminal investigation led by the Binghamton Police Department (BPD) and the Broome County District Attorney's Office (BCDAO) was initiated. *Id*. ¶¶ 69–71.

Crucially, both Defendants Herceg and Demkovich sent text messages in the days following the encounter that directly contradicted their allegations. *Id*. ¶ 67. Defendant Demkovich acknowledged that she had voluntarily joined the group, and her messages included statements that nothing nonconsensual had occurred. *Id*. ¶ 67(b)–(d). Meanwhile, Defendant Herceg's texts were even more damning: she stated explicitly that she intended to pursue allegations against Mr. Kweller in order to "settle for nothing less than a million" and that she "want[ed] the Benz and the Beamer." *Id*. ¶ 68(e)–(g).

Finally, immediately after the alleged assault, forensic testing showed that testing on material from Defendant Herceg included a mixture containing contributions from two males, which directly contradicted Defendant Herceg's account to law enforcement that she had not had consensual sex for a month and a half, and Defendant Demkovich's account that she saw one man have sex with her friend on that night. *Id*. ¶ 161(a)–(c).

Rather than investigate these inconsistencies and exculpatory evidence, BPD and BCDAO aggressively pursued charges against Mr. Kweller—despite knowing that no probable cause existed. *Id*. ¶ 72. Surveillance footage from before and after the alleged assault contradicted the narrative that either woman was unconscious or incapacitated. *Id*. ¶¶ 85–86. Yet BPD failed to recover and preserve footage from multiple other establishments, and the District Attorney's Office never subpoenaed electronic communications or social media data from either complainant. *Id*. ¶¶ 77–80.

Worse still, Defendant Assistant District Attorney Alyssa Congdon personally instructed Defendant Herceg to delete her social media accounts. *Id*. ¶ 112. This directive led to the loss of critical, contemporaneous communications and destroyed evidence that could have exonerated Mr. Kweller. *Id*. This conduct was undertaken in the course of

investigative decision-making, not in the exercise of prosecutorial advocacy. *Id*. ¶¶ 106–113.

Meanwhile, BCDAO and BPD both knew that they lacked probable cause to arrest Mr. Kweller, Rindgen, and Leor Kweller. *Id*. ¶¶ 123–124. Nonetheless, prosecutors were eager to obtain the men's DNA and believing—incorrectly—that they could not obtain DNA without an arrest, BCDAO directed police to arrest them purely to collect forensic evidence. *Id*. ¶¶ 129–132. As the complaint makes clear, the arrests were not based on a good-faith belief that a crime had been committed but were pretextual and unlawful acts of evidence-gathering. *Id*. And as the legal argument in this Memorandum establishes, no reasonable law enforcement officer would believe that the only way to obtain a target's DNA was by arresting them without probable cause.

On February 22, 2022, Mr. Kweller was arrested and charged with Rape in the Third Degree under New York Penal Law § 130.25(2), which requires proof that the complainant was incapable of consent for a reason other than age. *Id*. ¶¶ 128–136. At the time of the arrest, police and prosecutors knew that Defendant Demkovich had told them she thought the encounter was consensual, had never said "no" or any other words indicating a lack of consent, had not physically resisted, had never lost consciousness, or verbally withdrawn consent. *Id*. ¶ 138. The video from the establishments—provided freely by Mr. Kweller to law enforcement—also established that the night's activities were consensual and that Herceg and Demkovich were not incapacitated. Police and prosecutors and police knew that the required elements of the crime were not satisfied but proceeded anyway. *Id*. ¶ 139.

4

Following the illegal arrest, the constitutional violations continued. The prosecution suppressed key exculpatory evidence, including: (1) text messages between the complainants and others, in which the women acknowledged voluntary participation. *Id*. ¶¶ 150–153, 173; (2) DNA results excluding Mr. Kweller and his brother as contributors. *Id*. ¶¶ 160–161; (3) witness statements and footage that contradicted the complainants' claims. *Id*. ¶¶ 85–86, 152.

Throughout, ADAs Congdon and Amanda Cronin remained actively involved in the investigation—making strategic decisions, guiding the direction of the police investigation, and failing to disclose *Brady* material. *Id*. ¶¶ 106–113, 150–153.

In October 2023, the case went to trial. *Id*. ¶ 183. After just two hours of deliberation, the jury returned a unanimous acquittal on all charges. *Id*. ¶ 184. The prosecution's case had disintegrated under the weight of the very evidence they had worked for months to withhold.

The harm to Mr. Kweller was devastating. His businesses were shuttered, his reputation destroyed, and he and his family endured nearly two years of public disgrace and psychological distress. *Id*. ¶¶ 188–190. All of it was the result of a prosecution built on lies, concealment, and the unconstitutional abuse of state power.

## LEGAL STANDARD

A motion to dismiss under Rule 12(b)(6) of Federal Civil Procedure tests the legal sufficiency of a complaint, not the strength of the evidence. *Ryder Energy Distribution Corp. v. Merrill Lynch Commodities Inc.*, 748 F.2d 774, 779 (2d Cir. 1984), quoting *Geisler v. Petrocelli,* 616 F.2d 636, 639 (2d Cir.1980). Fed.R.Civ.P. 8(a)(2) requires only a "short and plain statement of the claim showing that the pleader is entitled to relief." To

survive a motion to dismiss, a complaint need only provide fair notice of the claims. *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007). "Facial plausibility" is the benchmark, and reasonable inferences suffice at this early stage. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

A complaint "does not need detailed factual allegations" but must merely "raise a right to relief above the speculative level." *Twombly,* 550 U.S. at 555. There need not be every detail, but "enough facts to raise a reasonable expectation that discovery will reveal evidence of [the claims]." *Twombly,* at 556.  "To assess this plausibility requirement, the court must accept as true all of the factual allegations contained in the complaint and draw all reasonable inferences in the non-movant's favor." *Racer Properties LLC v. Nat'l Grid USA*, No. 5:18-CV-1267, 2024 WL 4863462, at *2 (N.D.N.Y. Nov. 22, 2024) (citing *Erickson v. Pardus*, 551 U.S. 89, 94, (2007)).[1]

In evaluating a motion under Rule 12(b)(6), the court must accept all factual allegations as true and draw all reasonable inferences in the plaintiff's favor. *Ibid.*  The court must take the allegations as true, no matter how skeptical it may be, except where the claims are "sufficiently fantastic to defy reality as we know it." *Iqbal*, 556 U.S. at 696. It is not the court's function to weigh the evidence or assess credibility at the motion-to-dismiss stage. *Morris v. Northrop Grumman Corp.*, 37 F. Supp. 2d 556, 565 (E.D.N.Y. 1999); *Muralles-Osorio v. Town of Riverhead*, No.2:21-CV-3546, 2023 WL 2499070, at *1 (E.D.N.Y. Mar. 14, 2023).

---

[1] General claims do not necessarily doom a complaint. "Although the allegations made by the petitioner [in *Erickson*] were general, they were not overly broad." *Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008).

**6**

"[A] plaintiff need not plead specific, admissible evidence in support of a claim...." *Peck v. Hillside Children's Ctr.*, 915 F. Supp. 2d 435, 437 (W.D.N.Y. 2013) (quoting *Campanella v. County of Monroe,* 853 F.Supp.2d 364, 378 (W.D.N.Y.2012)). *See Briggs v. Women in Need, Inc.,* 819 F.Supp.2d 119, 124–25 (E.D.N.Y.2011) ("*Twombly* 'affirmed the vitality of *Swierkiewicz* [*v. Sorema,* 534 U.S. 506 (2002)], which applied a notice pleading standard, and explained that its decision did not require heightened fact pleading of specifics' ") (quoting *Boykin v. KeyCorp.,* 521 F.3d 202, 213 (2d Cir.2008)) (additional internal quotation marks omitted).

Kweller's allegations raise his apparent right to relief "above the speculative level," thus satisfying the threshold pleading standard. *Twombly,* at 555. Viewing the Complaint as a whole, the Complaint "contains sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Mallet v. New York State Dep't of Corr. & Cmty. Supervision,* 126 F.4th 125, 131 (2d Cir. 2025) (quoting *Shomo v. City of New York*, 579 F.3d 176, 183 (2d Cir. 2009) (internal quotation marks omitted).

Defendant Cronin moved for judgment on the pleadings under Rule 12(c).  A 12(c) motion, however, is only properly made once all defendants have answered, which is the meaning of pleadings being "closed." Courts facing a premature 12(c) motion generally treat them as 12(b)(6) motions. *Davis v. Erie Cty. Sheriff's Dep't,* No. 17-CV-955-LJV-MJR, 2018 WL 10335660, at *3, 2018 U.S. Dist. LEXIS 12502 (W.D.N.Y. Jan. 24, 2018), *report and recommendation adopted,* No. 17-CV-955, 2019 WL 4926289 (W.D.N.Y. Oct. 7, 2019). This Court should apply the same standards as those under Rule 12(b)(6). *Hayden v. Paterson*, 594 F.3d 150, 160 (2d Cir. 2010).  Accordingly, her

**7**

motion must be judged against the same notice-pleading and plausibility framework outlined above.

## ARGUMENT

### I.    Plaintiff Has Adequately Alleged Each Defendant's Personal Involvement, and the Complaint Does Not Rely on Improper Group Pleading

The City Defendants argue there are insufficient allegations of personal involvement of Defendants Minor, Miller, and the John Doe officers. They assert that the Complaint fails to specify how each defendant personally participated in any constitutional violations, characterizing the allegations as generalized and conclusory, without providing sufficient factual detail to meet the pleading standards required under Rule 8 and the principles articulated in *Iqbal* and *Twombly*. See ECF 40-1, Point II.  The County and Defendants Congdon and Cronin also argue that the Complaint fails to allege personal involvement of the District Attorney Defendants. ECF  The County Defendants further argue that Plaintiff's Complaint suffers from improper group pleading.  ECF 57-1, Point III; ECF 65-1, Point II; ECF 74-1, Point II.  These arguments fail because they misstate the applicable pleading standard and the substance of the factual allegations in the Complaint.

### A.  Plaintiff Has Specifically Alleged Each Individual Defendant's Personal Conduct

The Second Circuit construes personal involvement as:

'direct participation, or failure to remedy the alleged wrong after learning of it, or creation of a policy or custom under which unconstitutional practices occurred, or gross negligence in managing subordinates.' *Black v. Coughlin*, 76 F.3d 72, 74 (2d Cir. 1996); *see also Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994). Personal involvement need not be active participation. It can be found 'when an official has actual or constructive

**8**

> notice of unconstitutional practices and demonstrates gross negligence or
> deliberate indifference by failing to act.' *See Meriwether v. Coughlin*, 879
> F.2d 1037, 1048 (2d Cir. 1989).

*Nolan v. W. Reg'l Off Track Betting Corp.*, No. 21-CV-922S, 2024 WL 4555115, at *11

(W.D.N.Y. Oct. 23, 2024). When officers are jointly involved in a scheme to ensure that

a plaintiff was detained on false charges, each officer may be held liable for malicious

prosecution even though he did not personally prepare documents to initiate the

prosecution. *See Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 129 (2d Cir. 1997)

(finding summary judgment improper); *see also Mejia v. City of New York*, 119 F. Supp.

2d 232, 272-273 (E.D.N.Y. 2000) ("[P]ersons who conspire with a complaining witness

to manufacture evidence that is likely to influence the prosecutor's decision to commence

proceedings and the jury's verdict are jointly liable for malicious prosecution").

It is not until after discovery at the summary judgment stage, and often at the trial

stage, that sufficient facts are developed to determine whether "the individual defendants

participated in one or more aspects of the alleged false arrest and prosecution[.]"

*Moroughan v. Cnty. of Suffolk,* 514 F. Supp. 3d 479, 495 (E.D.N.Y. 2021). In

*Moroughan,* summary judgment was inappropriate where the plaintiff demonstrated

issues of fact as to the roles of each police officer in the "initiation and continuation of

the prosecution of plaintiff." *Id.*, at 525. The court found a reasonable jury could

conclude each officer was sufficiently involved, even though only one of them prepared

the documents at the Precinct. *Ibid.* Summary judgment on the relevant counts was

denied because the evidence developed "construed most favorably to plaintiff, including

all reasonable inferences" required a jury "to decide whether each of these defendants

**9**

participated in the alleged unconstitutional conduct in some way or, at the very least, knowingly failed to fulfill their duty to intervene to prevent such conduct." *Id.*, at 495.

The Complaint's allegations provide each named and unnamed defendant clear notice of their alleged roles, and the constitutional violations asserted. Nothing more is required at this pleading stage. See *Grullon v. City of New Haven*, 720 F.3d 133, 138-139 (2d Cir. 2013).

### 1.  The City Defendants

Contrary to the City Defendants' assertions, the Complaint provides clear and specific factual allegations that sufficiently establish the personal involvement of Defendants Joseph Zikuski, Cory Minor, Amanda Miller, and the John Doe Officers in constitutional violations, thus easily satisfying the pleading standards under Rule 8 and as articulated in *Iqbal* and *Twombly*. See ECF 1 ¶¶ 121, 137, 180, 221-223, 230-231, 238, 244-246 (Zikuski and Minor); 137, 180, 221-223, 230-231, 238, 244-246, (Miller). The Complaint's occasional reference to the three as "members of BPD" or "BPD" does not obscure the unambiguous allegations about what each did.

First, the Complaint explicitly identifies Defendants Zikuski and Minor as personally involved in decisions to arrest Mr. Kweller despite knowing the lack of probable cause, and as actively participating in meetings and communications with the prosecutors, including DA Korchak, ADA Congdon, and ADA Cronin, to devise and execute the strategy of arresting Plaintiff and others solely to obtain their DNA. (ECF 1 ¶¶ 92, 93, 123-124, 129–132.) These allegations explicitly tie Zikuski and Minor to deliberate investigative decisions known to be unconstitutional. The Complaint further alleges that Zikuski and Minor, in coordination with prosecutors, intentionally ignored

10

exculpatory evidence—such as surveillance videos and contradictory witness statements—at the investigative stage. (*Id*. ¶¶ 92, 94–95, 148.)

Second, the Complaint clearly specifies Investigator Amanda Miller's personal involvement in investigative misconduct. It alleges that Miller played a key investigative role, personally responsible for securing and reviewing crucial electronic evidence (including text messages and social media communications). Despite knowing complainant-defendants Herceg and Demkovich were deliberately withholding potentially exculpatory phone data and that their attorney Thomas Saitta explicitly alerted the prosecutors investigating the case to available exculpatory information, Miller intentionally failed to compel production or review this critical evidence. (*Id*. ¶¶ 103–105, 108, 111–113, 115–118, 146, 188, 190.) Miller's investigative failures were not passive; they were deliberate and active decisions made as part of the investigative team to suppress exculpatory material and further an unfounded prosecution.

Third, the Complaint identifies the John Doe Officers with adequate detail by explicitly describing their functional roles. It alleges these unnamed officers were directly involved in unlawfully arresting Plaintiff, knowing that probable cause did not exist and acting under instructions coordinated by Captain Minor and prosecutors. (*Id*. ¶¶ 129–132, 139–142, 149, 186–187, 205–206).[2] Further, the John Doe Officers are alleged to have actively participated in investigative misconduct, specifically failing to preserve clearly exculpatory video surveillance from multiple locations, and deliberately neglecting to gather electronic communications they knew would contradict the allegations made

---

[2] No Defendant challenges Plaintiff's identification of John Doe defendants.

**11**

against Mr. Kweller. (*Id.* ¶¶ 77–86, 150–153.) These specific descriptions, although referring to unknown officers by their investigative roles, unquestionably satisfy Rule 8's notice pleading standard and are sufficient for identification and further detailing through discovery. See *Davis v. Kelly*, 160 F.3d 917, 921–22 (2d Cir. 1998) (plaintiffs may plead Doe defendants and obtain their identities through discovery).

Thus, Plaintiff's Complaint provides ample detail about the individual roles and participation of Captain Minor, Investigator Miller, and the John Doe Officers in constitutional violations. These allegations clearly exceed the minimal requirements of notice pleading, providing each defendant fair notice of their alleged wrongdoing and fully satisfying the standard established by *Twombly* and *Iqbal*. Defendants' claims of insufficient personal involvement are therefore without merit, and their motion to dismiss on this ground must be denied.

The cases relied upon by the City Defendants are thus distinguishable and unpersuasive.  In *Solano v. New York,* 9:20-cv-01378, 2021 WL 4134793 (N.D.N.Y. Sept. 10, 2021), the Complaint had no factual allegations *at all* about what any defendant, except one, did. Except for the one correctional officer, any time a defendant was mentioned, they were all listed together. The Complaint itself contained fewer than five pages of factual allegations. See *id*., 9:20-cv-01378, ECF 1 at 6-13 (Complaint).  In *Lord v. Tashjian*, 1:23-CV-165, 2023 WL 8105956 (N.D.N.Y. 2023), the court dismissed one defendant out of dozens sued. Unlike here, that plaintiff had alleged nothing specific about the police chief's involvement in the raid that gave rise to the lawsuit.  In *MacLaren v. Chenango Cnty. Police*, No. 3:24-CV-922 (GTS/MJK), 2024 WL 4728884, at *1 (N.D.N.Y. Nov. 8, 2024), the mere allegation that defendants "continued their

12

investigation" despite knowing plaintiff was innocent was insufficient to allege false arrest. That is wildly distinguishable from the claims here where Plaintiff has laid out in great detail what each defendant is alleged to have done or not done.  In *Ware for DP v. Doe*, 1:24-cv-140, 2024 WSL 3874773 (N.D.N.Y. August 20, 2024), the Plaintiff sued only one unnamed person ("John Doe") but then neglected to specify in the complaint the "John Doe" inflicted the injuries in the scuffle involving Plaintiff and several officers. Plaintiff was given leave to amend to correct the deficiencies. *Ware for DP v. Doe* bears no semblance to this case, where Plaintiff expressly names the three individuals and explains what they did and asserts claims against "John Doe" defendants.

## 2. The District Attorney Defendants

Regarding the District Attorney Defendants, the Complaint explicitly distinguishes among the actions of individual prosecutors—naming each District Attorney Defendant and specifically alleging their direct and personal participation in investigative misconduct, particularly emphasizing their active involvement during the pre-arrest investigatory phase when their actions were clearly investigative rather than prosecutorial.

Specifically, Defendant Alyssa Congdon is alleged to have personally participated in investigative decision-making alongside law enforcement, including involvement in strategy meetings that resulted in the decision to arrest Plaintiff without probable cause solely to obtain DNA evidence. (ECF 1 ¶¶ 107–112, 129–132.) Congdon is further alleged to have directly instructed complainant Samantha Herceg to delete evidence known to contain exculpatory material, deliberately causing the destruction of evidence favorable to

**13**

Mr. Kweller. (*Id.* ¶¶ 66, 110–112.)[3] Additionally, Congdon is alleged to have intentionally failed to preserve crucial electronic communications from complainants' phones, despite being explicitly aware that these communications were likely exculpatory, and despite Mr. Saitta's clear alert that such material existed and was available. (*Id.* ¶¶ 107–112, 150–153.)

Similarly, Defendant Amanda Cronin is alleged to have directly approved investigative strategies and tactics that intentionally suppressed exculpatory evidence and knowingly facilitated Plaintiff's arrest without probable cause. (Id. ¶¶ 106–108, 129–132.) Cronin is specifically alleged to have failed to preserve, review, or disclose critical exculpatory electronic evidence and deliberately withheld DNA test results conclusively excluding Plaintiff as a contributor to biological evidence collected from one of the complainants. (*Id.* ¶¶ 106–108, 160–161.) These allegations explicitly identify Cronin's active investigative role, separate from prosecutorial advocacy.

Finally, the Complaint explicitly identifies Defendants Michael Korchak and Mark Loughran as personally involved in investigative decisions. Korchak and Loughran are alleged to have directly participated in and approved the decision to arrest Plaintiff and others without probable cause, specifically and solely for the improper investigative purpose of obtaining DNA evidence. (*Id.* ¶¶ 129–132.) These allegations explicitly establish their personal role in directing unconstitutional investigative actions, decisions clearly separate from prosecutorial functions.

---

[3] That Plaintiff has not alleged exactly when Congdon gave this instruction does not render the claim fatal at this pre-discovery stage.

**14**

Korchak assigned Congdon to the investigation despite knowing (or having reason to know) she was so unqualified that there would be a great risk she would violate Mr. Kweller's constitutional rights. ECF 1 ¶¶ 108-109, 127, 237-239. Korchak, Loughran, Congdon, and Cronin are alleged to have been personally told by Demkovich she never said "no" or resisted, and believed the activity to have been consensual, but Korchak did not recognize the exculpatory nature of the statement, disclose it, or factor it into the investigative decisions. *Id*. ¶¶ 138, 150, 172-173. Plaintiff alleges that each prosecutor, acting during the investigatory stage and as an investigator, knew the statements of Demkovich and Herceg were unreliable and untrustworthy, yet either deliberately or recklessly failed to investigate further.  *Id*. ¶¶ 123-124, 145-149, 110-114, 119, 120, 162, 172. This, with other information alleged to have been known to Korchak, Loughran, Congdon and Cronin and detailed in the Complaint, is sufficient to allege these defendants' personal involvement at this stage.  *Id*. ¶¶ 107-110, 114, 119, 140-141, 150-154.

Thus, the Complaint provides clear, specific, and individualized factual allegations against each District Attorney Defendant, thoroughly detailing their personal involvement in investigative misconduct during the investigatory phase. Such detailed allegations more than satisfy the pleading standards under Rule 8, clearly surpassing the requirements established in *Iqbal* and *Twombly*. The District Attorney Defendants' motion to dismiss on grounds of insufficient personal involvement should therefore be denied.

### B. Plaintiff's Limited Use of Collective Allegations is Proper and Permissible

**15**

The County Defendants argue incorrectly that the Complaint relies on impermissible "group pleading." ECF 57-1, Point III. However, collective references (e.g., "Defendants," "District Attorney Defendants," or "City Defendants") are permissible when defendants act jointly or closely coordinate their unconstitutional conduct. Courts in the Second Circuit routinely reject dismissal arguments based on alleged group pleading at the Rule 12 stage, provided the complaint reasonably permits each defendant to understand their involvement. *See Barrett v. City of Newburgh*, 720 F. App'x 29, 33-34 (2d Cir. 2017) (Summary reference to defendants as a group acceptable at pleading stage); *Soto v. City of New York*, 132 F. Supp. 3d 424, 449 (E.D.N.Y. 2015) (no dismissal where complaint gives fair notice of each defendant's misconduct). Courts permit reference to defendants collectively if "there is no confusion as to whom the allegation is asserted against. A plaintiff is not prohibited from "collectively referring to multiple defendants" so long as the "complaint alerts defendants that identical claims are asserted against each defendant." *Bones v. Cnty. of Monroe*, 22-CV-6072-FPG, 2022 WL 4921985, at *2 (W.D.N.Y. Oct. 4, 2022)(internal quotation marks/citations omitted) (finding collective allegations sufficiently specific); *Hudak v. Berkley Grp., Inc.*, 3:13-CV-00089-WWE, 2014 WL 354676, at *4 (D. Conn. Jan. 23, 2014)("Nothing in Rule 8 prohibits collectively referring to multiple defendants where the complaint alerts defendants that identical claims are asserted against each defendant."); *Buari v. City of New York,* 530 F. Supp. 3d 356, 390–91 (S.D.N.Y. 2021).[4]

---

**4** In *Buari,* the defendants argued that Buari failed to specify which NYPD Defendants participated directly in the coercion of witnesses and which NYPD Defendants were present and failed to intercede. The Court disagreed:

To allege a conspiracy, Plaintiff need not allege each defendant individually committed every overt act.  *See e.g.*, *Bledsoe v. Carreno*, 53 F.4th 589, 608 (10th Cir. 2022) (use of collective defined terms in certain allegations doesn't "doom" plaintiff's claims when viewed with other allegations in the complaint).

Use of defined subgroupings of defendants is allowed. *Ausco Prods., Inc. v. Axle, Inc.*, No. 6:19-CV-06798 EAW, 2020 WL 7028521, at *2 (W.D.N.Y. Nov. 30, 2020) (finding the complaint didn't engage in the sort of group pleading that warrants dismissal). *See Canon U.S.A., Inc. v. F&E Trading LLC*, No. 2:15-CV-6015 DRH AYS, 2017 WL 4357339, at *8 (E.D.N.Y. Sept. 29, 2017) (even though there were some collective allegations, the court rejected the defendants' group pleading argument).  In *Guerriero v. Diocese of Brooklyn,* No. 21-CV-4923 (MKB), 2024 WL 2826097, at *3 (E.D.N.Y. Mar. 28, 2024), *quoting Harnage v. Lightner*, 916 F.3d 138, 141 (2d Cir. 2019) the Eastern District of New York explained:

> Although Plaintiff asserts each of his five claims against '[a]ll Defendants' and refers to 'Defendants' jointly throughout the SAC without distinguishing between the Diocese and St. Bernadette …the SAC provides sufficiently specific factual

---

But such specificity as to each NYPD Defendant's individual actions is not required where, as here, the complaint 'give[s] each defendant 'fair notice of what the plaintiff's claim is and the ground upon which it rests.' *Southerland v. N.Y.C. Hous. Auth.*, No. 10-CV-5243 (SLT), 2010 WL 4916935, at *2 (E.D.N.Y. Nov. 23, 2010) (quoting *Atuahene v. City of Hartford*, 10 F. App'x 33, 34 (2d Cir. 2001) (summary order)); *see Breton v. City of New York*, 404 F. Supp. 3d 799, 815 (S.D.N.Y. 2019) (rejecting group pleading argument where the complaint alleged that specific officers 'each participated in the fabrication of evidence and the creation of police reports that omitted exculpatory evidence ... [and] that these defendants forwarded the misleading evidence to the prosecutors'); *Serrata v. Givens*, No. 1:18-CV-2016, 2019 WL 1597297, *5 (E.D.N.Y. Apr. 15, 2019) (rejecting group pleading argument where 'the complaint refers to all the defendants collectively because all the defendants were, it alleges, on the scene and actively involved in the complained-of conduct'); *Adamou v. County of Spotsylvania*, No. 1:12-cv-07789 (ALC) (SN), 2016 WL 1064608, at *11 (S.D.N.Y. Mar. 14, 2016) (denying motion to dismiss despite 'several instances of impermissible 'group pleading' ' because 'those allegations [we]re buttressed by specific allegations against [particular defendants]').
*Buari,* at 390-391.

**17**

allegations to give the Diocese 'a fair understanding of what [Plaintiff] is complaining about[.]'

. The *Guerriero* Court also cited: *LaFrantz v. St. Mary's Roman Cath. Church*, No. 21-CV-4920, 2024 WL 216718, at *3 (E.D.N.Y. Jan. 19, 2024) (while the plaintiff "could have alleged in greater detail conduct specific to each [d]efendant," her complaint did not fail to give notice to the defendants under Rule 8);  *Kashef v. BNP Paribas SA*, No. 16-CV-3228, 2021 WL 1614406, at *2–3 (S.D.N.Y. Apr. 26, 2021) (although the plaintiffs referred to "defendants" throughout the complaint and asserted claims against "all defendants," they "sufficiently put all defendants on notice of the nature of the claims against them," satisfying the requirements of Rule 8); and *Ausco Prods. v. Axle, Inc.*, *supra*.

 The Complaint identifies dozens of highly specific acts committed by specific defendants.  Plaintiff appropriately narrowed the list of defendants, formed small, effective subgroupings, and clearly identified which defendants were in which subgroup. The Complaint's defined subgroupings of defendants and collective allegations do not violate Rule 8. Plaintiff's collective allegations accurately reflect the joint nature of the misconduct alleged here. Plaintiff alleges coordinated investigative and prosecutorial decisions—for instance, the joint strategy meetings involving both District Attorney Defendants (Korchak, Loughran, Congdon, Cronin) and City Defendants (Zikuski, Minor, Miller and John Doe officers), during which they collectively decided to arrest Plaintiff and others despite knowing they lacked probable cause, solely for obtaining DNA evidence (ECF 1 ¶¶ 129–132). Plaintiff further alleges the simultaneous suppression of exculpatory evidence by multiple defendants—for example, prosecutors

**18**

(Congdon and Cronin) working in concert with police (Zikuski, Minor, Miller and Doe officers) to fail to preserve and disclose critical electronic communications and forensic data that undermined the complainants' accusations (*Id.* ¶¶ 77–86, 106–112, 150–153, 160–161). The Complaint also explicitly alleges Defendant Congdon's direct instructions to Defendant Herceg to delete social media evidence, an investigative action closely coordinated with the broader effort by prosecutors and police to conceal evidence favorable to Plaintiff (*id.* ¶¶ 110–112). Thus, any group references accurately represent the collective and collaborative actions of Defendants, providing sufficient notice under Rule 8.

### C.  The Complaint is Sufficiently Specific to Put Each Defendant on Notice.

Other than a conclusory, inaccurate statement it is "impossible" for them to have notice, defendants do not explain why this exceptionally detailed Complaint does not give them notice.

There is no ambiguity. Each defendant is alleged to have been involved at key moments in the investigation, taken or directed action against Plaintiff, and caused the constitutional violations.  The question is not whether each defendant did every act. It is whether each defendant has sufficient notice they are alleged to have *caused* the constitutional violation(s). 42 U.S.C. §1983. *Kentucky v. Graham*, 473 U.S. 159, 166 (1985). At this early stage in the proceedings, there is ample notice.

Specific details about which defendant said, did, wrote, authorized or what exactly each defendant knew are evidentiary matters Plaintiff can learn only through questioning each defendant in discovery.  It is irrelevant that defendants believe "actual

**19**

proof of those facts is improbable," (*Twombly*, at 544), because the only question now is whether reasonable inferences raise an expectation that discovery will reveal evidence of the claims. *Id*. at 556.

This is not "an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678. The Complaint sufficiently places each defendant on notice of what he is alleged to have done. *Cf. Hao Zhe Wang v. Verizon Commc'ns Inc.,* No. 19-CV-9506, 2020 WL 5982882, at *2 (S.D.N.Y. Oct. 8, 2020) ("Rule 8 does not prohibit referring to defendants as a group where the complaint alerts defendants that identical claims are asserted against each defendant.") (internal quotation marks omitted).

At the Rule 12(b)(6) stage, a plaintiff "'need not establish who, among a group of officers, directly participated [ ] and who failed to intervene.'" *Henry v. Doyle*, No. 1:23-CV-1124 (BKS/ML), 2024 WL 2784210, at *3 (N.D.N.Y. May 30, 2024) (quoting *Smith v. Sawyer*, 435 F. Supp. 3d 417, 441 (N.D.N.Y. 2020)). For example, in a case alleging excessive force, personal involvement is sufficiently alleged by identifying to the best of the plaintiff's ability who was present and that they *either* participated *or* failed to intervene). *See also Green v. Garcia*, No. 18-cv-1745, 2020 WL 1467359, at *5, 2020 U.S. Dist. LEXIS 55164 (S.D.N.Y. Mar. 25, 2020) ("[C]ourts in the Second Circuit have allowed plaintiffs to use a flexible approach, recognizing the difficulty that plaintiffs may have in pleading who did what.") (citation omitted). Plaintiff has done just that.

Even if the Complaint left ambiguities—which it does not—dismissal is not the remedy. Where defendants possess details of their precise roles, courts consistently allow plaintiffs discovery rather than prematurely dismissing claims. See *Davis v. Kelly*, *supra*, 160 F.3d at 921–22 (recognizing plaintiffs can identify Doe defendants during

discovery); *DiBlasio v. Novello*, 344 F.3d 292, 304–05 (2d Cir. 2003) (dismissal

inappropriate if fair notice is given, and details can be developed in discovery).

   The Complaint provides adequate detail about Defendants' actions and

collaborative conduct. To the extent Defendants seek more granular detail, discovery is

the appropriate vehicle to obtain that information—not a motion to dismiss.

### II.    Plaintiff Has Adequately Alleged the Absence of Probable Cause for His Arrest

   To state a claim under 42 U.S.C. § 1983 and New York State law for false arrest

and malicious prosecution, Plaintiff must plausibly allege he was arrested and prosecuted

without probable cause. *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996); *Manganiello v.*

*City of New York*, 612 F.3d 149, 161–62 (2d Cir. 2010). Probable cause exists only when

officers have reasonably trustworthy information sufficient to warrant a prudent person in

believing a crime was committed. *Weyant*, 101 F.3d at 852. Plaintiff's Complaint alleges

probable cause was absent from the outset and dissipated when Defendants intentionally

ignored evidence already available to them. And, as is set forth in more detail below, the

Complaint alleges that under the facts and circumstances, the grand jury indictment is not

curative. Here, probable cause is a factual issue to be determined by a jury.  Plaintiff has

plausibly alleged that probable cause was insufficient, the defendants had a duty to

investigate further, and the resultant arrest and prosecution violated Plaintiff's

constitutional rights.

### A.  Plaintiff's Arrest Was for Evidence-Gathering, Not Based on Probable Cause

Perhaps most strikingly, the Complaint explicitly alleges that Defendants deliberately arrested Plaintiff knowing full well they lacked probable cause, solely to collect DNA and additional evidence in an improper attempt to retroactively manufacture probable cause. (ECF 1 ¶¶ 128–133). The only reason to arrest a person to collect evidence is *because* probable cause does not exist, and the police and prosecutors hope that the additional evidence obtained post-arrest will provide the necessary probable cause. Such purposeful misuse of arrest authority is unequivocally prohibited by established Fourth Amendment jurisprudence. *Dunaway v. New York*, 442 U.S. 200, 216 (1979) (arrest without probable cause solely to gather evidence violates Fourth Amendment); *Brown v. Illinois*, 422 U.S. 590 (1975). It also establishes "malice." *See infra* Section V(A).

### B.  The Complainant-Defendants Were Not Reasonably Trustworthy

Courts repeatedly reassert the warning—conspicuously absent from the Defendants' memoranda—that while a crime victim's account can establish probable cause, this is only true "*unless there are circumstances that raise doubt as to the victim's veracity.*" *See, e.g., Jean v. City of New York,* No. 09 CV 801 RJD, 2011 WL 4529634, at *4 (E.D.N.Y. Sept. 28, 2011)(emphasis added). *See also Singer v. Fulton Cnty*, 63 F.3d 110, 119 (2d Cir. 1995)(same); *Ward v. City of New York*, No. 08 CIV 7380 RJH, 2010 WL 3629536, at *1 (S.D.N.Y. 2010) (Given the reasons to question the alleged victim's statements, "the pivotal question is. . .would an officer exercising "reasonable caution" have arrested Ward before conducting further investigation into the accusations?").

**22**

In *Selvaggio v. Patterson*, the court cited other cases clearly establishing the fundamental principle that statements made by a purported victim do not always establish probable cause sufficient to require dismissal of a Section 1983 action. *Selvaggio v. Patterson*, 93 F. Supp. 3d 54, 70-71 (E.D.N.Y. 2015). In *Richards v. City of New York*, 97–CV–7990 (MBM), 2003 WL 21036365, at *17 (S.D.N.Y. May 7, 2003), the court held that probable cause was not established when a witness made conflicting statements both (1) identifying the plaintiff as the killer and (2) exculpating the plaintiff. In *Ward v. City of New York*, No. 08–CV–7380 (RJH), 2010 WL 3629536, at *2 (S.D.N.Y. Sept. 17, 2010), the district court declined to find that probable cause was established as a matter of law where the victim had given equivocal, mixed statements. That is because when the circumstances known to the officer provide reason to question the truthfulness of the allegations, the officer must acquire information to corroborate the putative victim's complaint.

Contrary to Defendants' assertions (*e.g.* ECF 65-1 at 22),[5] the contradictory and exculpatory circumstances included much more than merely Demkovich "voicing self-doubt." From the outset, significant circumstances raised substantial doubts regarding the trustworthiness of complainant-defendants Herceg and Demkovich. The Complaint explicitly alleges the complainant-defendants had clear and substantial motives to fabricate their allegations, driven by concerns about their own conduct, a desire to avoid personal embarrassment or trouble, and explicit financial motivations. (ECF 1 ¶¶ 67–68.) Complainant Herceg openly stated her intent to seek monetary compensation ("nothing

---

[5] ECF page numbers refer to those assigned by the court in the ECF system, not the numbers that appear at the bottom at the page of the filed document.

less than a million," "the Benz and the Beamer," and "all their bars"). (*Id*. ¶ 68(e)-(g).) The complainant-defendants claimed extreme intoxication and that one was unconscious during the alleged assault, yet surveillance video directly contradicted these claims, showing the complainants fully conscious, in control of their faculties, walking unassisted, and displaying no signs of distress. (*Id*. ¶¶ 83–86, 146.) Finally, although the complainant-defendants account was that only one person had sexual intercourse with Defendant Herceg, and Defendant Herceg told law enforcement she had not had consensual sexual intercourse for more than a month, Herceg's rape kit contained a mixture with two male profiles—contradicting both of these claims. (*Id*. ¶ 161.)

Given these glaring inconsistencies and overt motivations to fabricate, the complainants' allegations were far from reasonably trustworthy. Thus, the investigating officers have a heightened obligation to investigate further before establishing probable cause. *Sankar v. City of New York*, 867 F. Supp. 2d 297, 306–08 (E.D.N.Y. 2012).

*Sankar* provides persuasive guidance. There, officers lost their motion for summary judgment on Plaintiff's malicious prosecution claim. Officers had taken the word of Plaintiff's tenant, who falsely claimed that Plaintiff had assaulted her with hot water, inflicting burns and that she had sought medical attention from EMS. Plaintiff alleged that officers neither saw the burns nor interviewed medical personnel the tenant had claimed to have seen. *Id.* at 303-304. Because the complainant had an obvious motive for a false accusation, it was undisputed that officers didn't canvass the area, interview plaintiff or her family, interview EMS personnel or seek medical records or collect any evidence, and because there were disputes of fact about whether officers had seen any injuries, probable cause would have to be determined by a jury. *Id*. at 306-308.

Judge Dearie's reasoning in *Sankar* is important here. In both *Sankar* and this case, officers had ample indications of a motive for a false accusation. In *Sankar*, the motive was a bitter prior relationship. Here, it was Demkovich and Herceg's desire to disclaim responsibility for their conduct to third parties, their concern they might get in trouble, and their desire to collect money from Plaintiffs. (ECF 1 ¶¶ 67-68). In both cases, the officers' observations disputed the alleged victims' claims: in *Sankar*, the officers saw no burns on the alleged victim; here, the officers had surveillance videos unmistakably disputing the complainants' account of events and forensic testing results that did not align with the complainant-defendants' accounts. In both cases, the officers failed to take reasonable steps to investigate the claims even though there were significant red flags: in *Sankar*, police failed to interview EMS personnel or determine if there were any records of medical evaluation or treatment; here, Plaintiff alleges police failed to obtain the complainants' cell phone data or conduct DNA testing that would have verified or invalidated the complainants' allegations. See ECF 1 ¶¶ 103–105 (alleging that police and prosecutors were aware that complainants' phones contained exculpatory communications but failed to obtain or review the data), ¶ 108 (alleging Defendants ignored notice from Saitta that he had obtained a hard drive containing relevant electronic evidence), ¶¶ 111–113 (alleging that police knew phone data would contain evidence of the complainants' mental state, intent, and contemporaneous descriptions of events, but took no steps to secure it), ¶¶ 115–118 (describing failure to compel or preserve phone content known to contain inconsistent and exculpatory messages), ¶ 146 (alleging failure to test or disclose forensic evidence, including phone data and DNA), ¶¶ 160–161 (alleging that DNA testing was performed, but exculpatory

results excluding Plaintiff were not disclosed or acted upon).  Here, as in *Sankar*, this Court cannot rely upon a blanket "presumption of victim reliability," because "this presumption only survives in the absence of circumstances that raise doubts as to the victim's veracity." *Sankar,* at 306 (cleaned up)(internal quotation marks and citations omitted).

If Demkovich and Herceg had appeared trustworthy and reliable, charges would have been brought immediately. The fact there was a substantial delay raises a reasonable inference that even the investigators didn't believe them. Even if defendants had believed Demkovich and/or Herceg, it does not matter. The standard for probable cause is an objective one that does not depend upon an officer's subjective motivations. *Whren v. United States,* 517 U.S. 806, 813 (1996); *United States v. $557,933.89, More or Less, in U.S. Funds,* 287 F.3d 66, 85 (2d Cir. 2002) (Sotomayor, J.). *See Devenpeck v. Alford,* 543 U.S. 146, 152-153 (2004) ("Our cases make clear that an arresting officer's state of mind (except for the facts that he knows) is irrelevant to the existence of probable cause.").

That an alleged victim's statement does not always establish probable cause is one every reasonable officer would have been aware of long ago. As one district court explained, "[p]olice officers may not purposely withhold or ignore exculpatory evidence that, if taken into account, would void probable cause." *Korthas v. City of Auburn*, No. 04-CV-537, 2006 WL 1650709, at *5 (N.D.N.Y. June 9, 2006) *Carbajal v. Vill. of Hempstead*, No. 02-CV-4270 (DLI), 2006 WL 845384, at *5 (E.D.N.Y. Mar. 29, 2006) (internal quotation marks and citations omitted); *see also Leogrande v. State of New York*, No. 08-CV-3088, 2013 WL 1283392, at *8 (E.D.N.Y. Mar. 29, 2013). "[T]he failure to make a further inquiry when a reasonable person would have done so may be

evidence of lack of probable cause." *Lowth v. Town of Cheektowaga*, 82 F.3d 563, 571 (2d Cir. 1996) (quoting *Colon v. City of New York*, 60 N.Y.2d 78, 468 N.Y.S.2d 453, 455 N.E.2d 1248, 1250 (1983)); *Moroughan*, 514 F. Supp. 3d at 524 ("Probable cause to prosecute not only dissipates when police officers uncover new evidence after an arrest, but in certain cases, can also dissipate when police officers fail to examine evidence already available to them.")

The City Defendants argue that probable cause was established based solely on the complainants' initial allegations, asserting a presumption of complainant credibility. (E.g., ECF 40-1 at 20–21, ECF 74-1, at 13-14). Defendant Cronin cites *Ricciuti v. N.Y.C. Transit Auth.*, *supra,* 124 F.3d at 128, for the proposition that officers need not "explore and eliminate every theoretically plausible claim of innocence." (ECF 74-1 at 13-14). However, this principle does not excuse deliberate disregard of plainly exculpatory information provided by alleged victims themselves. *Selvaggio*, 93 F. Supp. 3d at 70–71; *Jocks v. Tavernier,* 316 F.3d 128, 136 (2d Cir. 2003).

The same is true for the citation to *Singer, supra,* 63 F.3d at 119 (cited ECF 74-1, at 13). There, the Court clearly articulated the exception to the general rule: an alleged victim's sworn complaint or information is usually sufficient "*absent circumstances that raise doubts as to the victim's veracity*." *Id.* at 119 (emphasis added). The court in *Ricciuti v. NYC Transit Auth.*, *supra* did not state otherwise. There, the question was whether the arresting officer had to divine the *suspect's* state of mind, even though he confessed to causing the physical injuries to the alleged victim. *Ricciuti,* at 128-129. That case is thus distinguishable as is *Abdul-Aziz v. City of New York*, 56 A.D.3d 291, 293 (1st Dept. 2008), a case involving a suspect who confessed. See, e.g., ECF 65-1 at 23-24.

Thus, the cases Defendants rely on are inapposite because they either ignore the scenario at issue here—deliberate failure to investigate clearly contradictory statements and evidence—or involve significantly different facts.

To make these arguments, Defendants must overlook settled law that probable cause dissipates when officers discover or fail to pursue evidence contradicting allegations before arresting or prosecuting. *Moroughan*, 514 F. Supp. 3d at 524; *Lowth v. Town of Cheektowaga, supra*, 82 F.3d at 571.   Here, probable cause was not simply undermined after the fact; it never existed due to the evident unreliability of the complainant-defendants and the City and County Defendants' intentional refusal to address exculpatory information known to them.

Thus, Defendants are incorrect that the statement of a person claiming to be a victim is always sufficient to establish probable cause. Here, no probable cause existed to arrest Plaintiff in February 2022.

### C.  To the Extent Probable Cause Existed at Any Point Prior to Arrest, it Dissipated Due to Defendants' Failure to Examine or Deliberate Disregard of Exculpatory Evidence

"Probable cause to prosecute not only dissipates when police officers uncover new evidence after an arrest, but in certain cases, can also dissipate when police officers fail to examine evidence already available to them." *Moroughan, supra,* 514 F. Supp. 3d at 524. "[A]dditional evidence discovered before an arrest may vitiate probable cause, rendering the arrest unlawful." *Selvaggio*, *supra*, 93 F. Supp. 3d at 70 n. 17. *See Jocks v. Tavernier, supra,* 316 F.3d at 135 ("[U]nder some circumstances, a police officer's awareness of the facts supporting a defense can eliminate probable cause."); *see also Lowth,* 82 F.3d at 571 (in context of malicious prosecution claim, noting that probable cause may

"dissipate" where the "groundless nature of the charges [is] made apparent by the discovery of some intervening fact") (citing *Callan v. State,* 73 N.Y.2d 731, 535 N.Y.S.2d 590, 532 N.E.2d 96 (1988)).  *See also Cortez v. McCauley*, 478 F.3d 1108, 1118 (10th Cir. 2007) ("unsubstantiated double-hearsay originating from a two-year-old, standing alone, does not give rise to probable cause should have been patently obvious to any reasonable law enforcement official").

Defendants here intentionally ignored critical surveillance video clearly contradicting the complainant-defendants' allegations, showing complainants acting freely and consensually, walking independently, and exhibiting no distress both before and after the alleged crime. (ECF 1 ¶¶ 83–86, 92, 94–95, 146, 148.)  They also ignored DNA test results (from Herceg's rape kit) that contradicted the complainant-defendants' accounts as well as electronic data that contradicted their accounts and provided motive to fabricate. (See, *e.g., id.* ¶¶ 68, 161)

In *Selvaggio*, the Court explained that, while officers need not "explore and eliminate every theoretically plausible claim of innocence," (*Selvaggio*, at 70), (citing *Curley v. Village of Suffern,* 268 F.3d 65, 70 (2d Cir.2001)), nor may they ignore exculpatory information:

> the police cannot 'deliberately disregard' information plainly conveyed by the perceived victim that would tend to negate probable cause and 'establish justification.'

*Selvaggio*, 93 F. Supp. 3d at 70–71 (quoting *Jocks,* 316 F.3d at 136).  In *Selvaggio*, the court denied the defendants' motion for summary judgment on a false arrest claim. There, the purported victim made contradictory statements, some "controverting the elements of the false imprisonment offense." *Id.* at 71.  "[A]ny probable cause that previously existed

29

dissipated." *Ibid.* Because the alleged victim's pre-arrest statements vitiated probable

cause, a material dispute of fact prevented entry of summary judgment on behalf of

defendants; the question of "whether Plaintiff's and [the alleged victim]'s accounts of

those events should be credited—precludes a finding of probable cause." *Ibid.*

      Here, Defendants were explicitly aware that complainant-defendants provided

statements directly undermining their own allegations, as detailed above; additionally,

Herceg explicitly denied intercourse occurred, while Demkovich admitted her

interactions were consensual. (ECF 1 ¶¶ 136, 138, 141, 161, 186–187.) The law clearly

establishes that officers may not deliberately disregard contradictory statements or other

evidence that negates probable cause. *Jocks*, 316 F.3d at 135–36; *Selvaggio*, 93 F. Supp.

at 70–71.

      Defendants also deliberately refused to pursue critical exculpatory electronic

evidence from complainants' phones, despite knowing complainants withheld potentially

exonerating information and Plaintiff's repeated requests that they do so. Prior to

Plaintiff's arrest, the complainant-defendants' attorney Thomas Saitta explicitly alerted

the City and County Defendants that such evidence existed, yet Defendants deliberately

ignored the opportunity to obtain and examine it. (ECF 1 ¶¶ 103–105, 108, 111–113,

115–118, 146, 188, 190.) Such deliberate inaction further confirms the absence of

probable cause. See *Russo v. City of Bridgeport*, 479 F.3d 196, 208–09 (2d Cir. 2007).

### D. The Grand Jury Indictment Does Not Create a Presumption of Probable Cause Under the Circumstances Alleged

      Defendants also argue that the grand jury indictment forecloses Plaintiff's

malicious prosecution claim by creating a presumption of probable cause. See ECF 40-1

**30**

at 30; ECF 57-1 at 19. This argument misstates both the law and the allegations in the
Complaint. While it is true that a grand jury indictment generally creates a rebuttable
presumption of probable cause for malicious prosecution claims, the same is not true of
false arrest claims. See *Savino v. City of New York*, 331 F.3d 63, 75 (2d Cir. 2003),
observing "the New York Court of Appeals has expressly held that the presumption of
probable cause arising from an indictment 'applies only in causes of action for malicious
prosecution and is totally misplaced when applied in false [arrest] actions.' *Broughton v.
State,* 37 N.Y.2d 451, 456, 373 N.Y.S.2d 87, 335 N.E.2d 310 (1975)." Even for claims
where it does apply, courts have long recognized that this presumption can be overcome
by allegations that the indictment was procured through fraud, suppression of evidence,
material omissions, or other misconduct. See *Manganiello*, *supra,* 612 F.3d at 162;
*Savino*, 331 F.3d at 72–73; *Colon*, *supra,* 60 N.Y.2d at 82; *Ricciuti*, *supra,* 124 F.3d at
130.

    Plaintiff's Complaint clearly alleges that the indictment was obtained through
precisely this type of misconduct. Prosecutors and investigators presented the case to the
grand jury while omitting—and sometimes actively concealing—key exculpatory
information. These omissions were not inadvertent. For example, the Complaint alleges
that Defendants were in possession of surveillance video that clearly contradicted
complainants' claims of intoxication, helplessness, or lack of consent. Rather than
disclose these contradictions, Defendants either failed to preserve the video or declined to
confront complainants with it. (ECF 1 ¶¶ 85–86, 92–95, 148.)  The Complaint also
alleges that Defendants suppressed from the Grand Jury (and the defense) exculpatory
DNA evidence that the rape kit results contradicted the complainant-defendants'

accounts, or that Plaintiff was excluded as a contributor to biological material recovered from Herceg. (*Id*. ¶¶ 106–108, 160–161.)  Likewise, Defendants knew that complainants' phones contained inconsistent and potentially exculpatory communications, yet declined to obtain or review the data, and thus present it to the Grand Jury, despite knowing of its existence. (*Id.* ¶¶ 103–105, 108, 111–113, 115–118, 146, 188, 190.)  Relatedly, Defendant Congdon is alleged to have instructed a complainant to delete electronic data, thereby actively destroying exculpatory material before the indictment. (*Id.* ¶¶ 110–112.) Finally, the Complaint alleges that supervising prosecutors, including Defendants Korchak and Loughran, were aware of this misconduct and nonetheless presented the case to the grand jury without correction. (*Id.* ¶¶ 129–132, 156.)

These allegations go well beyond conclusory assertions. They identify specific individuals, describe the nature of the suppressed or omitted evidence, and explain how the suppression affected the integrity of the grand jury process. Courts in this Circuit routinely hold that where such facts are pled, the presumption of probable cause is rebutted and the malicious prosecution claim must be allowed to proceed. See, e.g., *Rosario v. City of New York*, 2019 WL 4450685, at 7–8 (S.D.N.Y. Sept. 17, 2019) (denying motion to dismiss where complaint alleged material exculpatory evidence was withheld from grand jury); *Richards v. City of New York*, *supra,* at *17 (same); *Sankar*, *supra,* 867 F. Supp. 2d at 306–08 (similar). Nor are the cases cited by Defendants relevant here. *Compare Debrosse v. City of New York,* 739 F. App'x 48, 51 (2d Cir. 2018) (ECF 74-1 at 14) was decided on summary judgment, after discovery, when the court determined that the allegations were "unsupported by admissible evidence in the record" because the deposition testimony (not simply the allegations) were conclusory and

speculative. *People v. Lancaster*, 69 N.Y.2d 20, 503 N.E.2d 990 (1986) (ECF 65-1 at 24)

holds merely that prosecutors need not present a potential "mental disease or defect"

defense on behalf of the accused by providing the Grand Jury with his psychiatric

records. In yet another case cited (ECF 65-1 at 23), *Kanciper v. Lato*, 989 F. Supp. 2d

216, 236 (E.D.N.Y. 2013), the court found the Plaintiff made "sufficient viable

allegations as to the absence of probable cause" and set aside the presumption.

  The presumption of probable cause from a grand jury indictment applies only

where the evidence was not deliberately withheld or where the omission did not rise to

the level of misconduct. Here, Plaintiff alleges knowing suppression and falsification of

evidence by police and prosecutors—exactly the conduct that renders the grand jury's

finding unreliable. *See Cogswell v. County of Suffolk*, 375 F. Supp. 2d 182, 187

(E.D.N.Y. 2005) ("The presumption of probable cause may be rebutted by evidence that

the authorities deliberately withheld material information from the Grand Jury."); *Jocks*,

316 F.3d at 135–36 (officer's knowledge of evidence supporting a defense eliminates

probable cause).

  Another significant factor undermining any presumption of probable cause is the

District Attorney Defendants' knowing use of erroneous and misleading jury instructions.

See ECF 1, ¶¶ 169a, 193-195. Use of these incorrect instructions was a pattern and done

knowing that they misstated the law on material elements. *Ibid.* Knowing use of

misleading instructions as part of a pattern of misconduct prevents the District Attorney

Defendants from relying on the presumption. *Cf. Manganiello*, *supra,* 612 F.3d at 162

(presumption of probable cause arising from a grand jury indictment may be rebutted "by

evidence that the indictment was procured by fraud, perjury, the suppression of evidence

*or other police conduct undertaken in bad faith.*" Viewing the allegations collectively, including the misleading charge to the grand jury, Plaintiff has sufficiently alleged that the presumption of probable cause is defeated.

Even if the indictment were presumptively valid, Plaintiff alleges that no probable cause existed at the time of arrest, and that Defendants used the arrest itself as an improper evidence-gathering mechanism. (ECF 1 ¶¶ 129–132, 139–142.) That renders the false arrest claim independently viable, regardless of the subsequent indictment. *See Stansbury v. Wertman*, 721 F.3d 84, 94–95 (2d Cir. 2013) (grand jury indictment creates a presumption only as to malicious prosecution—not false arrest).

Plaintiff has rebutted the presumption of probable cause through detailed allegations of misconduct in securing the indictment. These allegations must be credited at the pleading stage. "[V]iewing the facts in the light most favorable to Plaintiff, it is premature to rule on whether probable cause existed at this early stage in this case." *Francis v. City of Schenectady*, No. 1:20-CV-00703 (LEK/TWD), 2022 WL 4619326, at *6 (N.D.N.Y. Sept. 30, 2022) *See Walker v. Vill. of Freeport*, No. 15-CV-4646, 2016 WL 4133137, at *5, 2016 U.S. Dist. LEXIS 77582, at *13 (E.D.N.Y. June 13, 2016) ("[W]here disputes exist as to the pertinent events resulting in an arrest, a finding of probable cause is improper at the motion to dismiss stage.").

The malicious prosecution and false arrest claims are therefore well-pled and cannot be dismissed based on the indictment alone.

### III. Plaintiff's Claims Against the District Attorney Defendants Are Not Barred by Absolute Prosecutorial Immunity Because the Misconduct Alleged is Investigative and Administrative, Not Prosecutorial Advocacy

**34**

The County Defendants, including Defendants Korchak, Loughran, Congdon, and Cronin (collectively the "District Attorney Defendants"), argue that Plaintiff's claims are barred by absolute prosecutorial immunity, asserting categorically that all alleged misconduct relates to their prosecutorial functions (see ECF 57-1, Point II; ECF 65-1, Point I; ECF 74-1, Point I). These arguments misstate both the applicable law and the specific factual allegations in the Complaint. The District Attorney Defendants' conduct as alleged—directing the destruction of exculpatory evidence, withholding DNA evidence, and authorizing arrests without probable cause solely to obtain further evidence that could (but did not ultimately) establish guilt—is plainly investigative and administrative, not prosecutorial. The District Attorney Defendants' actions are clearly outside the scope of absolute immunity.

### A. Absolute Prosecutorial Immunity Is Narrowly Applied to Protect Only Advocacy, Not Investigative or Administrative Conduct

Courts in this circuit and throughout the country have been careful to limit the scope of absolute immunity. *Buckley v. Fitzsimmons,* 509 U.S. 259, 269 (1993) (observing the court's recognition of the doctrine has been "quite sparing"). Defendants asserting the doctrine bear the burden of establishing its application. *Id.,* at 273; *Burns v. Reed*, 500 U.S. 478, 486 (1991); *Howard v. City of Rochester*, No. 23-CV-6561, 2025 WL 860306, *5 (W.D.N.Y. March 19, 2025). See also *Werkheiser v. Cnty. of Broome*, 655 F. Supp. 3d 88, 101–02 (N.D.N.Y. 2023). In asserting the defense of absolute immunity, the District Attorney Defendants revert to a standard for absolute immunity long ago rejected by the Supreme Court: they essentially suggest that because every act

they took was related in some way to the prosecution, it is covered by absolute immunity. *Burns, supra*, 500 U.S. at 495-96.  The District Attorney Defendants are mistaken.

"Almost any action by a prosecutor, including his or her direct participation in purely investigative activity, could be said to be in some way related to the ultimate decision whether to prosecute, but [the Supreme Court has] never indicated that absolute immunity is that expansive." *Id.* "A prosecutor may not shield his investigative work with the aegis of absolute immunity merely because, after a suspect is eventually arrested, indicted, and tried, that work may be retrospectively described as 'preparation' for a possible trial." *Buckley*, 509 U.S. at 276, quoted in *Harris v. Tioga Cnty.*, 663 F.Supp.3d 212, 243 (N.D.N.Y. Mar. 23, 2023).

Absolute prosecutorial immunity is limited narrowly to actions intimately associated with the judicial process, such as initiating prosecution and presenting evidence in court. See *Imbler v. Pachtman*, 424 U.S. 409, 430 (1976). The Supreme Court has repeatedly emphasized that investigative or administrative conduct by prosecutors falls outside this narrow protection. *Buckley*, 509 U.S. at 273–74 (no absolute immunity for prosecutor's investigative actions); *Burns*, 500 U.S. at 492–96 (same). This is particularly true when prosecutors direct investigative misconduct by police, instruct witnesses to destroy evidence, or engage in administrative decisions related to evidence collection. *See Hill v. City of New York*, 45 F.3d 653, 661 (2d Cir. 1995).

The scope of absolute immunity depends on the function performed, not the "status of the defendant." *Briscoe v. LaHue*, 460 U.S. 325, 342 (1983); *Howard v. City of Rochester, supra; Buckley,* 509 U.S. at 269.  Absolute immunity for prosecutors does not

extend to investigative functions,[6] nor giving legal advice to police. *Burns*, 500 U.S. at 492. It doesn't extend to "fabricating evidence during the preliminary investigation of a crime." *Buckley*, at 261, 272–76; *Harris v. Tioga Cnty.*, 663 F.Supp.3d at 240. Pre-arraignment actions—such as interviewing a witness to obtain probable cause for an arrest—are not entitled to the protections of absolute immunity. *See Hill v. City of New York*, *supra,* 45 F.3d at 658, 661. Nor does absolute immunity apply when a prosecutor is not acting as 'an officer of the court,' but is instead engaged in other tasks, say, investigative or administrative tasks." *Van de Kamp v. Goldstein*, 555 U.S. 335, 342 (2009) (quoting *Imbler*, 424 U.S. at 431 n.33).

Because absolute immunity turns on specific facts, it is often unresolvable until the summary judgment stage.  *Harris v. Tioga Cnty.*, *supra,* 663 F.Supp.3d at 240.  That is because only after factual development can a court pinpoint the role and function that a prosecutor was performing in connection with a challenged action. The U.S. District Court for the Western District of New York recently explained:

> '[W]hen it may not be gleaned from the complaint whether the conduct objected to was performed by the prosecutor in an advocacy or an investigatory role, the availability of absolute immunity . . . cannot be decided as a matter of law' at such an early point of the litigation. *Hill v. City of New York*, [*supra*, 45 F.3d at 663]. The legal question here is a factually sensitive one, for which the moving Defendants bear the burden. See *Burns v. Reed*, [*supra*, 500 U.S. at 486 ('[T]he official seeking absolute immunity bears the burden of showing that such immunity is justified for the function in question.').

*Howard v. City of Rochester*, *supra,* 2025 WL at *5 (denying defendant-prosecutor's motion for judgment on the pleadings).

---

**6** *Buckley*, at 273; *Van de Kamp v. Goldstein,* 555 U.S. 335, 342 (2009); *Imbler* 424 U.S. at 431, n. 33.

## B.  The Complaint Clearly Alleges Investigative and
## Administrative Misconduct, Not Prosecutorial Advocacy

The Complaint explicitly alleges conduct by the District Attorney Defendants that falls into the investigative and administrative category—conduct which is categorically not protected by absolute immunity.

Investigative tasks beyond the scope of absolute immunity are those "normally performed by a detective or police officer." *Buckley*, 509 U.S. at 273; *see also Kanciper v. Lato*, *supra,* 989 F. Supp. 2d at 228-29 ("Investigation, arrest, and detention have historically and by precedent been regarded as the work of police, not prosecutors, and 'they do not become prosecutorial functions merely because a prosecutor has chosen to participate' ") (quoting *Day v. Morgenthau*, 909 F.2d 75, 77-78 (2d Cir. 1990)).

"There is no bright line for absolute immunity based on the stage of a criminal proceeding." *Buari*, 530 F. Supp. 3d at 379. As a general matter, "the doctrine is generally inapplicable 'where formal proceedings have not begun, and the prosecutor is acting in an investigative capacity.'" *Harris,* 663 F. Supp. at 240, *quoting Buari*, at 379. As the Supreme Court explained:

> [t]here is a difference between the advocate's role in evaluating evidence and interviewing witnesses as he prepares for trial, on the one hand, and the detective's role in searching for the clues and corroboration that might give him probable cause to recommend that a suspect be arrested, on the other hand.

*Buckley*, 509 U.S. at 273.

Nearly all of the Complaint's allegations against the District Attorney Defendants predate the institution of formal criminal proceedings against Mr. Kweller and involve investigatory or administrative conduct.  ECF 1 ¶¶ 106-107, 110-133, 140-141, 142(a),

144-147. That the District Attorney Defendants' investigatory misconduct led to a prosecution does not immunize them.[7]

The Complaint alleges that Defendants Korchak and Loughran personally approved and authorized Plaintiff's arrest—not because probable cause existed, but because they mistakenly believed they needed arrests to obtain DNA samples. ECF 1 ¶¶ 129–132. Defendants Congdon and Cronin also participated in investigative acts and decision-making pertaining to the investigation, including the decision to authorize Plaintiff's arrest without probable cause for the sole purpose of collecting his DNA. *Id.* ¶¶ 106–112, 129–132, 150-153. Absolute prosecutorial immunity does not extend to investigative or administrative decisions like authorizing arrests solely to collect evidence. *Burns*, 500 U.S. at 496 (no immunity for advice directing police investigative conduct).

In addition, Defendant Congdon is alleged to have participated in other investigative decisions about the collection, preservation, and suppression of electronic forensic evidence. *Id.* ¶¶ 107–112, 150–153. Decisions about whether and how to preserve electronic communications from complainants' phones are investigative functions and are clearly outside the prosecutorial immunity shield. See *Warney v. Monroe County*, 587 F.3d 113, 124 (2d Cir. 2009) (investigative conduct is non-immunized). Defendant Congdon is also alleged to have directed Defendant Herceg to

---

[7] Of course, defendants' theory that all pre-indictment conduct is immunized simply because an indictment later issued would eviscerate the ability of anyone to ever sue a prosecutor for performance of investigative functions.

39

delete social media evidence, thereby destroying evidence favorable to Plaintiff.[8] *Id.* ¶¶ 110–112. Congdon's role in personally instructing a witness to destroy exculpatory electronic evidence is quintessential investigative misconduct. See *Buckley*, 509 U.S. at 273–74 (prosecutors not immune for fabricating evidence or directing its destruction).

The *Harris* court denied summary judgment on the grounds of both qualified and absolute immunity because "a reasonable jury could conclude that [the district attorney], acting in a pre-indictment investigative capacity, participated in the fabrication of certain material evidence…." *Harris,* at 243; *id.*, at 240-241, citing *McDaniel v. City of N.Y.*, 585 F. Supp. 3d 503, 516–17 (S.D.N.Y. 2022)(collecting cases) and *Milstein v. Cooley*, 257 F.3d 1004, 1011 (9th Cir. 2001)(rejecting immunity defense in fabrication of evidence case); *Morse v. Fusto*, 804 F.3d 538, 547–48 (2d Cir. 2015); *Zahrey v. Coffey*, 221 F.3d 342, 347 (2d Cir. 2000)(no qualified immunity where the complaint alleged the prosecutor fabricated evidence while acting in an investigative capacity). Destruction of evidence, or conspiracy to destroy evidence, should be treated no differently. See *Howard v. City of Rochester, supra* (destruction of evidence during investigative activity after the prosecutorial stage is not protected by absolute immunity, and discovery would be allowed and motion for judgment denied).

### C. Absolute Immunity Does Not Shield the Suppression of Exculpatory Material Related to Investigative or Administrative Conduct

---

[8] In her motion, Congdon makes an assertion of fact that Congdon's instructions came during the trial preparation phase as Congdon was preparing Herceg to testify at trial. See ECF 65-1 at 17. While Plaintiff did not allege a specific date of Congdon's instructions to Herceg, that does not defeat the claim at this early stage.   See *Howard v. City of Rochester*, *supra,* at *5 (allowing claim to proceed to discovery to determine whether the prosecutor-defendant was "serv[ing] an advocacy function or not" when Plaintiff's cell phone was destroyed). See discussion, *infra*.

While prosecutors are absolutely immune from claims arising directly from courtroom advocacy decisions—including certain *Brady* disclosure decisions made in connection with advocacy—they receive no absolute immunity for *Brady* violations involving investigative suppression of evidence or witness-tampering outside the judicial process. See *Hill*, 45 F.3d at 661; *Buckley*, 509 U.S. at 273–74. Plaintiff alleges the District Attorney Defendants knew before Plaintiff's arrest that the rape kit results contradicted Demkovich and Herceg's account, that Demkovich thought the activity was consensual, that nothing corroborated their claims, and that available surveillance video appeared to contradict their claims. All of this information was withheld during the investigatory stage. See ECF 1 ¶¶ 104-127. The Complaint plainly alleges investigative suppression of *Brady* evidence by the District Attorney Defendants—suppression that occurred before arrest, independent of courtroom advocacy decisions, and therefore outside absolute immunity. *Id.*

Defendant Congdon argues that a violation of *Brady v. Maryland*, 373 U.S. 83 (1963) cannot provide a basis for liability of a prosecutor.  ECF 65-1 at 9-10.  But Congdon's cases are distinguishable insofar as they all concern not only during-litigation conduct but also functions that are prosecutorial in nature, in contrast to the pre-litigation, investigatory functions involved in the claims here. *Lawlor v. Connelly*, 471 Fed. Appx. 64 (2d Cir. 2012) concerned a claim the prosecutor withheld information from the Grand Jury, *Hill v. City of New York, supra,* 45 F.3d at 661 emphasized the issue concerned functions "after the prosecutorial phase" had begun, *Dory v. Ryan*, 25 F.3d 81, 83 (2nd

41

Cir. 1994) concerned preparing a witness for trial. *Warney v. Monroe County*, *supra,* 587

F.3d at 125, concerned withholding of evidence in the postconviction proceedings.[9]

### D. Advising a Witness to Destroy Evidence is Not Witness Preparation Protected by Absolute Immunity

Defendant Congdon's interpretation of the Complaint's allegations that she

instructed Herceg to destroy evidence must fail. The Complaint and reasonable inference

therefrom establish that the destruction occurred in March 2022, i.e., before the Grand

Jury convened. See ECF 1 ¶ 171.  Congdon, construing the allegations in the light most

favorable to herself, hypothesizes that Plaintiff alleges this misconduct (Congdon

instructing Herceg to destroy evidence) occurred later,when Congdon was preparing

Herceg for trial. (See ECF 65-1 at 17). Congdon interprets paragraph 112 of the

Complaint as somehow "modifying" or "clarifying" paragraph 66 to allege that

Congdon's instructions were given during trial preparation.  This Court must reject

Congdon's theory. Plaintiff does not allege that Congdon's instructions came during trial

or during preparation of the witness for trial. *See id.* ¶¶ 66, 112.  Nor is there a basis to

conclude that paragraph 112 somehow "modifies" or "clarifies" paragraph 66.  Any

factual dispute must await a later stage in this litigation and is not a reason to dismiss any

part of the Complaint. *Cf. Howard v. City of Rochester*, *supra,* at *5.

Congdon is also wrong that there are no allegations about the exculpatory nature

of the destroyed evidence.  Statements made to law enforcement when Herceg and

Demkovich made their accusations were exculpatory, as was the electronic data collected

---

[9] In dicta, the *Warney* Court makes a very broad statement about "advocacy functions," citing an old Sixth Circuit case, but is devoid of analysis or language that would clearly apply its *dicta* to the allegations here. *Id.*, at 125.

42

by Saitta. See ECF 1 ¶¶ 72, 186. Viewing the allegations in the light most favorable to Plaintiff, it is plausibly alleged that, during the investigation stage and as part of investigatory functions, Defendant Congdon instructed Herceg to destroy exculpatory evidence. Neither Congdon nor any other prosecutor is shielded by prosecutorial immunity for such misconduct. See *Howard v. City of Rochester*, *supra.*

### E.  At a Minimum, Factual Disputes Preclude Dismissal at This Stage

Finally, at the pleading stage, courts are cautious about applying absolute immunity broadly without factual development, given the need for careful line-drawing between advocacy and investigative or administrative actions. *See Hill*, 45 F.3d at 663; *Warney*, 587 F.3d at 120–21 (immunity determinations require factual analysis inappropriate at Rule 12 stage). Here, Plaintiff explicitly pleads investigative and administrative misconduct. To the extent Defendants dispute the characterization or context of their actions, factual disputes remain, and dismissal on absolute immunity grounds is inappropriate before discovery.  *Howard v. City of Rochester*, *supra,* at *5 ("Further discovery may help in determining precisely what role [prosecutor] Pilato played when Plaintiff's cell phone was destroyed, and whether this was a circumstance in which Pilato served an advocacy function or not.").

### IV.    Plaintiff's Claims are Not Barred by Qualified Immunity Because the Complaint Alleges Clearly Established Constitutional Violations and Objectively Unreasonable Conduct by City Defendants

When qualified immunity is asserted through a Rule 12(b)(6) motion to dismiss— as the City Defendants do here—courts apply a particularly rigorous standard, reflecting a strong preference for addressing this defense after the record is more fully developed.

**43**

The Second Circuit consistently discourages resolving qualified immunity defenses on pleadings alone, characterizing such early-stage efforts as procedural mismatches that rarely succeed. See *Chamberlain Est. of Chamberlain v. City of White Plains*, 960 F.3d 100, 110–11 (2d Cir. 2020); see also *Sabir v. Williams*, 52 F.4th 51, 64 (2d Cir. 2022); *Matzell v. Annucci*, 64 F.4th 425, 434 (2d Cir. 2023). The City Defendants' qualified immunity argument thus faces a significant—and typically insurmountable—challenge at this procedural stage.

Qualified immunity does not shield the City Defendants from liability because the Complaint plainly alleges conduct violating clearly established constitutional rights, including arresting without probable cause, malicious prosecution, and deliberate suppression and fabrication of evidence. It is clearly established that arresting an individual without probable cause violates the Fourth Amendment (*Weyant v. Okst*, *supra,* 101 F.3d at 852), as does malicious prosecution or fabrication of evidence (*Ricciuti v. N.Y.C. Transit Auth.*, *supra,* 124 F.3d at 130), suppression of exculpatory *Brady* evidence (*Zahrey v. Coffey*, *supra,* 221 F.3d at 355–57), failure to intervene (*Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994); *Terebesi v. Torreso*, 764 F.3d 217, 243 (2d Cir. 2014)).

In raising a qualified immunity defense, the City Defendants demand specificity that goes far beyond what is required.  Even without a case addressing the exact conduct, qualified immunity will not apply when the conduct is obviously unconstitutional. *Taylor v. Riojas*, 592 U.S. 7, 7-9 (2020).  So long as the then-existing precedent places the unconstitutionality of the alleged conduct "beyond debate," that is sufficient.  *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (courts do not "require a case directly on point, but

existing precedent must have placed the statutory or constitutional question beyond debate.") "General statements of the law" are sufficient if they apply "with obvious clarity to the specific conduct in question." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002); *United States v. Lanier*, 520 U.S. 259, 270-271 (1997). In *Seweid v. Cnty. of Nassau*, 21-CV-03712, 2024 WL 693981, at *15 (E.D.N.Y. Feb. 20, 2024), saying *Taylor v. Riojas* was "not a one-off", the court applied *Hope v. Pelzer* to find that the defendants' misconduct was obviously clear, removing the protections of qualified immunity. In "an obvious case" like this one, general standards of law "can 'clearly establish' the answer, even without a body of relevant case law." *Rivas-Villegas v. Cortesluna*, 142 S.Ct. 4, 6 (2021).

The Complaint clearly and explicitly alleges unconstitutional conduct by Defendants Zikuski, Minor, Miller and the John Doe officers—conduct that was obviously unconstitutional under clearly established standards. Specifically, these defendants are alleged to have knowingly arrested Plaintiff without probable cause, deliberately ignored exculpatory evidence, participated in suppressing or destroying crucial evidence favorable to Plaintiff, and pursued investigative tactics specifically designed to fabricate probable cause. (ECF 1 ¶¶ 70-87, 92, 94, 106-107, 111–112, 139–142, 145-147)

These allegations clearly describe conduct that has long been recognized as unlawful in this Circuit: it was clearly established that arresting and prosecuting someone without probable cause violates the Fourth Amendment (*Weyant*, 101 F.3d at 852);[10]

---

[10] This Court should reject the notion that a mistaken belief about probable cause bars the constitutional claims even if the unconstitutionality of the conduct was beyond debate and even if a lack of probable

deliberately fabricating evidence or knowingly using false or misleading information to support prosecution violates clearly established rights (*Ricciuti*, 124 F.3d at 130; *Zahrey*, 221 F.3d at 355–57); knowingly suppressing clearly exculpatory evidence violates clearly established due process rights (*Brady*, 373 U.S. at 87–88; *Zahrey*, 221 F.3d at 355–57); and officers have a clearly established duty to intervene to prevent constitutional violations committed by other law enforcement personnel (*Anderson v. Branen,* 17 F.3d at 557; *Terebesi,* 764 F.3d at 243). Given these longstanding and clearly established principles, no reasonable officer or investigator could have believed that deliberately arresting someone without probable cause to gather additional evidence, suppressing exculpatory evidence, or knowingly ignoring critical video and electronic evidence contradicting complainants' allegations was lawful or permissible.

The allegations go far beyond the "general statements of the law" identified in *Hope*, *Lanier*, and *Taylor, supra*. The conduct alleged here closely parallels violations that the Second Circuit has explicitly and repeatedly recognized as obviously unconstitutional—arresting without probable cause, malicious prosecution, fabricating evidence, and suppressing critical exculpatory material. See *Ricciuti*, 124 F.3d at 130;

---

cause is plausibly plead. This flawed view turns qualified immunity on its head. If "arguable probable cause" were the standard, that doctrine would "swallow the entire rule of qualified immunity…. This cannot be." *McColley v. Cnty. of Rensselaer*, 740 F.3d 817, 825–26 (2d Cir. 2014). Qualified immunity shields those who *reasonably believe their conduct is lawful*, not those who *know their conduct is unlawful* but who might think they may get away with it. One who acts recklessly or knowingly does not act reasonably and is not shielded by qualified immunity. As then-Judge Amy Coney Barrett explained (in a case alleging a violation of *Franks v. Delaware, supra*), a qualified immunity rule that imagines an officer (not a court) assessing whether they can get away with misconduct because other probable cause exists "doesn't make sense." *Rainsberger v. Benner*, 913 F.3d 640, 652 (7th Cir. 2019) (Barrett, Amy Coney, J.). Here, "arguable probable cause" doesn't make sense. If defendants knew that the statements from Demkovich and Herceg were unreliable and untrustworthy, and knew they needed additional evidence to corroborate their claims and knew probable cause was lacking, the choice they faced was whether to arrest and prosecute without probable cause. Any officer would know that was unlawful.

*Manganiello*, 612 F.3d at 165. Even absent a precisely identical factual precedent, the unlawfulness of the City Defendants' conduct alleged here was clearly and unmistakably established.

Defendants argue no one would know that it would violate Plaintiff's constitutional rights merely by attending meetings about a pending investigation. But of course, that is not all that is alleged. This is an extraordinary case where it would have been obvious to any reasonable actor that the consideration of exculpatory and contradictory evidence, as well as further investigation, was required. To find otherwise would require this Court to make factual assumptions that cannot be made at this stage, when the allegations must be viewed in the light most favorable to Plaintiff and all inferences must be drawn in favor of Plaintiff, not the defendants.

Plaintiff's Complaint satisfies the stringent pleading standards required to defeat qualified immunity at the Rule 12(b)(6) stage. The allegations clearly detail obviously unconstitutional investigative misconduct by the individual City Defendants. Because the constitutional rights were clearly established and because Defendants' alleged misconduct was objectively unreasonable and obviously unlawful, qualified immunity is unavailable at this early procedural stage. The City Defendants' motion to dismiss based on qualified immunity should thus be denied.

To the extent any defendant makes a specific qualified immunity claim to any individual Claim in the Complaint, it will be addressed below within that claim.

## V.    Plaintiff Has Plausibly Alleged His Claims

### A.  False Arrest and Malicious Prosecution (Claims 1 and 8)

47

The Complaint alleges the elements of false arrest and malicious prosecution.[11]
To state a claim for false arrest under both 42 U.S.C. § 1983 and New York law, a
plaintiff must plausibly allege that: (1) the defendant intended to confine the plaintiff; (2)
the plaintiff was conscious of the confinement; (3) the plaintiff did not consent to the
confinement; and (4) the confinement was not otherwise privileged. See *Weyant*, 101
F.3d at 853;  *Bernard v. United States,* 25 F.3d 98, 102 (2d Cir.1994). The final
element—lack of privilege—typically turns on whether the arresting officer had probable
cause. If probable cause existed, the arrest is privileged, and the claim fails. *Id*. Plaintiff's
Complaint alleges each element. Defendants intended to confine Plaintiff by executing a
warrantless arrest (ECF 1 ¶¶ 129–132); Plaintiff was clearly aware of the arrest (*id*. ¶¶
139–142); he did not consent to the arrest; and the confinement was not privileged, as it
was carried out without probable cause and for the improper purpose of collecting
evidence (*id*. ¶¶ 129–132, 139–142, 205–206).

To establish a claim under § 1983 for malicious prosecution, Plaintiff must show:
(1) initiation or continuation of a criminal proceeding against plaintiff;  (2) favorable
termination; (3) lack of probable cause; and (4) malice.  *Harris v. Tioga Cnty.,* 663 F.
Supp. 3d at 237 (citing *Dettelis v. Sharbaugh,* 919 F.3d 161, 163-64 (2d Cir. 2019) and
*Buari, supra,* 530 F. Supp. 3d at 383.  The elements of federal and state law malicious
prosecution claims are "substantially the same." *Boyd v. City of New York.*, 336 F.3d 72,

---

**11** Because a claim for false arrest under New York law is similar to that under § 1983, *see Weyant v. Okst, supra,* 101 F.3d at 852, and because most defendants addressed the two claims together in the briefing, Plaintiff does the same.

75 (2d Cir. 2003); *Lanning v. City of Glens Falls*, 908 F.3d 19, 25 (2d Cir. 2018); *Jocks v. Tavernier,* 316 F.3d at 134; *Moroughan,* 514 F. Supp. 3d at 523.

Defendants first argue that the false arrest and malicious prosecution claims fail because the Complaint does not allege a lack of probable cause. As described *supra*, this argument fails.  See *supra* Section II. The Complaint plausibly alleges in detail that Defendants knowingly arrested Plaintiff without probable cause for the improper purpose of gathering evidence and that Defendants intentionally disregarded and suppressed exculpatory evidence. *Id.*

Defendants next argue that Plaintiff's malicious prosecution claim fails for lack of malice.  "Under New York law, malice does not have to be actual spite or hatred but means only 'that the defendant must have commenced the criminal proceeding due to a wrong or improper motive, something other than a desire to see the ends of justice served.'" *Lowth*, 82 F.3d at 573.  "In most cases, the lack of probable cause—while not dispositive—'tends to show that the accuser did not believe in the guilt of the accused, and malice may be inferred from the lack of probable cause.' " *Id.* at 573 quoting *Conkey v. New York*, 74 A.D.2d 998, 427 N.Y.S.2d 330 (App. Div 4th Dep't. 1980)); *see Cunninham v. New York City*, No. 04-CV-10232, 2007 WL 2743580, at *6 (S.D.N.Y. Sept. 18, 2007) (same); *Mesiti v. Wegman*, 307 A.D.2d 339, 763 N.Y.S.2d 67, 70 (App. Div. 2003) ("[T]he jury was able to 'infer the existence of actual malice from the fact that there was no probable cause to initiate the proceeding.' " (quoting *Martin v. City of Albany*, 42 N.Y.2d 13, 396 N.Y.S.2d 612, 364 N.E.2d 1304, 1307 (1977)). Plaintiff has sufficiently alleged that "the indictment was produced by fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith." *Colon*, 60 N.Y.2d at 83.

The Complaint adequately alleges malice, both due to the lack of probable cause as well as the deliberate misconduct, including destruction and suppression of exculpatory evidence, initiation of charges to obtain evidence, and refusal to investigate known contradictions in the complainant-defendants accounts and allegations. Plaintiff has plausibly alleged there was neither probable cause nor "arguable probable cause."[12]

## B.  Due Process, Fabrication and Withholding of Evidence

Plaintiff's Complaint alleges that Defendants violated his clearly established right to a fair trial by deliberately withholding material exculpatory evidence, in violation of their obligations under *Brady v. Maryland*, *supra,* and its progeny. Defendants argue these claims are barred by absolute prosecutorial immunity, are inadequately pleaded as to individual defendants, that police officers have no independent duty to disclose exculpatory evidence, and that Plaintiff's acquittal extinguishes any claim under this theory. Each argument fails.

To state a claim for a *Brady* violation under § 1983, a plaintiff must allege: (1) the government possessed evidence favorable to the defense; (2) the evidence was suppressed, either willfully or inadvertently; and (3) the suppression resulted in prejudice. See *United States v. Coppa*, 267 F.3d 132, 140 (2d Cir. 2001); *Zahrey,* 221 F.3d at 350–51. While *Brady* claims traditionally arose in criminal trials, the Second Circuit has recognized that egregious investigative misconduct—including pretrial suppression of exculpatory evidence—can support a due process claim under § 1983. *See Poventud v.*

---

[12] See discussion, footnote 10 above regarding the inapplicability of "arguable" probable cause to the determination of whether the Complaint sufficiently alleges a lack of probable cause.

**50**

*City of New York*, 750 F.3d 121, 133–34 (2d Cir. 2014) (en banc); *Zahrey*, 221 F.3d at 349.

      The Complaint alleges numerous instances in which both prosecutors and police officers suppressed, ignored, or destroyed material exculpatory evidence, each sufficient to sustain a *Brady* claim.  *See* ECF 1 ¶¶ 110–112 (Congdon instructed complainant-defendant Herceg to delete her social media accounts, resulting in the destruction of exculpatory evidence); ¶¶ 105–108, 111–113, 117–120 (Prosecutors and BPD investigators, including Defendant Miller, deliberately failed to obtain and preserve electronic communications from the complainants' phones—despite knowing that the messages contained exculpatory content); ¶¶ 159–161 (Cronin allegedly withheld exculpatory evidence obtained during the processing of DNA test results that excluded Mr. Kweller and his brother as contributors to biological material recovered from the complainant-defendants); ¶¶ 82–87, 92–95, 138-140, 142-150 (Defendants knew that complainants contradicted themselves repeatedly—e.g., one claiming unconsciousness when surveillance video showed her walking, laughing, and interacting voluntarily—yet failed to investigate further or disclose these inconsistencies). These allegations detail a pattern of exculpatory evidence being deliberately destroyed or withheld by both police and prosecutors, well before any formal prosecution commenced. This misconduct took place during the investigatory phase, before the commencement of judicial proceedings, and was perpetrated in coordination between police and prosecutors. It was investigative and administrative —not advocacy—and is therefore outside the scope of absolute prosecutorial immunity. See *Buckley,* 509 U.S. at 273–74; *Burns*, 500 U.S. at 495–96. See *supra* Section III.

51

These allegations satisfy all three *Brady* elements: the suppressed material was favorable to the defense, it was deliberately withheld, and the result was a criminal prosecution unsupported by probable cause and ending only in a jury acquittal after two years of reputational, financial, and emotional harm to Plaintiff.

The City Defendants argue that *Brady* obligations run only to prosecutors and that police officers cannot be held liable for failing to disclose exculpatory evidence. This is incorrect. Courts in this Circuit have repeatedly held that police officers have an independent constitutional obligation to disclose exculpatory material to prosecutors or otherwise ensure it reaches the defense. Where they fail to do so—or worse, where they actively destroy or suppress that evidence—they may be held liable under § 1983. See *Zahrey*, 221 F.3d at 350–51; *Walker v. City of New York*, 974 F.2d 293, 299–300 (2d Cir. 1992); *Bermudez v. City of New York*, 790 F.3d 368, 377–78 (2d Cir. 2015).

Here, the Complaint alleges that police officers, including Defendants Zikuski, Minor, Miller, and the John Doe officers, directly participated in failing to preserve and disclose exculpatory evidence, and that their omissions were intentional and coordinated with the prosecution. (ECF 1 ¶¶ 70-87, 92, 94, 106-107, 111–112, 139–142, 145-147) These actions are not insulated by qualified immunity at the pleading stage because the constitutional duty to disclose and preserve *Brady* material was clearly established long before 2021. See *supra* Section IV.

The suppressed evidence went to the core of Plaintiff's defense: that the complainants' allegations were fabricated and that any encounters were consensual. (ECF 1 ¶¶ 72-75, 83–87, 92, 94–95, 110-120, 136, 139-141, 146-147, 160–162, 180-181.) By suppressing or failing to preserve this evidence, Defendants deprived Plaintiff of the

opportunity to challenge the complainants' credibility and to demonstrate his innocence. Because the charges against Plaintiff were ultimately dismissed (*id*. ¶ 102), and because the suppression of favorable evidence tainted the entire investigatory and charging process, Plaintiff has adequately pleaded prejudice.

Defendants also argue that Plaintiff's acquittal precludes his due process claim under *Brady*. That argument fails as a matter of law. The Second Circuit has squarely held that a *Brady* violation is actionable under § 1983 regardless of whether the prosecution ends in conviction, acquittal, or dismissal, so long as the plaintiff suffered harm because of the suppression. See *Poventud v. City of New York*, *supra,* 750 F.3d at 133–34 ("the suppression of exculpatory evidence is not made harmless simply because the defendant is later acquitted.") In *Garnett v. Undercover Officer C0039*, 838 F.3d 265, 277 (2d Cir. 2016) the court affirmed that an acquittal does not bar a due process claim based on the fabrication or suppression of evidence that caused the plaintiff to stand trial in the first place. The harm from these constitutional violations is not limited to the outcome of the trial; it includes the very fact of being wrongfully subjected to criminal proceedings without access to exculpatory evidence. *Id.* at 277. Here, Plaintiff alleges precisely that: he was arrested and prosecuted based on an incomplete, distorted evidentiary record; he was deprived of critical exculpatory material—including surveillance footage, DNA evidence, and electronic messages—that would have materially altered the course of the proceedings (ECF 1 ¶¶ 104–113, 115–118, 146, 149–153, 160–161); and he was subjected to the burdens of a public prosecution for over a year, ending only in a jury acquittal (*id*. ¶¶ 184–187).

Defendants' arguments rest on fact-based assertions about the purpose of their actions and the sufficiency of the remaining evidence, all of which are inappropriate for resolution on a motion to dismiss. At this stage, the Court must accept the Complaint's factual allegations as true and draw all inferences in Plaintiff's favor. *See Iqbal*, 556 U.S. at 678. Plaintiff's detailed and plausible allegations easily satisfy the pleading requirements for a due process claim under § 1983 based on *Brady* violations.

Defendants argue that there can never be a § 1983 based on a reckless investigation. *E.g.*, ECF 40-1 at 33-34; ECF 57-1 at 14; ECF 67-1 at 19 (relying primarily on *Newton v. City of New York*, 566 F. Supp. 2d 256, 278 (S.D.N.Y. 2008)).   While it is correct that numerous district courts have held that failure to investigate claims are properly pled as part of a claimant's false arrest and malicious prosecution claims, dismissal on this basis would be improper because the Second Circuit has never held that a deliberate failure to conduct a constitutionally adequate investigation violates a defendant's right to due process and to a fair trial – as Mr. Kweller has alleged. See *Grega v. Pettengill*, 123 F. Supp. 3d 517, 536 (D. Vt. 2015) ("the Second Circuit has yet to recognize a claim that a state officer's reckless failure to investigate all aspects of a crime violates the due process rights of the accused.")

In contrast, numerous other federal district and circuit courts have ratified independent failures to investigate claims asserted under the Due Process Clause. *See, e.g., Winslow v. Smith*, 696 F.3d 716 (8th Cir. 2012) (failure to investigate claims relates to the "liberty interest in fair criminal proceedings."); *Wilson v. Lawrence County, Mo.*, 260 F.3d 946, 956 n.8 (8th Cir. 2001) ("liberty interest in obtaining fair criminal proceedings before being denied one's liberty" is infringed by a "reckless investigation.";

*Martin v. Anderson*, No. 07- CV-2965, 2008 WL 4761734, at *9 n.8 (E.D. Pa. Oct. 29, 2008) ("To establish a due process violation for failure to investigate, the plaintiff must show the defendant acted intentionally or recklessly . . . ."); *Eckman v. Lancaster City,* 742 F. Supp. 2d 638, 653 (E.D. Pa. 2010), aff'd, 515 F. App'x 93 (3d Cir. 2013), and 529 F. App'x 185 (3d Cir. 2013) ("To bring a successful due process claim for failure to investigate, a plaintiff must show that a police officer acted intentionally or recklessly, in a manner that shocks the conscience, in failing to investigate.") (internal citation omitted); *Romero v. Fay,* 45 F.3d 1472, 1478 (10th Cir. 1995) (to succeed on a claim of an unreasonable investigation in violation of the Fourteenth Amendment a Plaintiff "must assert facts that, at a minimum, demonstrate Defendants acted with deliberate or reckless intent.") (internal citations omitted); *Lowery v. Cnty. of Riley,* 04-3101-JTM, 2006 WL 2663480, at *1 (D. Kan. Sept. 15, 2006) (citing Wilson and acknowledging that "reckless or intentional failure to investigate other leads offends a defendant's due process rights") (internal quotations omitted).

Because no binding precedent requires this Court to dismiss this cause of action, and because Mr. Kweller has pled failures to investigate that are deliberate or reckless, and that those failures directly impacted the fairness of the proceedings against him, this Court should allow the claim to proceed.

Defendants' motions to dismiss Plaintiff's second cause of action should be denied.

### C. Failure to Intervene

Plaintiff's third cause of action alleges that multiple defendants, despite having a realistic opportunity to intervene and prevent constitutional violations—including false

arrest, malicious prosecution, and suppression of exculpatory evidence—failed to do so. ECF 1 ¶¶ 207–210. The City and County Defendants move to dismiss this claim, arguing that the Complaint does not adequately plead personal involvement, that the claim duplicates other constitutional theories, or that they had no opportunity to intervene. See ECF 40-1 at 36; ECF 57-1 at 11-13. These arguments misstate the law and ignore the detailed factual allegations in the Complaint.

"It is widely recognized that all law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence." *Terebesi, supra*, 764 F.3d at 243 (quoting *Anderson v. Branen, supra*, 17 F.3d at 557). "An officer who fails to intercede is liable for the preventable harm caused by the actions of the other officers where that officer observes or has reason to know…*that any constitutional violation has been committed by a law enforcement official.*" *Anderson v. Branen, supra*, 17 F.3d at 557 (citations omitted, emphasis added); see also *Terebesi, supra*, at 243 ("An officer who fails to intercede in the use of excessive force *or another constitutional violation* is liable for the preventable harm caused by the actions of other officers.")(emphasis added); *Buari, supra,* 530 F. Supp. 3d at 391-392 (no excessive force claim was alleged, it was failure to intervene to prevent coercion of witnesses to commit perjury) .

Defendants are wrong that failure-to-intervene claims are limited to excessive force claims. Excessive force is only one example. In *Moroughan*, the court explained that one of the defendants could "be held liable for the malicious prosecution of plaintiff, just as he may be for the false arrest claim, based upon his alleged failure to intervene in connection with the charges being filed against plaintiff." *Moroughan*, 514 F. Supp. 3d at

526. In *Werkheiser, supra*, 655 F. Supp. 3d at 108–09, the Court recognized (and refused to dismiss) a failure-to-intervene claim based on malicious prosecution.[13] Other courts have recognized the claim but found the plaintiff's factual allegations insufficient to support it.[14]

    If some defendants are alleged both to have committed the unconstitutional conduct and to have failed to intervene to prevent others' misconduct, that is not grounds for dismissal. At this stage in the litigation, Plaintiff "may proceed with these claims in the alternative." *Rutherford v. City of Mount Vernon,* 698 F. Supp. 3d 574, 609 (S.D.N.Y. 2023).

    Plaintiff has plausibly alleged that each defendant failed to intervene. See ECF 1 ¶¶ 92, 94-95, 07–210 (alleging that Korchak, Loughran, Congdon, Cronin, Wagner, Minor, Miller, and Zikuski each had a realistic opportunity to intervene but failed to do so); ¶¶ 123–124, 127 (Korchak, Loughran, Minor, and Zikuski failed to correct Congdon and Miller's mistaken legal belief they could not obtain DNA or electronic data pre-arrest, leading directly to Plaintiff's unlawful arrest); ¶¶ 106–112 (Loughran, Minor, Miller, and Congdon failed to intervene in or stop suppression of exculpatory evidence, including Congdon's instruction to a complainant to delete social media accounts); ¶¶ 118–119 (Loughran and Korchak were informed that the Saitta Folder contained key

---

[13] The court ruled that "[f]ailure to intervene claims based on malicious prosecution accrue when the malicious prosecution claims accrue," so the claims were timely. *Ibid.*

[14] *Hicks v. City of New York*, 232 F. Supp. 3d 480, 496 (S.D.N.Y. 2017), *aff'd in part, vacated in part sub nom. Hicks v. Marchman,* 719 F. App'x 61 (2d Cir. 2018); *Dash v. Montas*, 612 F. Supp. 3d 138, 158 (E.D.N.Y. 2020); *Grinols v. Beers*, 532 F. Supp. 3d 95, 108–09 (W.D.N.Y. 2021). See also *Rutherford v. City of Mount Vernon*, 698 F. Supp. 3d 574, 607 (S.D.N.Y. 2023)(at the summary judgment stage, refusing to dismiss claims against two officers but granting motion as to a third defendant)(unlawful search and excessive force).

57

exculpatory data and failed to ensure it was retrieved or disclosed); ¶ 153 (Cronin failed to intervene or correct Congdon's mistaken understanding of discovery obligations); ¶ 156 (Korchak, Loughran, Cronin, and Congdon oversaw and presented the case to the grand jury despite knowingly omitting critical exculpatory information); ¶¶ 150–153, 115–11 (Wagner failed to retrieve exculpatory phone data as directed and Congdon and Zikuski failed to supervise or intervene to prevent suppression of evidence or unlawful arrest practices). Plaintiff alleges the defendants had a realistic opportunity to intervene and prevent the harm, a reasonable person in the situation would know Plaintiff's constitutional rights were being violated, and each defendant failed to take reasonable steps to intervene. See also *Terebesi, supra; Anderson, supra; Jean-Laurent v. Wilkinson*, 540 F. Supp. 2d 501, 512 (S.D.N.Y. 2008); *O'Neill v. Krzeminski*, 839 F.2d 9, 11 (2d Cir. 1988).

The County alleges that it, as a municipal entity, had no opportunity to intervene. ECF 57-1 at 12. Plaintiff withdraws the failure to interview claim against the County only.

### D. Supervisory Liability

Plaintiff's fourth cause of action alleges that supervisory officials—including Defendants Korchak, Loughran, Minor, and Zikuski—violated Plaintiff's constitutional rights by failing to supervise and discipline their subordinates, despite knowing of their unconstitutional conduct. See ECF 1 ¶¶ 211–217. Each official held a policymaking or senior supervisory role and either directly participated in the misconduct or failed to act despite actual or constructive knowledge of violations occurring under their watch. Defendants seek dismissal by asserting that Plaintiff has not adequately alleged their

58

personal involvement. See *e.g.* ECF 40-1 at 23–24, 37. But their arguments misstate the applicable legal standard and ignore the factual specificity of the allegations in the Complaint.

While the Supreme Court's decision in *Iqbal* clarified that respondeat superior liability is not available under § 1983, the Second Circuit continues to recognize that a supervisor may be held liable if they: (1) Directly participated in the constitutional violation; (2) Failed to remedy the violation after learning of it; (3) Created or permitted a policy or custom under which unconstitutional practices occurred; (4) Were grossly negligent in supervising subordinates; or (5) Deliberately failed to act on information indicating that unconstitutional acts were occurring. *See Terebesi*, 764 F.3d at 234; *Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020). While *Tangreti* emphasized the need to connect each defendant's conduct to the specific constitutional violation, it reaffirmed that supervisors who are aware of unconstitutional conduct and fail to act may still be liable where the allegations are specific and plausible.

The Complaint does not rely on generalized claims of supervisory authority. It pleads in detail how each supervisory defendant had actual knowledge of, participated in, or failed to correct constitutional violations.

**Korchak**: Plaintiff alleges that DA Korchak personally approved Plaintiff's arrest despite knowing probable cause was lacking and that the arrest was solely for the purpose of gathering DNA evidence. He was made aware of investigative misconduct—including suppression of exculpatory evidence—and failed to take corrective action. (ECF 1 ¶¶ 123–124, 129–132, 156, 188–190, 211–213.)

59

**Loughran**: As First Assistant DA, Loughran was involved in pre-arrest strategy meetings, knew about the exculpatory content of the Saitta Folder and suppression of evidence, and took no action to correct investigative misconduct. (*Id.* ¶¶ 106–108, 118–119, 129–132, 153, 156, 211–214.)

**Minor**: As Captain of the BPD, Minor helped plan and approve the unlawful arrest and was responsible for oversight of officers who failed to preserve or disclose exculpatory evidence. (*Id.* ¶¶ 93, 123–124, 129–132, 150–153, 211, 215.)

**Zikuski**: As Chief of Police and final policymaker, Zikuski was responsible for supervising investigative and evidence handling procedures. Plaintiff alleges he failed to implement or enforce systems to ensure Brady compliance and discipline investigators who engaged in known misconduct. (*Id.* ¶¶ 93, 188–190, 211, 216–217.)

These are not vague or conclusory allegations. They provide a factual basis for the Court to conclude that each defendant was either directly involved in, aware of, or responsible for supervising unconstitutional conduct, and failed to intervene or remedy it.

Defendants argue Plaintiff has failed to connect these officials to the specific violations. But *Tangreti* and its progeny require that a plaintiff allege how a supervisor's actions (or inaction) contributed to the violation—not that they personally executed the underlying misconduct. The Complaint does precisely that.

At this early stage, Plaintiff must only plausibly allege that each supervisor knew of, facilitated, or failed to correct subordinate misconduct. Where, as here, the Complaint alleges repeated instances of direct knowledge, approval of unconstitutional strategies, and ongoing failure to act, supervisory liability is well-pled. See *Terebesi*, 764 F.3d at 234 (supervisor's liability proper where they were aware of and failed to act on

violations); *Alvarado v. Westchester County*, 22 F.4th 40, 51–52 (2d Cir. 2022)

(reversing dismissal where complaint alleged supervisor failed to intervene in

constitutional misconduct).

Regardless of whether supervisory liability is viewed as a theory of liability or as

an independent cause of action, Plaintiff's allegations against Korchak, Loughran, Minor,

and Zikuski are more than sufficient to survive a motion to dismiss. There are good

reasons to maintain a Supervisory Liability claim at least until discovery is complete.

Courts have pointed out the appropriateness of maintaining supervisory personnel as

defendants in lawsuits stating a colorable claim until the plaintiff has been afforded an

opportunity through discovery to identify the subordinate officials with personal liability.

*See Soto v. Brooklyn Correctional Facility,* 80 F.3d 34, 37 (2d Cir.1996) ("[B]ut for [the

plaintiff's] mistake [in naming the correctional facility as a defendant], he would have ...

at least named the superintendent of the facility and obtained the names of the responsible

officers through discovery."); *Satchell v. Dilworth,* 745 F.2d 781, 786 (2d Cir.1984)

("Plaintiff should have a reasonable opportunity, through discovery [of senior personnel],

to ascertain what individuals ... caused [the alleged violation]." *See also Oliveri v.

Thompson,* 803 F.2d 1265, 1279 (2d Cir.1986) (pointing out advantage, in suits against

governmental entities and supervisors, of permitting early discovery to identify

responsible subordinate officials).

Plaintiff's supervisory liability claim is supported by detailed factual allegations

showing that each defendant had actual knowledge of constitutional violations, helped

facilitate or directly approved them, or failed to take reasonable supervisory steps to stop

the harm. The Complaint satisfies the standards under *Tangreti* and related Second

Circuit precedent. Defendants' motions to dismiss the fourth cause of action should be denied.

### E.  *Monell v. Dep't of Social Servs.*, 436 U.S. 658 (1978)

Municipalities can be liable under section 1983 when a plaintiff can demonstrate "(1) an official [municipal] policy or custom that (2) cause[d] the plaintiff to be subjected to (3) a denial of a constitutional right." *Torraco v. Port Auth. of N.Y. & N.J.*, 615 F.3d 129, 140 (2d Cir. 2010) (quoting *Wray v. City of New York*, 490 F.3d 189, 195 (2d Cir. 2007)).

Plaintiff can establish an official policy or custom by showing any of the following: (1) a formal policy officially endorsed by the municipality; (2) actions or decisions made by municipal officials with decision-making authority; (3) a practice so persistent and widespread that it constitutes a custom of which policymakers must have been aware; or (4) a failure by policymakers to properly train or supervise their subordinates, such that the policymakers exercised "deliberate indifference" to the rights of the plaintiff and others encountering those subordinates. *Kenton v. City of New York*, No. 24-CV-1630 (LDH) (PK), 2025 WL 510049, at *2 (E.D.N.Y. Feb. 15, 2025).  *See Brandon v. City of New York,* 705 F. Supp. 2d 261,276-77 (S.D.N.Y. 2010); *Iacovangelo v. Corr. Med. Care, Inc.*, 624 F. App'x 10, 13–14 (2d Cir. 2015) (formal policy); *Matusick v. Erie County Water Authority*, 757 F.3d 31, 62 (2d Cir. 2014) (widespread and persistent practice); *Carter v. Inc. Vill. of Ocean Beach*, 759 F.3d 159, 164 (2d Cir. 2014) (failure to train amounting to deliberate indifference); *Jones v. Town of E. Haven*, 691 F.3d 72, 81 (2d Cir. 2012) (policymaking official's "express" or "tacit" ratification).

**62**

No "heightened pleading standard" applies to *Monell* claims. *Leatherman v. Tarrant County*, 507 U.S. 163, 168 (1993). The *Twombly* Court expressly denied that it was requiring any "heightened fact pleading of specifics." 550 U.S. at 570. The reasons for not requiring heightened fact pleading in a § 1983 municipal liability complaint remain even in the wake of *Twombly* and *Iqbal*: a plaintiff, as an outsider to municipal government, is not expected to have information about a city's official policies, practices, or training programs at the pleading stage. *Buari*, at 407 ("Buari cannot be expected to know particulars of Bronx DA training policies prior to discovery[.]").

In *Hines v. City of Albany*, the court noted that the Second Circuit has evolved from requiring specific allegations of fact to the post-*Leatherman* conclusion that the court may not go beyond Rule 8(a)(2) to require the plaintiff to provide more detailed factual allegations. *Hines v. City of Albany*, 542 F.Supp.2d 218, 228-230 (N.D.N.Y. 2008). In *Francis v. City of Schenectady*, *supra,* the court reiterated that *Monell* claims need only comply with the notice pleading requirement of Rule 8(a)(2). 2022 WL 4619326 at *10.

Plaintiff's allegations are much more than a boilerplate recitation of the grounds for municipal liability. Specific actions are alleged. The municipal actors have fair notice of what they are alleged to have done.

Defendants argue that Plaintiff fails to state an underlying constitutional violation, he fails to allege an official policy or practice, and he fails to sufficiently allege failure to train. These arguments are meritless.

**1.    Plaintiff plausibly alleges an underlying constitutional violation.**

**63**

As alleged above, Plaintiff has sufficiently alleged that Broome County and the City of Binghamton, through final policymakers, caused Plaintiff to be falsely arrested and maliciously prosecuted. They did so by hiding evidence, presenting false testimony from witnesses, and conspiring to violate his Fourth and Fourteenth Amendment rights. Thus, Plaintiff has satisfied this element of his *Monell* claim.

### 2.    Plaintiff plausibly alleges misconduct of final policymakers

Plaintiff alleged that:

- District Attorney Korchak, Chief Assistant District Attorney Loughran and Assistant District Attorneys Alyssa Congdon and Amanda Cronin were final policymakers for the BCDAO. ECF 1 ¶ 219 (BCDAO Defendants), ¶ 241 (Korchak Loughran, Congdon, and Cronin), and

- Chief Zikuski, Captain Minor, and Investigator Amanda Miller were final policymakers for the BPD. ECF 1 ¶ 244 (Zikuski, Minor and their delegates),  ¶ 261 (Zikuski, Minor and Miller).

and that in these roles, these final policymakers were directly involved in the constitutional violations alleged:

**Korchak and Loughran** are plausibly alleged to have assigned Congdon knowing she had no relevant prosecutorial experience and that she was unprepared, unsupervised, untrained, and unable to prevent violations of Plaintiff's constitutional rights. (ECF 1 ¶¶ 105-106, 108-109, 125, 235-237, 239). They ceded ultimate control to her, (*id*., ¶¶ 127, 235-236, 239), failed to train or supervise her about how to not violate a suspect's constitutional rights and how to perform basic investigative tasks (*id*. ¶¶ 123-125, 150, 152-154, 237), failed to discipline or correct her when she violated those rights

**04**

and failed to intervene to prevent those constitutional violations (*id*. ¶¶ 119, 150, 152-154, 156, 159, 237). They ignored Congdon's warnings when she told them she was unprepared. (*Id*. ¶ 237).

**Korchak and Loughran** are alleged to have personally participated in the constitutional violations. Each knew Demkovich never said "no", didn't resist any sex acts, and believed it was consensual, but proceeded against Plaintiff anyway and did not reveal this highly exculpatory information to the defense, the court, or the Grand Jury, (e.g., *id*. ¶¶ 138, 140-141, 150, 152-154, 173). Each continued without probable cause (*id*. ¶¶ 120, 140-141, 148-149) and did not confront Demkovich and Herceg with evidence that contradicted their stories or obtain readily-available evidence that would have disproved them (*id*. ¶¶ 110, 117, 119, 124, 143-145, 147, 162, 164-171, 172, 173, 176, 181-182). These are not alleged to have been mistakes or mere negligence. That Korchak, Loughran, and the other BCDAO Defendants actively resisted Plaintiff's efforts to obtain the exculpatory information is a powerful allegation that these Defendants' actions and decisions were malicious. (e.g., *id*. ¶¶ 114, 119, 143-44, 164-171). Korchak and Loughran are alleged to have conspired and cooperated with filing of a false Certificate of Compliance, (*id*. ¶ 159), which again is a persuasive indication that Plaintiff's *Monell* allegations rise above the speculative level.

**Congdon** is alleged to have taken, as a policymaker for *Monell* purposes (*id*. ¶ 241), most actions identified and cited above regarding Korchak and Loughran.[15] Congdon is plausibly alleged to have accepted responsibility for the investigation when

---

[15] Those citations to the Complaint are incorporated here by reference without having to repeat them.

she knew she was unqualified, knew she lacked sufficient knowledge to avoid violating Plaintiff's constitutional rights, and (in some instances) knew she was violating said rights. (E.g., *id.* ¶¶ 122-123,  124, 128, 131, 152-154, 237-240). She is alleged to have failed to ensure that readily-available exculpatory evidence was obtained and provided, (*id.* ¶¶ 114-119, 143-144, 162, 176, 181-182, 124, 128). She is alleged to have caused Plaintiff's arrest in a misguided and incorrect belief it was the only way to get more evidence.  (*Id.* ¶ 131). She is alleged to have known the same things cited above regarding Korchak and Loughran about Demkovich's belief her activity was consensual and that would have been on Demkovich's cell phone to that effect. (*Id.* ¶¶ 138, 140-141, 150, 152-154, 173). Like Korchak and Loughran, she is alleged to have continued the prosecution without probable cause and/or long after probable cause had dissipated, (*id.* ¶¶ 120, 140-141, 148-149), and to have blatantly violated non-discretionary duties to obtain and provide exculpatory evidence to the defense, other prosecutors, the court, and the Grand Jury. (*Id.* ¶¶ 110, 117, 119, 124, 143-144, 147-149, 152-154, 155, 162, 164-171, 172, 173, 176, 181-182). She is also alleged to have conspired with a witness to destroy exculpatory evidence. (*Id.* ¶ 112). As observed above, regarding Korchak and Loughran, Congdon conspired with other defendants to actively resist Plaintiff's efforts to obtain the exculpatory information is a powerful allegation that her actions and decisions were malicious. (e.g., *id.* ¶¶ 114, 119, 143-44, 164-171). Congdon is alleged to have filed a false Certificate of Compliance, (*id.* ¶ 159), which is a persuasive indication that Plaintiff's *Monell* allegations rise above the speculative level.

**66**

**Cronin** is alleged to have taken, as a policymaker for *Monell* purposes (*id*. ¶ 241), most actions identified and cited above regarding Korchak, Loughran, and Congdon.[16] She is alleged to have failed to ensure that readily-available exculpatory evidence was obtained and provided, (*id*. ¶¶ 110, 114-119, 124, 128, 143-144, 162, 176, 181-182). She is alleged to have directly participated in the violations, e.g., by concealing exculpatory information (*e.g*., *id*. ¶¶ 138, 149-155, 173). With Congdon and conspiring with other BCDAO defendants, Cronin is alleged to have filed a false Certificate of Compliance, (*id*. ¶ 159), which is a persuasive indication that Plaintiff's *Monell* allegations rise above the speculative level.

**Zikuski and Minor** are alleged to be policymakers for *Monell* purposes (*id*., ¶¶ 244, 261). Plaintiff alleges that, as in those portions of the Complaint about Korchak, Loughran, Congdon, and Cronin,[17] Zikuski and Minor knew or should have known constitutional disclosure obligations and knew or should have known that BPD had unconstitutionally infirm policies and procedures and insufficient training protocols concerning constitutional disclosure obligations. (*Id*. ¶¶ 123-124, 248-256, 259-260. Zikuski and Minor are alleged, in their role as policymakers, to have known (or should have known) that high exculpatory, readily-available information was not being gathered and/or not being provided to others, including prosecutors, courts, defense attorneys, and the Grand Jury. (E.g., *id*., ¶¶ 110, 114, 123, 138, 140-141, 148-149, 260). Zikuski and Minor are alleged to have failed to train and supervise Defendant Miller, who had

---

[16] Those citations to the Complaint are incorporated here by reference without having to repeat them.

[17] Those citations to the Complaint are incorporated here by reference without having to repeat them.

**67**

insufficient knowledge about how to comply with constitutional disclosure requirements. (*Id.*, ¶ 260).

Whether viewed as a "ratification" of the work of others or as a violation in which these final policymakers personally participated,[18] this is sufficient for *Monell* liability.

Municipalities are answerable for actions undertaken by their final policymakers, whether or not those actions conform to their own preexisting rules. "An official policy 'includes the decisions of a government's lawmakers, *the acts of its policymaking officials,* and practices so persistent and widespread as to practically have the force of law.' " *McDonald v. City of Troy*, 542 F. Supp. 3d 161, 174 (N.D.N.Y. 2021) (emphasis added) (*quoting Connick v. Thompson*, 563 U.S. 51, 61 (2011)). "Policies can be 'pronounced or tacit,' and can take the form of 'either action or inaction.' " *McDonald*, 542 F. Supp. 3d at 174 (quoting *Lucente v. Cnty. of Suffolk*, 980 F.3d 284, 297 (2d. Cir. 2020)). As another court in the Northern District has observed:

> [T]he Supreme Court has sanctioned four methods of proving a *Monell* claim:
>
> > (1) A policy formally adopted and endorsed by the municipality; (2) *actions taken by policymaking officials that caused the particular deprivation alleged*; (3) practices by subordinate officials that are not expressly authorized but are so widespread and consistent that policymakers must have been aware of them; or (4) a failure by policymakers to train or supervise that amounts to "deliberate indifference" to the rights of those who come into contact with the inadequately trained or supervised municipal employees.

*McDonald*, 542 F. Supp. 3d at 174 (emphasis added)(*quoting Crawley v. City of Syracuse*, 496 F. Supp. 3d 718, 729 (N.D.N.Y. 2020). Proof that an "authorized decisionmaker" has taken the action or directed it establishes *Monell* liability. *Bd. of*

---

**18** "Actions of a policymaker" and "ratification" are independent theories of *Monell* liability.

*County Comm'rs v. Brown*, 520 U.S. 397, 405 (1997); *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481 (1986).

Under *Pembaur*, a plaintiff may establish municipal liability by alleging that a municipal official with final policymaking authority acted in violation of a plaintiff's constitutional rights. Plaintiff makes just such allegations. (See citations to Complaint, above, e.g. ¶¶ 219, 241, 244, 261)(alleging that Korchak, Loughran, Congdon, Cronin, Zikuski, and Minor were all policymakers for *Monell* purposes). Plaintiff alleged that specific actions taken by these defendants caused the constitutional violations. (See citations to Complaint, above).

*Pembaur* supports Plaintiff's claim to have plausibly alleged that Defendants Korchak, Loughran, Congdon, Cronin, Zikuski, and Minor acted with final policymaking authority in ordering investigation and prosecution of Plaintiff and in facilitating withholding of evidence. In *Pembaur*, the United States Supreme Court held that "municipal liability under § 1983 attaches where—and only where—a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." 475 U.S. at 483–84 (citation omitted). The Supreme Court concluded that the municipality was liable for the conduct of the county prosecutor because the county prosecutor possessed final decision-making authority to establish county policy and directed law enforcement to forcibly enter the plaintiff's premises. *Id.* at 484–85.

### *Redundant claim against the County*

The BCDAO argues that, because as an administrative arm of the County, it is a "non-suable" entity and so the complaint against it "as an entity" should be dismissed as

redundant. (ECF 57-1 at 9), citing *Baker v. Willett*, 42 F. Supp. 2d 192, 198 (N.D.N.Y.

1999).  Plaintiff agrees that his claims against the BCDAO should be construed as

brought against the County. *See ibid.*

### F.  Conspiracy

"[C]onspiracies are by their very nature secretive operations, and may have to be

proven by circumstantial, rather than direct, evidence." *Pangburn v. Culbertson*, 200 F.3d

65, 72 (2d Cir. 1999)(internal quotation marks and citations omitted); *National Rifle

Association of America v. Cuomo*, 350 F.Supp.3d 94 (2018). These realities must drive

the decision at this early stage in the proceedings:

> a conspiracy is often difficult to prove and the court, may at times, have to
> rely on circumstantial evidence of a conspiracy. Moreover, a conspiracy
> need not be shown by proof of an explicit agreement but can be
> established by showing that the parties have a tacit understanding to carry
> out the prohibited conduct.

*Lalonde v. City of Ogdensburg*, 662 F. Supp. 3d 289, 318 (N.D.N.Y. 2023)(cleaned up).

Plaintiff's allegations are sufficient. From the allegations in the Complaint, "[o]ne

could plausibly infer that these Defendants agreed not to drop the charges because they

did not want to jeopardize their shared objective of securing a conviction against [Yaron

and Leor Kweller and Jordan Rindgen]." *Johnson v. City of New York*, No. 22-CV-3320

(DG)(PK), 2023 WL 11868258, at *12 (E.D.N.Y. Sept. 15, 2023). *Johnson* offers

powerful guidance because most reasons the court denied the motions to dismiss apply

here as well:

> Individual Defendants, who were colleagues working on shared
> investigations, likely had opportunities to enter into an agreement and a
> shared motivation to do so. *See McCray v. City of New York*, No. 03-CV-
> 10080 (DAB), 2007 WL 4352748, at *23 (S.D.N.Y. Dec. 11, 2007) (finding
> a Section 1983 conspiracy plausible where 'Defendant police officers and
> prosecutors acted in concert to coerce and fabricate statements and conceal

**70**

exculpatory evidence,' stating ' 'we do not encounter here a bare allegation
of conspiracy supported only by an allegation of conduct that is readily
explained as individual action plausibly taken in the actors' own economic
interests.' '); *Biswas v. City of New York*, 973 F. Supp. 2d 504, 533-34
(S.D.N.Y. 2013) (permitting a civil conspiracy claim to proceed where
plaintiff alleged that police officers ' 'devis[ed] a plan to arrest, detain,
restrain, prosecute and suspend [the plaintiff], all knowing that there was no
evidence linking [the plaintiff] to any criminal conduct' ').

Id., at *12. The *Johnson* Court concluded:  "Although Plaintiff does not provide

allegations of direct evidence of a conspiracy, he alleges circumstantial evidence

plausibly showing that Individual Defendants entered into a tacit agreement to 'frame'

Johnson." *Ibid*.

Plaintiff's Complaint is nothing like the "cynical delusion and fantasy" that filled

the Complaint in *Gallop v. Cheney*, 642 F.3d 364, 369 (2d Cir. 2011) (See ECF 67-1 at

23 and 57-1 at 16). There, the plaintiffs alleged that the 9-11 attack on the Pentagon was

not caused by a plane crash, but instead by government officials who plotted and bombed

the Pentagon. *Id*. at 367-368. Other cases cited are equally irrelevant. E.g. *Brook v.

Ruotolo*, 2024 WL 3912831 (2d Cir. 2024)(plaintiff, son of a mentally incapacitated

woman, alleged "a grand conspiracy" among the state court judge, the court evaluator,

the court-appointed guardian and many attorneys to "rig" her guardianship proceedings,

but had no facts that this "grand conspiracy" existed).[19]  In *Bertuglia v. City of New York*,

839 F.Supp.2d 703 (S.D.N.Y. 2012), some of the conspiracy claims were dismissed and

some were not. *Id*., at *728, *736. The allegation that two of the defendants acted

together was "sufficient to suggest plausibly that there was a genuine meeting of the

minds." *Id*., at *728.  In *Palmer v. City of New York*, 564 F.Supp.3d 221 (E.D.N.Y.2021)

---

[19] See ECF  67-1 at 17 and ECF 57-1 at  9 (citing *Gallop*).

(see ECF 74-1 at 16), the complaint contained a single sentence alleging the "defendants made an agreement[.]"  Plaintiff's allegations are far more robust than those in the cases Defendants cite.

All defendants except Cronin seek protection of the intracorporate conspiracy doctrine.[20] If this doctrine even applies to this civil rights conspiracy,[21] it would hypothetically bar only the claims that the DA defendants (Congdon, Cronin, Korchak, Laughran, and Wagner) conspired *with each other* and that the City defendants (Zikuski, Minor, and Miller) conspired *with each other*. The doctrine does not apply to allegations that a DA defendant and a City defendant conspired, nor that either or both conspired with Demkovich and/or Herceg. *Galgano v. Cnty. of Putnam*, 16-CV-3572 (KMK), 2020 WL 3618512, at *16 (S.D.N.Y. July 2, 2020) (doctrine did not bar conspiracy allegation that an employee of the Carmel Police Department conspired "with several employees of a separate corporate entity: Putnam County… Conspiracies between distinct corporate entities present no 'intracorporate' difficulties.").

The Complaint sufficiently alleges that BPD defendants conspired with BCDAO defendants, and both conspired with Herceg and Demkovich.  *E.g.*, ECF 1, ¶¶ 138, 150 (BCDAO and BPD defendants and Demkovich knew she believed the activity was consensual, but none told Plaintiff's attorneys for over a year); 124, 173 (same, regarding phone extractions), 123 (neither Miller nor Congdon obtained Plaintiff's DNA);[22] 114

---

**20** See ECF 40-1, at 27-28; ECF 57-1, at 10; ECF 67-1 at 17; ECF 65-1 at 22.

**21** The doctrine's application to a § 1983 civil conspiracy claim has been assumed but not decided. See *Galgano v. Cnty. of Putnam*, 16-CV-3572 (KMK), 2020 WL 3618512, at *16 (S.D.N.Y. July 2, 2020).

**22** Discovery is expected to reveal to what extent defendants' failure to obtain DNA was reckless and/or knowing or was the result of ignorance. At this stage of the proceedings, Plaintiff has given notice of allegations of all of these theories because various evidence supports the various theories alleged.

(both BCDAO and BPD tried to keep the electronic data from the defense); 162 (neither BCDAO nor BPD obtained forensic images of the phones of Herceg or Demkovich); 119, 143-144, 176, 181-182 (same, the "Saitta folder"); 122-23 (Congdon planned with Miller about getting Kweller's DNA but ended up not doing it, ostensibly because they didn't know how); 131-133 (Congdon met with BPD defendants on February 22, 2022 and then went forward with the arrest to get more evidence); 140-141, 148 (any probable cause was vitiated but Zikuski, Congdon, Miller and Korchak proceeded with the arrest and prosecution anyway). Because it is so obvious that each action and inaction should have been taken (or avoided), a reasonable inference is that the BCDAO defendants agreed with the BPD defendants, Herceg, and Demkovich to take the actions and not comply with the Constitution. A reasonable inference is they all agreed to hide exculpatory information and continue the prosecution despite the lack of probable cause.

It is reasonable to infer that they agreed to work together to accomplish this unconstitutional objective. Such inferences are sufficient at the pleading stage. See *Lalonde v. City of Ogdensburg*, 662 F. Supp. 3d 289, 318 (N.D.N.Y. 2023) ("a conspiracy is often difficult to prove and the court, may at times, have to rely on circumstantial evidence of a conspiracy. Moreover, a conspiracy need not be shown by proof of an explicit agreement but can be established by showing that the parties have a tacit understanding to carry out the prohibited conduct") (internal quotation marks and citations omitted); *McCrae v. Town of Brookhaven*, No. 18-CV-07061 (NRM) (LB), 2024 WL 5120016, at *15 (E.D.N.Y. Dec. 16, 2024) ("a conspiracy can be alleged with only circumstantial evidence") (internal quotation marks and citation omitted).

73

## VI.    Plaintiff's Additional State Claims Are Plausibly Alleged[23]

### A.  Intentional, Reckless, or Negligent Infliction of Emotional Distress (Claim 9)

An intentional infliction of emotional distress ("IIED") claim "requires a showing of: '(i) extreme and outrageous conduct; (ii) intent to cause, *or disregard a substantial probability of causing*, severe emotional distress; (iii) a causal connection between the conduct and injury; and (iv) severe emotional distress.' " *Rich v. Fox News Network, LLC*, 939 F.3d 112, 122 (2d Cir. 2019)(emphasis added).

Defendants essentially argue that Mr. Kweller's emotional distress is not extreme enough.  ECF 40-1 at 39-40, 57-1 at 22-23, 65-1 at 28, 67-1 at 24, 74-1 at 17. "Given the allegations of the Complaint, it suffices to say that their accusations could only be made with tongue in cheek and are patently meritless." *Franco v. Diaz*, 51 F. Supp. 3d 235, 248 (E.D.N.Y. 2014). Defendants fail to recognize that the element of "extreme and outrageous conduct" can be established by the collective allegations, "even though each individual allegation alone might not be sufficiently outrageous—because, taken together, these acts might amount to a deliberate and malicious campaign of harassment." *Rich v. Fox News Network, LLC.*, 939 F.3d at 122.

This claim must await discovery and factual development. At this stage, Mr. Kweller has sufficiently alleged that "Defendants' actions unreasonably endangered Yaron Kweller's mental health and safety, and caused him to suffer physical and

---

[23] False arrest and malicious prosecution (Claim 8) are discussed in V., A. above.

emotional harm, including physical ailments resulting from the circumstances and duration of his wrongful incarceration." ECF 1  ¶ 283. *See id*., ¶¶ 188-190.

As for Defendant's argument that Claim 9 "falls well within the ambit of other traditional tort liability," e.g., ECF 40-1 at 39, quoting *dicta* in *Fischer v. Maloney*, 402 N.Y.S.2d 991 (1978),[24] which was decided almost 50 years ago under factually distinguishable circumstances.  Defendants identify no such "traditional tort."  These facts are a far cry from the battery in *Salmon v. Blesse*r, 802 F.3d 249 (2nd Cir. 2015) or the minor vandalism between neighbors described in *Seltzer v. Baye*, 272 A.D.2d 263 (1st Dept. 2000)(both cited ECF 40-1 at 39).  Elsewhere, Defendants argue that Mr. Kweller's allegations are ***no**t* within the ambit of malicious prosecution or *Brady*, which defeats their argument on Claim 9.  Acts like those alleged here are sufficient at the pleading stage. See e.g. *Gonzalez v. Bratton*, 147 F. Supp. 2d 180, 194 (S.D.N.Y. 2001), *aff'd,* 48 F. App'x 363 (2d Cir. 2002) (collecting cases, observing that filing a false complaint has been held to satisfy the elements of intentional infliction of emotional distress)(citing *Levine v. Gurney,* 149 A.D.2d 473, 539 N.Y.S.2d 967, 968 (N.Y.App. Div.2d Dep't 1989)).

Defendants are also wrong to urge dismissal of the claim for negligent infliction of emotional distress on the theory that they owed no duty to Plaintiff. The duty alleged here is "more than that owed the public generally"(see *Valdez v. City of New York*, 18

---

[24] See *Turner v. Manhattan Bowery Mgmt. Corp*., 49 Misc. 3d 1220(A), 28 N.Y.S.3d 651 (N.Y. Sup. Ct. 2015)(declining to follow *Fischer*'s *dicta*). See *Fischer*, 402 N.Y.S.2d at 993 ("***it may be questioned*** whether the doctrine of liability for intentional infliction of extreme emotional distress should be applicable where the conduct complained of falls well within the ambit of other traditional tort liability, here malicious prosecution and abuse of process") (emphasis added).

N.Y.3d 69, 75, 960 N.E.2d 356 (2011)). Here, Defendants had already established a

relationship with Plaintiff. He was cooperating. He was at great risk of harm if the

Defendants were negligent).  Here, there was an "affirmative undertaking" by the police,

i.e., that they would investigate the case and obtain the evidence Plaintiff told them

would completely exonerate him. They thus created the type of "justifiable reliance" that

warrants holding a municipality liable for negligence in performing a governmental

function. Cf. *Cuffy v. City of New York*, 505 N.E.2d 937 (N.Y. 1987) (discussing

limitations on duty to provide police protection).

The City defendants further argue they cannot be liable on a negligence theory

because their actions and inactions were within their discretionary authority. ECF 40-1 at

44-45, citing *Gabriel v. City of New York*, 89 A.D.3d 982, 983, 933 N.Y.S.2d 360 (2d

Dept. 2011). There, police found a murdered child, but because the body was

unidentified, they could not notify the deceased child's parents. Those facts are

distinguishable and of no value to Defendants here. See *Rugova v. City of New York*, 132

A.D.3d 220, 16 N.Y.S.3d 233 (2015) (disagreeing with *Gabriel* and permitting lawsuit).

### B.  Due Process and Search and Seizure (Claim 10)

The County and City Defendants argue that Claim 10 duplicates Claims 2 and 8

and other state torts provide remedies; therefore, they argue, the state constitutional

claims cannot be brought as separate state law claims. ECF 40-1 at 35-36; ECF 57-1 at

23-24. They do not explain how these other remedies could reach them under a theory of

Respondeat Superior. Thus, this Court should deny the motions for the same reason as in

*Buari*:

**76**

> [T]he City does not identify an alternative state cause of action that could have
> been brought to redress Plaintiff's due process claim against the City based on a
> *respondeat superior* theory. Accordingly, as other courts in this Circuit have held,
> Plaintiff's 'state constitutional due process claim[ ] against the City' may 'survive
> to the extent [it is] based on a *respondeat superior* theory.' *See Buari*, 530
> F.Supp.3d at 409-410. The City's motion to dismiss Plaintiff's due process claim
> under Article I § 6 of the New York State Constitution is denied.

*Rodriguez v. City of New York,* 623 F. Supp. 3d 225, 259–60 (S.D.N.Y. 2022).

"§ 1983 is not an adequate alternative remedy for state-constitutional claims that

rely on a theory of respondeat superior," and claims seeking to hold a municipality liable

under such a theory may survive. *Alwan v. City of New York*, 311 F. Supp. 3d 570, 587

(E.D.N.Y. 2018); *Buari*, 530. F. Supp. 3d at 409 (collecting cases). See *Johnson v. City*

*of New York,* No. 22-CV-3320 (DG)(PK), 2023 WL 11868258, at *13 (E.D.N.Y. Sept.

15, 2023) ("Because Section 1983 is not an adequate alternative remedy for Plaintiff's

state constitutional claims against the City, a private right of action for his claim exists

under the New York State Constitution.").

## C.  Respondeat Superior (Claim 11)

The City and County Defendants seek to avoid liability by arguing that the city

employees were working within the scope of their employment, the employees had never

done this before, so the employer(s) had no notice, that there is no underlying tort and

governmental immunity applies. ECF 40-1 at 42-43; ECF 57-1 at 24-25. This Court

should reject these claims.

Plaintiff has plausibly alleged that Defendants Korchak and Loughran, as

supervisors, were well aware of the great risk that Defendant Congdon had a propensity

for future misconduct. Korchak and Loughran knew Congdon had no experience and

hadn't had sufficient training. ECF 1 ¶¶ 235-236. *She told Congdon she was unprepared.* *Id*., ¶ 237. See also *id*., ¶ 125 (Congdon was provided no supervision, correction or instruction in the critical pre-arrest period). Her violations are alleged to have resulted from her supervisor's actions and inactions; the supervisors are alleged to have been involved enough to be aware of her misconduct in numerous of the events. E.g., ECF 1, ¶¶ 123 (DNA), 127 (Korchak and Loughran ceded authority to Congdon), 239 (same), 119, 143-144, 150-154, 173 (investigation and discovery), 124, 162-171 (phones and electronic data), 159, 179 (instructional errors and false certificate of compliance). The same is true of the City Defendants, supervisors Zikuski and Minor. In addition to the above paragraphs (many of which include allegations naming or pertinent to the allegations against the City), *see e.g.* ECF 1, ¶¶ 110, 122-124, 147, 259-260. At this early stage of the proceedings, because the claims are plausibly pled, this Court should deny the motion to dismiss Claim 11.

### D.  Abuse of Process (Claim 12)

A  malicious abuse-of-process claim lies against a defendant who "(1) employs regularly issued legal process to compel performance or forbearance of some act (2) with intent to do harm without excuse of justification, and (3) in order to obtain a collateral objective that is outside the legitimate ends of the process." *Cook v. Sheldon,* 41 F.3d 73, 80 (2d Cir.1994). The Complaint sufficiently alleges facts supporting these elements.

Defendants Zikuski and Korchak argue that Plaintiff's allegations of their motivation for continuing the prosecution – i.e., to support Korchak's re-election and to quell public outcry – are unsupported by factual allegations. ECF 40-1 at 41; ECF 67-1 at

25. Zikuski and Korchak are mistaken. Plaintiff sets forth the extraordinary level of public outcry, from which a reasonable inference arises. ECF 1 ¶¶ 88-103. Korchak also makes factual allegations contradicting those in the Complaint; this factual dispute is inappropriate for resolution at this stage. ECF 67-1 at 25-26.  At this stage, if the allegations support two inferences, one favoring the defendants and one favoring the Plaintiff, the latter must be respected by this Court. *Cf. In re Aluminum Warehousing Antitrust Litigation*, 95 F. Supp. 3d 419 (S.D.N.Y. 2015) (if a fact is susceptible to two or more competing inferences, the court must draw the inference that favors the plaintiff if it is reasonable).

This Court may not weigh the evidence in the guise of a plausibility analysis. *See Twombly,* 550 U.S. at 556. Under the proper standards, this Court should deny the motion to dismiss because Plaintiff's allegations "nudge [his]  claims ... across the line from conceivable to plausible." *Iqbal,* 556 U.S. at 679–80 (quoting *Twombly,* 550 U.S. at 570).

## CONCLUSION

Defendants' motions to dismiss the Complaint should be denied.  If this Court finds that any claim is subject to dismissal, Plaintiff respectfully requests that the Court grant leave to amend. *See Iqbal,* at 687. See also F. R.C.P. 15(a)(2)("[t]he court should freely give leave when justice so requires."). This is the preferred practice. *Garvey v. Face of Beauty LLC*, 634 F. Supp. 3d 84, 98 (S.D.N.Y. 2022) ("When granting a motion to dismiss 'leave to amend at least once should normally be granted as a matter of course.'")(quoting *Oliver Schools, Inc. v. Foley*, 930 F.2d 248, 253 (2d Cir. 1991)). "It is the usual practice upon granting a motion to dismiss to allow leave to replead."  *Cruz v. Loc. 32BJ,* No. 22-CV-03068 (JAV) (SDA), 2025 WL 47936, at *2 (S.D.N.Y. Jan. 8,

2025). *See Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991).

"Without the benefit of a ruling [on a motion to dismiss], many a plaintiff will not see the

necessity of amendment or be in a position to weigh the practicality and possible means

of curing specific deficiencies." *Loreley Fin. v. Wells Fargo Secs., LLC*, 797 F.3d 160,

190 (2d Cir. 2015).

Dated: March 24, 2025                               Respectfully Submitted,

                                                    /s/ Karen A. Newirth
                                                    Karen A. Newirth
                                                    N.D.N.Y. Bar Roll Number 705865
NEWIRTH LINEHAN PLLC
43 West 43rd Street, Suite 160
New York, NY 10036
(917) 426-5551
karen@newirthlinehan.com

/s/Oscar Michelen
N.D.N.Y. Bar Roll Number 705863
CUOMO LLC
200 Old Country Road
Suite 2 South
Mineola, NY 11501
(516) 741-3222
omichelen@cuomollc.com

/s/Elena Fast
N.D.N.Y. Bar Roll Number 702080
THE FAST LAW FIRM
521 Fifth Avenue, 17 Floor
New York, NY 10175
(212) 729-9494
elena@fastlawpc.com

*Attorneys for Plaintiff Yaron Kweller*

**80**