**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

YARON KWELLER,

          Plaintiff,

                                      3:24-CV-1328 (AJB/ML)

       -v-

The COUNTY OF BROOME, *et al.*,

          Defendants.

**Hon. Anthony Brindisi, U.S. District Judge:**

**<u>DECISION and ORDER</u>**

## I.      INTRODUCTION

On October 30, 2024, plaintiff Yaron Kweller ("plaintiff") filed this 42 U.S.C. § 1983 action against defendants Hailey Demkovich, Samantha Herceg, the City of Binghamton (the "City"), City Police Chief Joseph Zikuski ("Chief Zikuski"), City Police Captain Cory Minor ("Captain Minor"), City Police Investigator Amanda Miller ("Investigator Miller"), the County of Broome (the "County"), the Broome County District Attorney's Office ("BCDA"), Broome County District Attorney Michael Korchak ("DA Korchak"), Broome County Chief Assistant District Attorney Mark Loughran ("Chief ADA Loughran"), Broome County Assistant District Attorneys Alyssa Congdon ("ADA Congdon") and Amanda Cronin ("ADA Cronin"), BCDA Investigator Jeff Wagner ("BCDA Investigator Wagner"), and unidentified BCDA and City Police Department employees # 1–10 (the "Does").  Dkt. No. 1.

In short, plaintiff alleges that Hailey Demkovich and Samantha Herceg falsely accused him of rape, the Binghamton Police Department ("BPD") inadequately investigated those false

allegations, and the BCDA deliberately disregarded exculpatory evidence and chose to prosecute him anyway. *See generally* Dkt. No. 1. Plaintiff was acquitted of all charges after a jury trial.

The twelve-count complaint asserts 42 U.S.C. § 1983 claims for "False Arrest and Malicious Prosecution" (Count I); "Due Process and Denial of the Right to a Fair Trial" (Count II), "Failure to Intervene" (Count III), "Supervisory Liability" (Count IV), "*Monell* Liability" (Counts V & VI), "Civil Rights Conspiracy" (Count VII), as well as related state law claims for "False Arrest and Malicious Prosecution" (Count VIII), "Intentional, Reckless, or Negligent Infliction of Emotional Distress" (Count IX), violations of Article I, Sections 6 and 12 of the New York State Constitution (Count X), "*Respondeat Superior*" (Count XI), and "Abuse of Process" (Count XII). Dkt. No. 1, ¶¶ 191–302.[1]

Defendants Hailey Demkovich and Samantha Herceg answered the complaint, Dkt. Nos. 37, 39, but the other groups of defendants[2] have moved to dismiss the pleading pursuant to Federal Rule of Civil Procedure 12(b)(6). Dkt. Nos. 40, 57, 65, 67, 74.

Defendants' motions have been fully briefed,[3] *see* Dkt. Nos. 40, 57, 65, 67, 74, 80, 96–100, and will be considered on the basis of the submissions without oral argument.

## II.    BACKGROUND

The following facts are taken from the complaint and will be assumed true for the purpose of assessing defendants' motions to dismiss.

---

[1] The complaint is sequentially numbered by line. Accordingly, citations to the pleading correspond with that document's internal pagination.

[2] BCDA Investigator Jeff Wagner originally defaulted. Dkt. No. 76. After the entry of default was vacated, Dkt. No. 94, he too moved to dismiss plaintiff's claims, Dkt. No. 101. That motion will not be addressed here. This decision resolves only the motions filed by DA Korchak, Chief ADA Loughran, ADA Congdon, ADA Cronin, Chief Zikuski, Captain Minor, Investigator Miller, the City, and the County.

[3] Pagination corresponds to the electronically generated CM/ECF headers.

Plaintiff Yaron Kweller co-owns several bars and restaurants in downtown Binghamton. Dkt. No. 1 ("Compl."). On the night of November 26, 2021, plaintiff and his brother, Leor Kweller ("Leor"), went to visit some of plaintiff's bars and restaurants including the Colonial, the Stone Fox, and Dos Rios Cantina. Compl. ¶ 24. The brothers arrived at Dos Rios Cantina around 10:00 p.m., staying for some time before going to the Colonial, and eventually, the Stone Fox. *Id.* ¶ 25.

At the Stone Fox, the brothers met up with Jordan Rindgen ("Rindgen"), the general manager of the Colonial, the Stone Fox, and Dos Rios Cantina. Compl. ¶ 26. After Rindgen clocked out, he and the brothers went to Dillinger's, a nearby bar not owned by plaintiff. *Id.* The three arrived at Dillinger's sometime after midnight. *Id.* There, an unknown woman, later identified as Samantha Herceg ("Herceg"), approached plaintiff. *Id.* ¶ 27. Leor and Rindgen purchased a round of alcoholic beverages and shots of alcohol for themselves, plaintiff, and Herceg. *Id.*

Around 2:00 a.m., plaintiff, Leor, Rindgen, and Herceg walked to the Stone Fox. Compl. ¶ 28. The Stone Fox had since closed, but Rindgen went inside and returned with a bottle of wine and canned alcoholic seltzers. *Id.* The four then traveled to plaintiff's business office, which was located nearby. *Id.* ¶ 29. While there, Herceg invited friends to join the group at plaintiff's office. *Id.* ¶ 32. Among those invited was Haley Demkovich ("Demkovich"), who arrived at plaintiff's office a short time later. *Id.* ¶¶ 32–33.

Once Demkovich arrived, the group went to the Colonial. Compl. ¶ 36. At the Colonial, Herceg and Demkovich (the "complainants") ordered shots of alcohol and began to kiss each other. *Id.* ¶¶ 38–39. The complainants approached and kissed Rindgen, who was socializing with plaintiff and Leor. *Id.* ¶ 39. The complainants "danced together in a sexual manner," and

"also danced sexually with [p]laintiff." *Id.*  Surveillance cameras inside the Colonial captured footage of these events.  *Id.* ¶ 40.

Around 3:00 a.m., the Colonial closed for the night, and the five returned to plaintiff's office.  Compl. ¶ 41.  The complainants went into the bathroom together, emerging partially undressed before disrobing completely and engaging in sexual contact with one another in front of plaintiff, Leor, and Rindgen.  *Id.* ¶ 45.  Rindgen and the complainants used cocaine together. *Id.* ¶ 46.

Then, Rindgen and Demkovich "began kissing and touching each other sexually.  When [p]laintiff approached them . . . Demkovich initiated oral sex on [p]laintiff."  Compl. ¶ 47. Demkovich "told [p]laintiff in sum and substance that she wanted to have unprotected sex with him."  *Id.* ¶ 48.  "Plaintiff obtained a condom.  Plaintiff and Defendant Demkovich did not, however, have sexual intercourse."  *Id.* ¶ 49.  "[A]pproximately forty-five minutes after the group had returned to the office for the second time . . . Herceg and Demkovich told [p]laintiff, his brother Leor, and . . . Rindgen that they were ready to go home."  *Id.* ¶ 50.  Surveillance cameras captured the complainants leaving plaintiff's office and walking toward a parking garage at 3:48 a.m.  *Id.* ¶ 83.

Later the same day, the complainants reported to the New York State Police that they had been sexually assaulted and underwent rape examinations.  Compl. ¶¶ 69, 161(a).  The State Police advised the complainants to contact the Binghamton Police Department.  *Id.*

That evening, Demkovich's boyfriend called the Colonial to report that the owners had drugged and raped Demkovich the night before.  Compl. ¶ 57.  Rindgen, who also worked as a general manager at the Colonial, informed plaintiff that Demkovich's boyfriend had called, and plaintiff contacted a friend in BPD, Detective Bob Fimbres, who confirmed that a report had

been filed against the men.  *Id.* ¶¶ 57–60.  Plaintiff promptly retained counsel and voluntarily took a private drug test.  *Id.* ¶¶ 61–62.

The next day, November 28, 2021, BPD Investigator Miller was assigned to investigate the complainants' allegations.  Compl. ¶ 70.  Miller separately interviewed the complainants, who restated their accusations and provided text messages and photographs from the night of the alleged assault.  *Id.* ¶ 72.  Demkovich allegedly told Investigator Miller that she was questioning whether she was raped or whether the physical or sexual contact was consensual, but this statement was never recorded.  *Id.* ¶ 75.  Two days later, plaintiff's attorney provided Investigator Miller with surveillance footage from inside the Colonial.  *Id.* ¶ 80.

On December 6, 2021, Investigator Miller and Captain Minor, her supervisor, executed a search warrant at plaintiff's office, where the alleged assaults occurred, but they recovered no physical evidence.  Compl. ¶ 82.  BPD did, however, obtain third-party surveillance footage that covered the street area surrounding plaintiff's office.  *Id.* ¶ 83.

On December 8, 2021, newly hired ADA Congdon attended a meeting with DA Korchak, Chief ADA Loughran, Captain Minor, and Investigator Miller to discuss the investigation into complainants' allegations.  *Id.* ¶ 106.  Chief ADA Loughran suggested that BPD and the BCDA attempt to obtain the complainants' phones.  *Id.* ¶ 107.  After the meeting, DA Korchak and Chief ADA Loughran assigned ADA Congdon to the investigation.  *Id.* ¶ 108.  ADA Congdon was a criminal defense lawyer for almost a decade, but had never worked as a prosecutor.  *Id.* ¶ 105.

On December 9, 2021, Chief Zikuski allegedly told plaintiff's defense attorney, F. Paul Battisti, that he advised against filing criminal charges against the men at that time.  Compl. ¶ 92.  Meanwhile, rumors of the complainants' allegations began to spread throughout the Binghamton

community.  Compl.  ¶ 88.  Public outrage intensified as local news outlets picked up the story.

*Id*.  Soon, other putative assault victims came forward with their own allegations against plaintiff

and Rindgen.  *Id.*  On social media, groups planned a protest against the Colonial and its owners.

*Id.* ¶ 90.  Notwithstanding Chief Zikuski's statement to plaintiff's then-attorney, BPD released a

public statement on December 10, 2021, "stating that it is investigating a November 28, 2021[,]

incident involving the owners of the Colonial and that it is aware of additional allegations being

made on social media."  *Id.* ¶ 94.  DA Korchak issued a similar statement on behalf of the

BCDA, "encourag[ing] those with knowledge to contact the BCDA[ ] or local police

departments."  *Id.* ¶ 95.

On December 14, 2021, Chief ADA Loughran, Investigator Miller, ADA Congdon, and a

BCDA investigator met separately with the complainants, seeking consent to extract electronic

data from their cell phones.  Compl. ¶ 111.  But the complainants refused.  *Id.*  A week later,

plaintiff's defense attorney filed an order to show cause in county court requesting preservation

of the complainants' cell phone data.  *Id.*  ¶ 113.  The BCDA opposed this motion, but continued

their own attempts to obtain the complainants' consent to access this data.  *Id.* ¶¶ 114–15.  The

motion was denied on January 21, 2022, because no criminal action was pending against plaintiff

or Leor at the time.  *Id.* ¶ 121.

Sometime during the investigation, the complainants retained attorney Thomas Saitta.

Compl. ¶ 116.  On January 14, 2022, Saitta informed ADA Congdon that he had a folder

containing printouts of the complainants' electronic data (the "Saitta folder").  *Id.* ¶ 117.  ADA

Congdon directed BCDA Investigator Jeff Wagner to pick up the Saitta folder, but it was never

retrieved.  *Id.* ¶¶ 118–19.  Throughout January 2022, members of the BCDA, including ADA

Congdon and Chief ADA Loughran, continued to seek consent to extract electronic data from the complainants' phones. *Id.* ¶ 120. Those attempts were unsuccessful. *Id.*

ADA Congdon worked closely with BPD during the investigation. Compl. ¶ 122. For instance, she worked with Investigator Miller to draft a search warrant to obtain plaintiff's DNA. *Id.* According to the complaint, "Congdon did not know that she could apply directly to a court to obtain a suspect's DNA and neither she, . . . Miller, or anyone at BCDA[ ] or BPD knew how to draft an appropriate application." *Id.*

Though ADA Congdon was given "ultimate decision-making authority" over the investigation, she met with DA Korchak and Chief ADA Loughran multiple times between November 2021 and February 2022. Compl. ¶¶ 127, 125.

Ultimately, on February 22, 2022, ADA Congdon met with BPD officers and decided to file criminal charges against plaintiff, Leor, and Rindgen. *Id.* ¶ 133. Members of the press were present at the courthouse when plaintiff, Leor, and Rindgen were arrested and charged. *Id.* ¶ 135. Plaintiff was "charged with Rape in the Third Degree in violation of New York Penal Law section 130.25(d), a Class E Felony." *Id.* ¶ 136.

At some point, the BCDA hired ADA Cronin to assist ADA Congdon with plaintiff's prosecution. Compl. ¶ 129. ADA Cronin had worked as a sex crimes prosecutor for a number of years. *Id.*

After plaintiff's arrest, he continued to urge members of BPD and the BCDA to obtain the complainants' electronic data. Compl. ¶ 142. On or about March 10, 2022, plaintiff "filed a motion pursuant to C.P.L. § 245.50(3) seeking to compel preservation and disclosure of forensic images of [the complainants'] cell phones." *Id.* ¶ 142(b). But BPD and the BCDA opposed, and plaintiff's motion was denied, "based, in part, on the allegedly speculative nature of [p]laintiff's

arguments that the phones would contain relevant, material, admissible evidence and due in part to the lack of jurisdiction over what was at that time a local court matter." *Id.*  Plaintiff also subpoenaed cell phone carriers and social media companies in an attempt to independently obtain the complainants' electronic data. *Id.* ¶ 142(c).  But unbeknownst to plaintiff at the time, Herceg obtained a new phone and iCloud account sometime in March 2022.  *Id.* ¶ 171.

ADA Congdon decided to present the case to a grand jury at the end of March 2022. Compl. ¶ 154.  Chief ADA Loughran and ADA Cronin assisted ADA Congdon in presenting the case.  *Id.* ¶ 156.  Nevertheless, according to plaintiff, ADA Congdon erroneously "charged the Grand Jury with regard to a corroboration requirement on sexual assault cases that was repealed by the legislature in 1974" and misstated the legal standard for the return of an indictment.  *Id.* ¶ 179 (internal quotation omitted).

"The Grand Jury returned an indictment as to [p]laintiff, charging him with Rape in the First Degree in violation of New York Penal Law § 130.35, a Class 'B' violent felony . . . and Sexual Abuse in the First Degree, in violation of New York Penal Law § 130.65, class 'D' violent felony."  *Id.* ¶ 157.  Plaintiff was arraigned in Broome County Court and pleaded not guilty to both charges on March 31, 2022.  Compl. ¶ 158.

In June 2022, Leor consented to a buccal DNA swab.  Compl. ¶ 161.  His DNA was compared only with the material obtained from Herceg's rape kit, as the material obtained from Demkovich's rape examination was unsuitable for testing.  *Id.* ¶ 161(a).  A two-male DNA profile mixture was obtained from Herceg's rape kit, despite her earlier claim that she had not had any other sexual partners for more than a month prior to the alleged assault.  *Id.* ¶ 161(b).  At some point during the investigation, Herceg revealed to authorities a possible consensual sexual

partner from the relevant period, but that person was excluded as a contributor to the DNA profile.  *Id.* ¶ 161(d).

Leor was also excluded as a contributor to the mixture obtained from Herceg's rape kit. Compl. ¶ 161.  And "[b]ecause the method of testing applied to Leor['s] biological material was Y-STR, [p]laintiff[,] as his biological brother[,] was also excluded as a contributor."  *Id.* ¶ 161(e).

On July 11, 2022, counsel for plaintiff, Leor, and Rindgen moved to compel production of the complainants' phones.  Compl. ¶ 163.  On August 5, 2022, while the motion to compel remained pending, ADA Congdon notified the defense that complainants had agreed to allow BPD to image their phones.  *Id.* ¶ 164.

On November 10, 2022, the BCDA received a hard drive containing extractions of the complainants' electronic data.  Compl. ¶ 165.  The BCDA insisted plaintiff's counsel review the data on the hard drive at BCDA's office, despite lacking the appropriate technology to permit productive review of the materials.  *Id.* ¶ 167.  Plaintiff's counsel repeatedly requested access to the hard drive, but the BCDA refused to furnish it without a protective order.  *Id.* ¶ 168.

In January 2023, plaintiff's counsel sought court intervention, and the presiding judge ordered ADA Congdon and ADA Cronin to turn over the hard drive before February 13, 2023. Compl. ¶ 169.  The parties executed a protective order, and ADA Congdon turned over a report containing the data extracted from Demkovich's phone (the "BCDA report").  *Id.* ¶ 170. Plaintiff never received a copy of the data from Herceg's phone because she had obtained a new phone and iCloud account in March 2022.  *Id.* ¶ 171.

On February 14, 2023, plaintiff's attorney and private investigators began reviewing the BCDA report.  Compl. ¶ 172.  They discovered relevant exculpatory and impeaching text

messages. *Id.* They also discovered that both complainants had given their electronic data from the relevant period to their attorney, Saitta, before Herceg had gotten a new cell phone. *Id.* ¶ 174. For some reason, though, the BCDA had yet to retrieve the Saitta folder. *Id.* ¶ 176.

On February 24, 2023, counsel for plaintiff, Leor, and Rindgen filed a joint motion seeking dismissal of all charges. Compl. ¶ 177. The motion was granted in part, but only the charges against Leor were dismissed. *Id.* ¶ 178.

On June 22, 2023, plaintiff's counsel sought a judicial subpoena for the Saitta folder. Compl. ¶ 181. The court issued a subpoena on July 5, 2023, and Saitta provided the records to plaintiff's counsel. *Id.* ¶ 182. The records contained new exculpatory material not contained in the BCDA report. *Id.*

Plaintiff obtained the following text messages from the BCDA report and the Saitta folder:[4]

    a. November 27, 2021 - Defendant Demkovich to a Third Party: "I don't want anyone to know…." "And it was consensual. I knew what was happening. But those guys should be fucking disgusted with themselves."

    b. November 27, 2021 - Defendant Demkovich to Defendant Herceg: "And I remember saying to Jordan I was like I better not get denied at any of ur bars."

    c. November 27, 2021 - Defendant Herceg to Defendant Demkovich: "Like I can't have this get out…"

    d. November 28, 2021 - Exchange between Defendant Herceg and Defendant Demkovich (referencing Defendant Miller): "I am not gonna show her those" Herceg: "I don't think you should" Demkovich: "I am 100% not going to" Herceg: "I am worried about her calling stupid f**king Bianca"

    e. November 29, 2021 - Defendant Herceg to Defendant Demkovich and a Third Party: "I'm settling for nothing Less then a million"

---

[4] Plaintiff does not distinguish the messages in the BCDA report from those in the Saitta folder. Compl. ¶ 68.

f.  November 29, 2021 - Defendant Herceg to Defendant Demkovich and a Third Party: (referring to Plaintiff and Mr. Rindgen) "I want the Benz and the Beamer" "And both their houses"

g.  November 29, 2021 - Defendant Herceg and Defendant Demkovich and a Third Party: (referring to Plaintiff and Mr. Rindgen) "I want all their bars . . ."

h.  November 29, 2021 - Defendant Herceg to Defendant Demkovich: "Yup 100% but i do remember being at Alisha's and when she said we were at Jordan's i was like wtf we were w them? And she was like yeah haikey said u guys got raped and obviously I'm still drunk I'm like whattt no way it doesn't even feel like I've had sex i don't think anything happened and Alisha was like exactly"

i.  November 30, 2021 - Defendant Demkovich to Defendant Herceg and Third Parties: "the reason i had to call 911 is because when i told my parents my dad literally got in the car and was headed straight to downtown"

j.  December 3, 2021 - Defendant Demkovich instant messages to Defendant Herceg and Third Parties: "if you guys have any photos of us drinking if u could delete them that would be good" "we can't erase everything but minimize it as much as possible" "Danayah maybe archive ur disposals of them on insta" "i might just delete any risky pics" "i need to go on my computer to delete my vsco"

k.  December 3, 2021- Defendant Herceg instant message to Defendant Demkovich: "I've deleted all my posts and changed my user name to no lastnight and trying to delete all my republishes"

l.  December 3, 2021 from a Third Party to Defendant Demkovich, Defendant Herceg, and Third Parties: "i already deleted everything w [Herceg] in it and everything hailet sent me to delete"

m.  December 7, 2021 from a Third Party ("T.P.") to Defendant Demkovich: T.P.: "it da took me 5 mins of silence to go all the way back up to the messages that night" Demkovich.: "mad far and i don't even have them bc i think i accidentally deleted them that night" T.P.: "yeah i deleted them all out of your phone bc u were going to dylan's [Demkovich.'s then boyfriend]"

n.  December 7, 2021 from a Third Party to Defendant Demkovich: "and then i told her that when [Herceg] came over she told me she didn't have sex but she turned the corner and saw you but thats all she could remember" "bro yeah she [Herceg] was like that whole night i would know if i got fucked i don't feel anything in my vagina but it was prob bc bitch was numb af"

o.  December 8, 2021 - Defendant Demkovich. to Defendant Herceg: "okay so i'm slightly panicking at work because i was just reading my texts from the day after the incident and i said to danayah that it was consensual and that i knew what was happening. but the whole day after the incident i was questioning if i

got raped and i thought it might be classified as consensual because i didn't say no."

p. December 8, 2021 - Defendant Herceg to Defendant Demkovich: "Trust me i was panicking too [about the text messages] Bc i said in the groupchat that night "I'd fuck"

q. December 8, 2021 - Defendant Herceg to Defendant Demkovich: "I don't think you have anything to worry about. Bc if she did get the subpoena [for the phone messages] I'm sure she only got it from the times of like 1-4am"

r. December 8, 2021 - from Defendant Herceg. to Defendant Demkovich and Third Parties: "Yes i deleted everything then made it private and changed everything"

s. December 27, 2021 Defendant Demkovich to her mother - (after defense counsel served and filed an Order to Show Cause on December 22, 2021, requesting preservation of the Defendants Herceg and Demkovich's cell phones): "i told you i have a message of me saying it was consensual the day after, because i was confused and not in the right head space if the defense sees it, i'm done"

t. December 27, 2021 - Defendant Demkovich. to Defendant Herceg.: "and i have a message of me saying it's consensual" "the day after"

u. December 27, 2021 - Defendant Herceg to Defendant Demkovich: "I have messages w Alisha saying I'd fuck ring ding [Jordan Rindgen]"

v. December 27, 2021 - Defendant Demkovich. to Defendant Herceg: "yeah they will take the message of me saying it's consensual and i'm done" "the lawyer tom [Saitta] needs to make it so they can't get our phones period"

w. December 28, 2021 - Defendant Demkovich to her mother: "I told them [BPD] the next day I was questioning if what happened to me was actually rape . . . "

x. December 28, 2021 - Defendant Demkovich to her mother: "i accidentally deleted one text it was in the group text"

y. December 28, 2021 - text message from Defendant Demkovich to Defendant Herceg: "i told him i said it was consensual" "i'm just worried that I said more than once it was consensual" "i said something about it being consensual"

z. January 13, 2022 - Defendant Demkovich to her mother: "I just don't want [Herceg's] parents to judge me for saying it was consensual"

aa. January 14, 2022 - Defendant Demkovich to Defendant Herceg: "i really don't see why they'd still want to supoena our phones after i've provided all of That" "so fingers crossed"

- 12 -

bb. March 7, 2022 - Defendant Herceg to Defendant Demkovich: "My parents wanted us to press charges because why tf would we not if the cops are called and we're getting fucking rape kits done. I told my mom the second i told her i didn't want the cops involved. I didn't have a choice in that matter. Whoever is telling you what you're doing is okay is enabling bad behavior that is literally gonna take a shit on you in the future, again you've already said it was consensual and now you're acting essentially like nothing happened which is exactly what the defense is gonna say. So good luck w that, trying to get you to understand is like talking to a brick wall. Maybe 30 days now hailey they have to turn in every last bit of evidence if you think they aren't watching you right now more then ever you'd be fucking dumb. I've said what i had to say to you now three times and I'm sure you'll go right behind my back and disrespect me a fourth. What you do reflects you, not me so idk what i give a fuck anyway."

cc. June 6, 2022 - Defendant Demkovich to her mother: "and the text messages i sent really fuck me up" "i didn't know because i didn't say no"

dd. June 13, 2022 - Defendant Herceg to Defendant Demkovich: ". . . Fuck you hailey you're a piece of shit. You think you sit in a high horse bc you "came looking for me" that night "only one who cared" no you didn't. If you thought I was in such danger like you say then you would've called the cops you would've brought everyone there w you to get me out. You came for what you thought was gonna be a good time. You're a garbage human who see nothing wrong w their actions."

ee. June 15, 2022 - Defendant Herceg to a Third Party: "She [Demkovich] told Bianca on FaceTime on her walk to "save me" that she wanted to fuck Jordan [Rindgen], she wanted to go because she wanted to sleep w Jordan. Not to come save me" . . . "And she came for what she thought was going to be a good time" . . . "I don't remember anything from that night" "Everything I know is from he[r] [Demkovich]"

ff. July 25, 2022 - Defendant Demkovich to her mother: "i wanna drop the charges" Demkovich's mother: "[Herceg] got a new phone…" "No access to her old cloud" Demkovich: "and i texted [Herceg] and she got a new phone so they didn't subpoena hers"

Compl. ¶ 68(a)–(ff) (errors in original).

On October 23, 2023, plaintiff and Rindgen took the criminal case to trial. Compl. ¶ 183. At some point during the trial, Herceg testified "that she was instructed to destroy electronic data relating to the night in question by . . . [ADA] Congdon, the lead prosecutor on the case, and that she did in fact destroy that evidence." *Id.* ¶ 66. She also revealed that she had not been shown

- 13 -

the surveillance footage at any point in the investigation.  *Id.* ¶ 87.  The jury deliberated for around two hours before returning a verdict.  *Id.* ¶ 184.

Plaintiff and Rindgen were acquitted of all charges on October 31, 2023.  Compl. ¶ 184.

## III.    LEGAL STANDARD

The Federal Rules of Civil Procedure permit a party to move to dismiss a pleading for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  To survive dismissal, "a complaint must contain sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*; *see also Ginsburg v. City of Ithaca*, 839 F. Supp. 2d 537, 540 (N.D.N.Y. 2012) ("[T]he '[f]actual allegations must be enough to raise a right to relief above the speculative level.'") (quoting *Twombly*, 550 U.S. at 555).

To assess this facial plausibility requirement, the court "must accept as true all of the factual allegations contained in the complaint," *Erickson v. Pardus*, 551 U.S. 89, 94 (2007), and draw all reasonable inferences in favor of the plaintiff, *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002).   In doing so, the court generally confines itself to the facts alleged in the pleading, documents attached to the complaint or incorporated into it by reference, and matters of which judicial notice may be taken.  *Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016).

IV.    **DISCUSSION**

Chief Zikuski, Captain Minor, Investigator Miller, DA Korchak, Chief ADA Loughran,

ADA Cronin, ADA Congdon, the City, and the County have moved to dismiss all of plaintiff's

claims against them.  *See* Dkt. No. 40, 57, 65, 67, 74.

Plaintiff asserts a number of § 1983 claims against the moving defendants including:

(1) False arrest, against Chief Zikuski, Captain Minor, Investigator Miller (collectively, the "individual BPD defendants"), DA Korchak, ADA Cronin, and ADA Congdon, Compl. ¶¶ 191–97;

(2) Malicious prosecution, against the individual BPD defendants, DA Korchak, ADA Cronin, and ADA Congdon, *id.*;

(3) Due process and denial of the right to a fair trial, against the individual BPD defendants, DA Korchak, ADA Cronin, and ADA Congdon, *id.* ¶¶ 198–205;

(4) Failure to intervene, against the individual BPD defendants, DA Korchak, Chief ADA Loughran, ADA Cronin, ADA Congdon (collectively, the "individual BCDA defendants"), the City, and the County, *id.* ¶¶ 206–10;

(5) Supervisory liability, against Chief Zikuski, Captain Minor, DA Korchak, and Chief ADA Loughran, *id.* ¶¶ 211–17;

(6) Municipal liability, against Chief Zikuski, Captain Minor, the City, and the County, *id.* ¶¶ 218–62; and

(7) Civil rights conspiracy, against the individual BPD defendants, the individual BCDA defendants, the BCDA, the City, and the County, *id.* ¶¶ 263–66.

Along with his § 1983 claims, plaintiff brings several related state law claims:

(1) False arrest, against the individual BPD defendants, the individual BCDA defendants, the BCDA, the City, and the County, Compl. ¶¶ 267–80;

(2) Malicious prosecution, against the individual BPD defendants, the individual BCDA defendants, the BCDA, the City, and the County, *id.* ¶¶ 267–80;

(3) Intentional, reckless, or negligent infliction of emotional distress, against the individual BPD defendants, the individual BCDA defendants, the BCDA, the City, and the County, *id.* ¶¶ 281–85;

(4) Violations of Article I, sections 6 and 12 of the New York State Constitution, against the individual BPD defendants, the individual BCDA defendants, the BCDA, the City, and the County, *id.* ¶¶ 286–89;

(5) *Respondeat superior*, against the City and the County, *id.* ¶¶ 290–94; and

(6) Abuse of process, against Chief Zikuski, DA Korchak, and the City, *id.* ¶¶ 295–302.

Defendants primarily argue that plaintiff has failed to plausibly allege any of these claims against them.  Dkt. No. 40 ("BPD Mem.") at 26–38; Dkt. No. 57 ("County Mem.") at 11–18; Dkt. No. 65 ("Congdon Mem.") at 20–28; Dkt. No. 67("Korchak & Loughran Mem.") at 14–24; Dkt. No. 74 ("Cronin Mem.") at 12–17.  In addition, the individual BCDA defendants contend that, to the extent plaintiff might have plausibly alleged any of these claims against them, they are entitled to absolute or, alternatively, qualified immunity.  Korchak & Loughran Mem. at 9–14; Congdon Mem. at 8–20; Cronin Mem. at 8–12.

In opposition, plaintiff maintains that he has plausibly alleged his § 1983 and state law claims against each of the moving defendants, and contends that their alleged conduct falls outside the scope of absolute or qualified immunity.  Dkt. No. 80 ("Pl.'s Opp.") at 45–91.

**A. Broome County District Attorney's Office**

As an initial matter, plaintiff has named Broome County and the BCDA as defendants in this action.  *See* Compl. ¶ 11.  He refers to the entities interchangeably, but the County argues that the BCDA is not a suable entity and must be dismissed.  Dkt. No. 57 ("County Mem.") at 9.

"The capacity of the District Attorney's Office to be sued is determined by state law." *Harris v. Tioga Cnty.*, 663 F. Supp. 3d 212, 233 (N.D.N.Y. 2023) (citing Fed. R. Civ. P. 17 (b)), *appeal dismissed*, 2024 WL 4179651 (2d Cir. Sept. 13, 2024).  "'Under New York law, departments which are merely administrative arms of a municipality, do not have a legal identity separate and apart from the municipality and cannot sue or be sued.'"  *Id.* (quoting *Hall v. City of*

*White Plains*, 185 F. Supp. 2d 293, 303 (S.D.N.Y. 2002)). "Courts have routinely applied this rule to conclude that 'the District Attorney's Office is not a suable entity.'" *Harris*, 663 F. Supp. at 233 (quoting *Woodward v. Office of Dist. Att'y*, 689 F. Supp. 2d 655, 658 (S.D.N.Y. 2010)).

Plaintiff concedes that "his claims against the BCDA[ ] should be construed as brought against the County." Pl.'s Opp. at 80–81. Accordingly, plaintiff's claims against the BCDA are dismissed, and allegations against the BCDA will be treated as if made against the County.

## B.  Absolute Immunity

The individual BCDA defendants argue that the doctrine of absolute prosecutorial immunity bars all of plaintiff's claims against them. Korchak & Loughran Mem. at 9–12; Cronin Mem. at 8–10; Congdon Mem. at 20–28. In opposition, plaintiff argues that absolute prosecutorial immunity does not apply here, because these defendants were "actively involved in the investigation—making strategic decisions, guiding the direction of the police investigation, and failing to disclose *Brady* material." Pl.'s Opp. at 16.

As the Second Circuit has repeatedly acknowledged, the principles affording prosecutors absolute prosecutorial immunity from § 1983 claims for damages are the same as those that protect a prosecutor from civil liability under state law. *Shmueli v. City of N.Y.*, 424 F.3d 231, 237–38 (2d Cir. 2005) (citing *Rudow v. City of N.Y.*, 822 F.2d 324, 329 (2d Cir. 1987)).

Absolute prosecutorial immunity is broad, applying even in situations where a prosecutor is alleged to have acted maliciously. *Johnson v. Town of Colonie*, 102 A.D.2d 925, 926 (N.Y. App. Div. 3d Dep't 1984) ("Actions performed by the prosecutor which are associated with the prosecutorial phase of the criminal process . . . bar civil liability for such action, even if it be assumed that such actions were done maliciously."); *Giraldo v. Kessler*, 694 F.3d 161, 166 (2d

Cir. 2012) ("[A]bsolute immunity applies to protect the prosecutor even in the face of a complaint's allegations of malicious or corrupt intent behind the acts.").

"In determining whether absolute prosecutorial immunity attaches, [courts] apply a 'functional approach.'" *Giraldo*, 694 F.3d at 165 (quoting *Hill v. City of N.Y.*, 45 F.3d 653, 660 (2d Cir. 1995); *see also Rodrigues v. City of N.Y.*, 193 A.D.2d 79, 86 (N.Y. App. Div. 1st Dep't 1993) ("[L]ike federal courts, the courts of [New York] take a functional approach when analyzing claims of immunity.").

## 1. Advocacy Function

Consistent with this "functional approach," courts find prosecutors absolutely immune for actions taken in connection with their advocacy functions. *Johnson v. Kings Cnty. Dist. Att'y's Off.*, 308 A.D.2d 278, 285 (N.Y. App. Div. 2d Dep't 2003) ("District Attorneys are immune from civil liability for activities 'intimately associated with the judicial phase of the criminal process,' meaning 'initiating a prosecution and in presenting the State's case.'" (quoting *Imbler v. Pachtman,* 424 U.S. 409, 430–31 (1976)). For instance, "a prosecutor enjoys absolute immunity when determining which offenses to charge, initiating a prosecution, presenting a case to a grand jury, and preparing for trial." *Anilao v. Spota*, 27 F.4th 855, 864 (2d Cir. 2022); *see also Blake v. City of N.Y.*, 148 A.D.3d 1101, 1104–05 (N.Y. App. Div. 2d Dep't 2017) (holding prosecutors entitled to absolute immunity for "activities in processing criminal charges after . . . arrest . . . based upon evidence assembled by police"); *Giraldo*, 694 F.3d at 167 (holding prosecutor entitled for absolute immunity for interviewing putative victim after suspect was arrested); *Flagler v. Trainor*, 663 F.3d 543, 550 (2d Cir. 2011) ("[A] prosecutor is absolutely immune for withholding/preserving evidence to be used in connection with a criminal prosecution.").

### 2. Investigative Function

However, prosecutorial immunity does not apply to a prosecutor's investigative activities. *See Simon v. City of N.Y.*, 727 F.3d 167, 172 (2d Cir. 2013) ("Investigation, arrest, and detention have historically and by precedent been regarded as the work of police, not prosecutors, and 'they do not become prosecutorial functions merely because a prosecutor has chosen to participate.'" (quoting *Day v. Morgenthau,* 909 F.2d 75, 77–78 (2d Cir.1990)).

"Although all investigative activity could be considered in some sense to be 'preparing for the initiation of judicial proceedings,'. . . the Supreme Court has sought to draw a line between . . . preparatory steps that a prosecutor takes to be an effective advocate of a case already assembled and . . . investigative steps taken to gather evidence." *Smith v. Garretto*, 147 F.3d 91, 94 (2d Cir. 1998) (quoting *Buckley v. Fitzsimmons*, 509 U.S. 259, 273 (1993))

In doing so, "[t]he Court has identified 'evaluating evidence and interviewing witnesses' as falling on the absolute immunity side of the line, leaving 'searching for the clues and corroboration' that might lead to a recommendation for an arrest on the qualified immunity side." *Smith v. Garretto*, 147 F.3d at 94 (quoting *Buckley,* 509 U.S. at 273); *Sculti v. Finley*, 167 A.D.3d 796, 797 (N.Y. App. Div. 2d Dep't 2018) ("Conduct in connection with the application for a search warrant is investigative in nature and, therefore, is governed by qualified immunity."); *Buckley*, 509 U.S. at 275  (holding prosecutor not absolutely immune for fabrication of evidence during preliminary investigation); *Kirchner v. Cnty. of Niagara*, 107 A.D.3d 1620, 1624 (N.Y. App. Div. 4th Dep't 2013) (rejecting absolute immunity defense where prosecutor coached witness to provide false information to police in an effort to reopen closed investigation).

### 3. Functional Analysis

The Court must look to defendants' alleged conduct to determine which acts, if any, are "advocacy" activities shielded by absolute prosecutorial immunity.

### a. DA Korchak & Chief ADA Loughran

DA Korchak and Chief ADA Loughran argue that they are entitled to absolute immunity because plaintiff "fails to allege that [they] acted outside of their respective roles as the District Attorney and Chief Assistant District Attorney at any time." Korchak & Loughran Mem. at 10. In response, plaintiff argues he has plausibly alleged that DA Korchak and Chief ADA Loughran were "personally involved in investigative decisions." Pl.'s Opp. at 25.

The complaint contains a number of allegations that detail DA Korchak and Chief ADA Loughran's personal involvement in the investigation. "[D]irecting of an investigation by police and other law enforcement personnel," is an investigative activity that falls outside the scope of absolute immunity. *Barbera v. Smith*, 836 F.2d 96, 101 (2d Cir. 1987); *Claude H. v. Cnty. of Oneida*, 214 A.D.2d 964, 965, 626 N.Y.S.2d 933, 935 (1995) ("Where a prosecutor goes outside his quasi-judicial role, however, and acts as an investigator or police officer, he is entitled only to qualified immunity.").

First, plaintiff alleges that DA Korchak and Chief ADA Loughran worked together with ADA Congdon and police to plan and execute the investigation, Compl. ¶¶ 105–08, 120, 125, and that Chief ADA Loughran allegedly met with the complainants in an attempt to gather evidence in support of the investigation, *id.* ¶ 111. These alleged actions fall outside the scope of DA Korchak's and Chief ADA Loughran's advocacy function. *See Smith v. Garretto*, 147 F.3d at 94. Accordingly, these alleged acts are not shielded by absolute prosecutorial immunity.

Second, plaintiff alleges that DA Korchak issued a video statement "assert[ing] that his office received 'numerous' emails and phone calls regarding 'several incidents that occurred recently' in Broome County . . . and encourag[ing] those with knowledge to contact the BCDA[ ] or local police departments." Compl. ¶ 95. Because a prosecutor's "statements to the media are not entitled to absolute immunity," *Buckley*, 509 U.S. at 277, DA Korchak is not entitled to absolute immunity for his alleged video statement.

Third, plaintiff alleges that DA Korchak and Chief ADA Loughran failed to (1) supervise and train ADA Congdon; (2) advise ADA Congdon of her discovery obligations as a prosecutor; and (3) correct her various mistakes of law. Compl. ¶¶ 123–24, 152–53. However, prosecutors are absolutely immune for failing to train or supervise their subordinates as to their prosecutorial duties and obligations. *See Van de Kamp v. Goldstein*, 555 U.S. 335, 344 (2009) ("[P]rosecutors involved in such supervision or training or information-system management enjoy absolute immunity from the kind of legal claims at issue here."); *see also Crawford v. New York Cnty. Dist. Atty.*, 99 A.D.3d 600, 601 (N.Y. App. Div. 1st Dep't 2012) (holding District Attorney entitled to absolute immunity where he allegedly "discourage[d] ADAs from being respectful of individuals' constitutional rights when prosecuting gun possession cases." (citing *Van de Kamp*, 555 U.S. at 344–46)). Accordingly, DA Korchak and Chief ADA Loughran are absolutely immune from liability for their alleged failure to instruct and advise ADA Congdon on her prosecutorial responsibilities throughout the prosecution.

Fourth, the remainder of plaintiff's allegations against DA Korchak and Chief ADA Loughran involve conduct protected by absolute prosecutorial immunity because it concerns advocacy activities routinely recognized by courts as "intimately associated with the judicial process." Compl. ¶¶ 156 (presenting case to grand jury), 159 (filing certificate of compliance),

161(d) (failing to disclose evidence), 162 (failing to preserve evidence after plaintiff's

indictment), 166 (failing to review evidence), 177 (declining to dismiss charges).  Accordingly,

DA Korchak and Chief ADA Loughran are absolutely immune from liability for this alleged

conduct.

### b.  ADA Cronin

Like DA Korchak and Chief ADA Loughran, ADA Cronin argues that she is entitled to

prosecutorial immunity because her alleged conduct falls within the established categories of

prosecutorial conduct to which absolute immunity attaches, and plaintiff has not plausibly

alleged that she "worked outside of her prosecutorial function."  Cronin Mem. at 9.  In

opposition, plaintiff maintains he has plausibly alleged that ADA Cronin "directly approved

investigative strategies and tactics that intentionally suppressed exculpatory evidence and

knowingly facilitated [p]laintiff's arrest without probable cause."  Pl.'s Opp. at 25.

"Among the acts for which a prosecutor is absolutely immune is the initiation of a

prosecution."  *Schloss v. Bouse*, 876 F.2d 287, 289 (2d Cir. 1989) (citing *Imbler*, 424 U.S. at

410, 424–25).  A prosecutor also "enjoys absolute immunity for failure to disclose exculpatory

evidence, because deciding what disclosure to make is part of a prosecutor's role as advocate,

and constitutes a core prosecutorial function."  *Schnitter v. City of Rochester*, 556 F. App'x 5, 7

(2d Cir. 2014) (summary order) (citing *Warney v. Monroe County,* 587 F.3d 113, 125 (2d

Cir.2009)).

Consequently, a prosecutor is protected by absolute immunity for allegedly withholding

exculpatory evidence from a grand jury.[5]  *See Hill*, 45 F.3d 653 at 662 (holding absolute

---

[5] In any event, a prosecutor need not present exculpatory evidence to a grand jury.  *United States v. Williams*, 504
U.S. 36, 37 (1992) ("Because it has always been thought sufficient for the grand jury to hear only the prosecutor's
side, and, consequently that the suspect has no right to present, and the grand jury no obligation to consider,

immunity applied to decision to withhold alleged *Brady* material); *Drake v. City of Rochester*, 408 N.Y.S.2d 847, 857 (N.Y. Sup. Ct. 1978) ([A] district attorney alleged to have withheld exculpatory evidence from a Grand Jury, given improper advice to a Grand Jury, suppressed and concealed evidence and conspired with others to obtain a Grand Jury indictment, permitted the presentation of false and misleading testimony to a Grand Jury, and took no action to correct the same was immune from liability."), *aff'd*, 74 A.D.2d 996 (N.Y. App. Div. 4th Dep't 1980).

Plaintiff alleges that, at some point prior to his arrest, ADA Cronin was hired by the BCDA and assigned to work with ADA Congdon on his case. Compl. ¶ 129. He further alleges that ADA Cronin (1) assisted ADA Congdon in presenting the criminal case against plaintiff to the grand jury, *id.* ¶ 156; (2) failed to recognize the exculpatory nature of certain information, *id.* ¶ 150; (3) withheld exculpatory evidence from plaintiff and the grand jury, *id.* ¶¶ 155, 161(d), 173; (4) failed to preserve, obtain, or review all available exculpatory evidence, such as the complainants' cell phone data, *id.* ¶¶ 159, 162, 166; and (5) did not intervene and correct ADA Congdon's mistakes of law, *id.* ¶ 153.

In sum, plaintiff alleges that ADA Cronin, together with others, initiated the prosecution against him, and failed to identify and disclose certain exculpatory evidence. Both categories of allegations concern "advocacy" functions "intimately associated with the judicial phase of the criminal process" to which absolute immunity ordinarily attaches. *Imbler*, 424 U.S. at 430.

There is a limited exception to this rule. "A prosecutor engaging in 'prosecutorial activities intimately associated with the judicial phase of the criminal process' loses 'the absolute immunity he would otherwise enjoy' only if he 'acts without any colorable claim of authority.'"

---

exculpatory evidence, it would be incompatible with the traditional system to impose upon the prosecutor a legal obligation to present such evidence.").

*Shmueli*, 424 F.3d at 237 (quoting *Barr v. Abrams*, 810 F.2d 358, 361 (2d Cir. 1987)).  But plaintiff has not plausibly alleged that ADA Cronin lacked authority in prosecuting plaintiff's case.  *See generally*, Compl.  Accordingly, ADA Cronin is entitled to absolute prosecutorial immunity from plaintiff's § 1983 and related state law claims.

### c.  ADA Congdon

Finally, ADA Congdon argues that her alleged conduct fell "within the ambit of prosecutorial duties," entitling her to absolute immunity.  Congdon Mem. at 13.[6]  In opposition, plaintiff maintains that ADA Congdon is not entitled to absolute prosecutorial immunity because she "personally participated in investigative decision-making alongside law enforcement, including involvement in strategy meetings that resulted in the decision to arrest [p]laintiff without probable cause."  Pl.'s Opp. at 24.

At the outset, plaintiff does not plausibly allege that ADA Congdon acted without jurisdiction *during* his prosecution.  Thus, ADA Congdon is protected by absolute prosecutorial immunity for any actions taken as an "advocate" during the prosecution.

However, the complaint alleges that ADA Congdon was heavily involved in the pre-arrest investigation, too.  Compl. ¶¶ 106–08, 111, 117–19, 120, 122–28, 130–31, 133.

Generally speaking, "where the prosecutor advises the police . . . or performs investigative work in order to decide whether a suspect should be arrested . . . the prosecutor is not entitled to absolute immunity."  *Kirchner*, 107 A.D.3d at 1623 (citing *Burns v. Reed*, 500 U.S. 478, 493–495 (1991); *Buckley*, 509 U.S. at 273–275)).

---

[6] According to ADA Congdon, "plaintiff's main complaint is that [she] was an inept prosecutor," Congdon Mem. at 11 (citing Compl. ¶¶ 104–109, 117–133, 150–159, 166), and, by framing his complaint this way, "plaintiff concedes that [ADA Congdon]'s complained-of conduct is prosecutorial in nature and, as such, is therefore shielded by absolute prosecutorial immunity." *Id.* at 11.  The Supreme Court has repeatedly rejected this argument as circular.  *See Buckley*, 509 U.S. at 273 (citing *Imbler*, 424 U.S. at 430–31).

The complaint alleges that as early as December 8, 2021, ADA Congdon was assigned to plaintiff's investigation.  Compl. ¶ 108.  The BCDA and BPD "worked closely during the investigatory period prior to the decision to charge [p]laintiff," *id.* ¶ 122, but ADA Congdon allegedly held "the ultimate decision-making authority over the investigation," *id.* ¶ 127.

Plaintiff alleges that, on December 14, 2021, ADA Congdon and others met separately with the complainants and tried, unsuccessfully, to obtain their consent to extract their electronic data.  *Id.* ¶ 111.  The complainants denied consent again in January 2022.  *Id.* ¶ 120.

On January 14, 2022, the complainants' attorney, Saitta, e-mailed ADA Congdon and "informed her that he had a folder containing printouts of electronic data" from the complainants' phones.  Compl. ¶ 117.  Plaintiff alleges that ADA Congdon instructed BCDA Investigator Jeff Wagner to retrieve the file, but he never did.  *Id.* ¶¶ 118–19.  Plaintiff also alleges that, at some point, ADA Congdon assisted Investigator Miller in trying to draft a search warrant for plaintiff's DNA.  *Id.* ¶ 122.

"[O]n or about February 22, 2022," ADA Congdon allegedly "met . . . and decided with BPD to file criminal charges against [p]laintiff."  Compl. ¶ 133.  Plaintiff alleges that between December 2021 and plaintiff's arrest, ADA Congdon met multiple times with BPD officers and other BCDA employees to discuss the allegations against plaintiff and the ongoing investigation.  *Id.* ¶¶ 106–07.

Absolute immunity does not attach to this alleged conduct.  "The pre-litigation function that a prosecutor performs has at least two aspects: (1) the supervision of and interaction with law enforcement agencies in *acquiring* evidence which might be used in a prosecution, and (2) the *organization, evaluation, and marshalling* of this evidence into a form that will enable the

prosecutor to try a case or to seek a warrant, indictment, or order." *Barbera*, 836 F.2d at 100 (emphasis in original).

ADA Congdon argues that her pre-litigation conduct falls within the latter category, characterizing it as an "evaluation of the evidence against plaintiff" and "plainly the type of protected conduct . . . engaged in as an officer of the court . . . which, accordingly, falls under the protections of absolute prosecutorial immunity." Congdon Mem. at 11. However, as the Supreme Court made clear in *Buckley*:

> [A] prosecutor may not shield his investigative work with the aegis of absolute immunity merely because, after a suspect is eventually arrested, indicted, and tried, that work may be retrospectively described as "preparation" for a possible trial; every prosecutor might then shield himself from liability for any constitutional wrong against innocent citizens by ensuring that they go to trial.

509 U.S. at 276; *see also Claude H.*, 214 A.D.2d at 965 (holding that prosecutor acted "in an investigative, law-enforcement role when he directed the police to arrest plaintiff").

At this stage, plaintiff has plausibly alleged that ADA Congdon performed one or more investigative activities when she worked with BPD throughout the investigation, assisted with evidence-gathering, and directed police to arrest plaintiff. Compl. ¶¶ 106–07, 111, 120, 122, 133. Accordingly, absolute prosecutorial immunity does not attach to this alleged conduct.

Plaintiff also alleges that, at trial, Herceg testified that ADA Congdon instructed her "to destroy electronic data relating to the night in question," Comp. ¶ 66, and "to delete her social media accounts," *id.* ¶ 112.

Notably, the complaint does not indicate when this instruction allegedly occurred. ADA Congdon, for her part, argues that "[a] liberal reading of the complaint makes clear . . . that this allegedly occurred later[,] during a meeting between defendant and defendant Herceg in preparation for the ultimate trial that occurred." Congdon Mem. at 17. Plaintiff responds that ADA Congdon told Herceg to delete electronic data relating to the night of the alleged assault

*before* his arrest and indictment, citing the immediately preceding allegation concerning ADA Congdon's December 14, 2021, meeting with the complainants, and the immediately subsequent allegation, concerning plaintiff's December 22, 2021, request for a show cause order.  Pl.'s Opp. at 43 (citing Compl. ¶¶ 110–12).

At this early stage, taking every reasonable inference in plaintiff's favor, the complaint plausibly alleges that this conduct was pre-litigation investigative conduct.  Plaintiff's allegation that Herceg obtained a new phone in March 2022, Compl. ¶ 171, bolsters his argument.  Because plaintiff was indicted at the end of March, it could reasonably be inferred that Herceg followed ADA Congdon's alleged instruction to destroy electronic data relating to the night of the alleged assault sometime prior to his indictment.  Compl. ¶ 171.  In sum, plaintiff has plausibly alleged that ADA Congdon engaged in investigative conduct for which she is not entitled to absolute immunity.

While ADA Congdon argues that she may be entitled to qualified immunity for any alleged investigative conduct, Congdon Mem. at 17–20, "the better approach to resolving cases in which the defense of qualified immunity is raised is to determine first whether the plaintiff has alleged a deprivation of a constitutional right at all."  *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 841 n.5 (1998).

### C.  Section 1983 Claims

Plaintiff asserts 42 U.S.C. § 1983 claims for false arrest, malicious prosecution, fabrication of evidence, *Brady* violations, "failure to investigate," failure to intervene, and civil conspiracy against the moving individual defendants.  Plaintiff also asserts those claims against the City and the County (the "municipal defendants"), under a theory of municipal liability pursuant to *Monell v. Dept. of Soc. Servs. of City of N.Y.*, 436 U.S. 658 (1978).  Compl. ¶¶ 191– 266.  All have moved to dismiss the § 1983 claims asserted against them.

### 1. Personal Involvement

Because "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983," *Moffitt v. Town of Brookfield,* 950 F.2d 880, 886 (2d Cir. 1991), the Court addresses it first.

Chief Zikuski, Captain Minor, Investigator Miller, DA Korchak, and Chief ADA Loughran argue that plaintiff has not plausibly alleged their personal involvement in the alleged constitutional violations.  BPD Mem. at 19–26; Korchak & Loughran Mem. at 20–23.  In opposition, plaintiff argues that he has plausibly alleged each defendant's personal involvement in his unlawful arrest and prosecution.  Pl.'s Opp. at 19–30.

"It is well settled that, in order to establish a defendant's individual liability in a suit brought under § 1983, a plaintiff must show, *inter alia,* the defendant's personal involvement in the alleged constitutional deprivation."  *Grullon v. City of New Haven*, 720 F.3d 133, 138 (2d Cir. 2013).  The same applies to supervisory officials.  *Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020).

### a. Investigator Miller

Investigator Miller has moved to dismiss plaintiff's claims against her, arguing, in part, that plaintiff has not alleged that "any specific BPD [d]efendant arrested or decided to arrest Plaintiff, charged or decided to charge Plaintiff, fabricated evidence that led to Plaintiff's arrest or prosecution, participated in Plaintiff's prosecution, or withheld any specific exculpatory evidence."  BPD Mem. at 22.  In opposition, plaintiff argues he plausibly alleged that Investigator Miller "played a key investigative role," and was "personally responsible for securing and reviewing crucial electronic evidence."  Pl.'s Opp. at 22.  The Court agrees.

Plaintiff has sufficiently alleged that Investigator Miller was personally involved in the alleged conduct. Specifically, plaintiff claims that Investigator Miller interviewed the complainants, Compl. ¶ 71; collected evidence, *id.* ¶¶ 71, 80; executed a search warrant at plaintiff's office, *id.* ¶ 82; discussed the investigation at meetings with members of the BCDA, *id.* ¶¶ 106–07; assisted ADA Congdon in attempting to obtain a DNA sample from plaintiff, *id.* ¶ 122; neglected to retrieve, obtain, or otherwise preserve other evidence, *id.* ¶ 78; and failed to document exculpatory statements, *id.* ¶¶ 105(g), 138. Accordingly, Investigator Miller's motion to dismiss is denied on this ground.

### b. Supervisory Defendants

Plaintiff's complaint asserts "supervisory liability" as an independent cause of action against DA Korchak, Chief ADA Loughran, BPD Chief Zikuski, and BPD Captain Minor. Compl. ¶¶ 211–17. Specifically, he alleges that, "Korchak and Zikuski, and other supervisors, including . . . Loughran[,]. . . Minor, and others . . . provided grossly inadequate training, supervision, and discipline of the defendant assistant district attorneys and police officers." *Id.* ¶ 214.

Defendants argue this claim must be dismissed because there is no longer a special rule for supervisory liability in the Second Circuit, and plaintiff has not otherwise alleged their personal involvement. BPD Mem. at 36–37; Korchak & Loughran Mem. at 21–23. Again, plaintiff disagrees, arguing that he has plausibly alleged their personal involvement and insisting that defendants have misstated the legal standard for supervisory liability. *See* Pl.'s Opp. at 70–73.

Prior to the Second Circuit's decision in *Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020), a plaintiff could impose supervisory liability by alleging one or more of the following:

> (1) actual direct participation in the constitutional violation, (2) failure to remedy a wrong after being informed through a report or appeal, (3) creation of a policy or custom that sanctioned conduct amounting to a constitutional violation, or allowing such a policy or custom to continue, (4) grossly negligent supervision of subordinates who committed a violation, or (5) failure to act on information indicating that unconstitutional acts were occurring.

*Hernandez v. Keane*, 341 F.3d 137, 145 (2d Cir. 2003) (citing *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir. 1995)). But this is no longer good law. In *Tangreti*, the Second Circuit made clear that "[t]here is no special rule for supervisory liability." 983 F.3d at 618. "Instead, a plaintiff must plead and prove 'that each Government-official defendant, through the official's own individual actions, has violated the Constitution.'" *Id.* (quoting *Iqbal*, 556 U.S. at 676).

Defendants contend that plaintiff has not met his burden under *Tangreti*. *See* BPD Mem. at 36–37; Korchak & Loughran Mem. at 21–23. Plaintiff argues that the correct standard permits supervisory liability where it is alleged that a defendant:

> (1) Directly participated in the constitutional violation; (2) Failed to remedy the violation after learning of it; (3) Created or permitted a policy or custom under which unconstitutional practices occurred; (4) Were grossly negligent in supervising subordinates; or (5) Deliberately failed to act on information indicating that unconstitutional acts were occurring.

Pl.'s Opp. at 70. As defendants point out plaintiff mistakenly relies on the pre-*Tangreti* standard. Dkt. No. 100 ("BPD Reply") at 10. Given that there is no longer a special rule for supervisory liability, plaintiff must directly establish the elements of his claims against each individual defendant. Accordingly, plaintiff's standalone "supervisory liability" claim is dismissed.

Plaintiff maintains that, regardless, he has plausibly alleged each supervisory defendant's personal involvement in the underlying constitutional violations.  As noted above, "a defendant in a § 1983 action may not be held liable for damages for constitutional violations merely because he held a high position of authority."  *Black v. Coughlin*, 76 F.3d 72, 74 (2d Cir. 1996).  Instead, "[t]he focus is on what the *supervisor* did or caused to be done, 'the resulting injury attributable to his conduct, and the *mens rea* required of him to be held liable, which can be no less than the *mens rea* required of anyone else.'"  *Tangreti*, 983 F.3d at 618 (quoting *Porro v. Barnes*, 624 F.3d 1322, 1327–28 (10th Cir. 2010) (Gorsuch, J.)) (emphasis in original).

Personal involvement of a supervisor may also "be established by showing that he created a policy or custom under which the violation occurred." *Taranto v. Putnam Cnty.*, 2023 WL 6318280, at *14 (S.D.N.Y. Sept. 28, 2023) (internal quotation omitted).  However, "conclusory allegations that a defendant was involved in the creation and enforcement of unconstitutional policies cannot sustain a claim of personal involvement."  *Id.*

### i.  Chief Zikuski & Captain Minor

According to defendants, "the Complaint barely mentions [Chief Zikuski and Captain Minor] and contains no allegations that they individually engaged in unconstitutional conduct." BPD Mem. at 24.  In opposition, plaintiff argues that he has plausibly alleged that Chief Zikuski and Captain Minor actively participated in meetings where "deliberate investigative decisions" were made.  Pl.'s Opp. at 21–22.

Plaintiff's complaint offers three particular allegations about these defendants.  First, on December 6, 2021, Captain Minor and Investigator Miller executed a search warrant at plaintiff's office, but did not recover any evidence.  Compl. ¶ 82.  Second, on December 8, 2021, Captain Minor and Investigator Miller attended a meeting with members of the BCDA, where they discussed the investigation and allegedly considered "subpoenaing [the complainants'] phones."

*Id.* ¶¶ 106–07.  Third, on December 9, 2021, Chief Zikuski allegedly informed plaintiff's

attorney that he opposed filing criminal charges against plaintiff in connection with the

complainants' allegations.  *Id.* ¶ 92.

However, the remainder of plaintiff's allegations against these defendants are speculative,

conclusory, or based solely on their supervisory status, rather than their individual actions.  For

example, plaintiff alleges that Captain Minor and Chief Zikuski (1) did not review evidence in

their possession, despite plaintiff's insistence that such evidence was exculpatory; and (2) failed

to correct ADA Congdon's various mistakes of law.  Compl. ¶¶ 166, 123–24.  Plaintiff further

alleges that Chief Zikuski, among others, possessed "information and material that vitiated any

. . . probable cause."  *Id.* ¶ 140.  Notably, the complaint also fails to identify any particular

custom or policy either Chief Zikuski or Captain Minor created.  Compl. ¶¶ 18, 244, 259.

Taking plaintiff's nonconclusory factual allegations as true, plaintiff has not plausibly

alleged that either Captain Minor or Chief Zikuski were personally involved in any alleged

constitutional violations, warranting dismissal of plaintiff's § 1983 claims against them.

### ii.  DA Korchak & Chief ADA Loughran[7]

Of the BCDA defendants, only DA Korchak and Chief ADA Loughran seek dismissal of

plaintiff's § 1983 claims for lack of personal involvement.  *See* Korchak & Loughran Mem. at

20.  They argue that "[p]laintiff fails to plead facts which demonstrate that Korchak and

Loughran, through their individual actions, violated Plaintiff's constitutional rights."  *Id.*  In

response, plaintiff contends that "Korchak and Loughran are alleged to have directly participated

in and approved the decision to arrest [p]laintiff . . . without probable cause, specifically and

solely for the improper investigative purpose of obtaining DNA evidence."  Pl.'s Opp. at 25.

---

[7] Plaintiff only asserts § 1983 claims for failure to intervene, supervisory liability, and civil rights conspiracy against Chief ADA Loughran.  Compl. ¶¶ 206–210, 211–17, 263–66.

After *Tangreti*, a plaintiff must allege more than supervision alone to hold a supervisor individually liable under § 1983. *See Levine v. New York State Police*, 2022 WL 1987845 at *16 (N.D.N.Y. June 6, 2022) (holding insufficient a "conclusory allegation that [a supervisor] approved or authorized all arrests"); *Thomas v. Town of Lloyd*, 2022 WL 1747650, at *3 (N.D.N.Y. May 31, 2022) ("[A] supervisor cannot be held liable under § 1983 for his supervision alone[.]"); *Myers ex rel. Est. of Myers v. Davenport*, 2022 WL 3017367, at *4 (N.D.N.Y. July 29, 2022) ("Liability based solely on the actions of a subordinate under the watch of a superior, or solely due to a failure to supervise, without more, constitutes precisely the type of vicarious, *respondeat superior* liability that *Iqbal* and *Tangreti* eliminate." (citing *Iqbal*, 566 U.S. at 676)).

Plaintiff's allegations against DA Korchak and Chief ADA Loughran amount to little more than mere supervision. For instance, the pleading alleges that on December 8, 2021, either "Korchak or . . . Loughran asked . . . [ADA] Congdon to attend a meeting with members of BPD regarding [the complainants'] sexual assault allegations." Compl. ¶ 105. DA Korchak and Chief ADA Loughran allegedly attended this meeting, where they discussed the investigation with BPD officers and considered future investigative action. *Id.* 106–07. After the meeting, "Korchak and/or . . . Loughran assigned . . . Congdon to the investigation" and "ceded ultimate decision-making authority over the investigation to . . . Congdon." *Id.* ¶¶ 108, 127.

Plaintiff further alleges that on December 10, 2021, DA Korchak "issued a video statement to Facebook and other channels . . . assert[ing] that his office received 'numerous' emails and phone calls regarding 'several incidents that occurred recently' in Broome County." Compl. ¶ 95. Korchak also "encouraged those with knowledge to contact the [BCDA] or local police departments." *Id.* And plaintiff alleges that, between December 8, 2021, and February 22, 2022, Korchak and Loughran met with ADA Congdon "multiple times to discuss the

investigation." Compl. ¶ 125. Finally, plaintiff alleges that DA Korchak and Chief ADA Loughran failed to correct ADA Congdon's various mistakes of law throughout the investigation and prosecution. *Id.* ¶¶ 123–25.

In other words, the core of plaintiff's complaint against DA Korchak and Chief ADA Loughran is that they assigned ADA Congdon to plaintiff's prosecution despite knowing that she "lacked the necessary prosecutorial experience, knowledge, and training to handle a serious felony investigation." Compl. ¶ 127.

Without more, these allegations fall far short of plausibly establishing personal participation in any violation of plaintiff's constitutional rights. Accordingly, plaintiff's § 1983 claims are dismissed as to DA Korchak and ADA Loughran.

### c. John Does 1–10

Plaintiff names ten unidentified Doe defendants who are "employees, agents and officers of either the BCDA[] or BPD." Compl. ¶ 20.

The BPD defendants moved to dismiss all of plaintiff's claims against the BPD Doe defendants. BPD Mem. at 1. They argue that plaintiff's § 1983 claims against the BPD Doe defendants must be dismissed because plaintiff has "not plausibly pled any facts sufficient to establish the personal involvement of any BPD Defendants in the underlying constitutional violations." BPD Mem. at 21. Plaintiff responds that "the [c]omplaint identifies the John Doe Officers with adequate detail by explicitly describing their functional roles." Pl.'s Opp. at 22.

"[W]here, as in this case, [plaintiff] is suing 'John Doe' defendants, the pleading must nevertheless contain plausible allegations of wrongdoing by such defendants, even if their actual names are presently unknown." *James v. Monroe Cnty.*, 2022 WL 17155831, at *7 (W.D.N.Y. Nov. 22, 2022) (citing *Antonetti v. City of N.Y.*, 2022 WL 1105172, at *3 (E.D.N.Y. Apr. 13,

2022)).  "The absence of allegations against them and lack of personal involvement is fatal to his

claims against the John Does."  *Azaryev v. City of N.Y.*, 2021 WL 3861722, at *4 (E.D.N.Y. Aug.

27, 2021).; *see also Johnson v. New York*, 2019 WL 13563241, at *3 (E.D.N.Y. Nov. 20, 2019)

("While John Does 1[–]10 appear to be the officers who effected [plaintiff]'s arrest, [plaintiff]

does not identify these officers' supervising agency or provide any detail about the officers'

particular roles in his arrest. Because [plaintiff] fails to state any facts that might constitute 'a

claim to relief that is plausible on its face' against these John Doe defendants, his § 1983 claim

against them must be dismissed." (quoting *Twombly*, 550 U.S. at 570)).

As the BPD defendants correctly point out, *see* BPD Mem. at 22, many of plaintiff's

allegations regarding BPD officers are not attributed to any of the named BPD defendants, but

rather to "members of BPD," generally.  Compl. ¶¶ 83, 86–87, 110, 122, 128, 130, 133–34, 138,

141, 162, 166.  Plaintiff maintains that this "limited use of collective allegations is proper and

permissible."  Pl.'s Opp. at 26–27.

Plaintiff has certainly alleged that other unknown BPD officers were involved in his

investigation and arrest.  However, he has not plausibly alleged that any individual Doe

defendant personally violated his constitutional rights.  For instance, plaintiff alleges that

unnamed BPD officers "obtained footage from security cameras," which was never shown to the

complainants.  Compl. ¶¶ 83, 86–87.  Plaintiff also alleges that "no one from BPD . . . took any

steps to obtain or preserve . . . [the complainant's] electronic data."  *Id.* ¶ 110.  Further, ADA

Congdon allegedly "met with BPD . . . and decided with BPD to file criminal charges against

[p]laintiff."  *Id.* ¶ 133.  Plaintiff also claims that BPD "notified [p]laintiff's attorney that

[plaintiff] would have to appear to be arrested, charged and arraigned," and that plaintiff was

ultimately arrested by "members of BPD" on or around February 22, 2022.  *Id.* ¶ 130, 134.

However, plaintiff has not plausibly alleged that any individual Doe defendant personally violated his constitutional rights.  Accordingly, the BPD Doe defendants are dismissed.

The BCDA defendants have not explicitly moved for dismissal of plaintiff's claims against the BCDA Doe defendants.  This is understandably so, as it is unclear how many of the Doe defendants are alleged to be BCDA employees and which claims plaintiff has asserted against them.  Compl. ¶ 20.

Of course, courts may dismiss Doe defendants on the basis of the pleadings where a plaintiff has failed to state a plausible claim against them.  *See, e.g.*, *Darby v. Greenman*, 14 F.4th 124 (2d Cir. 2021) (affirming district court's dismissal of Doe defendants who had not appeared in the action where claims against the appearing defendants and the Doe defendants were based on the same legal theories); *Baker v. Spinner*, 2019 WL 3430918, at *6 n.6 (N.D.N.Y. July 30, 2019) (dismissing unidentified and unserved Doe defendants *sua sponte* where defendants sought dismissal of entire complaint and their failure to appear on behalf of Does was likely "an oversight") *aff'd*, 826 F. App'x 105 (2d Cir. 2020); *see also Hanks v. City of Syracuse*, 2022 WL 4619877 (N.D.N.Y. Sept. 30, 2022), *aff'd*, 2023 WL 8889764 (2d Cir. Dec. 26, 2023).

Such is the case here.  If anything, plaintiff's allegations against the unidentified members of the BCDA are more tenuous than those asserted against the unknown BPD officers.  *See* Compl. ¶ 130.  Plaintiff repeatedly alleges that "the BCDA[]," generally, failed to obtain or review certain evidence, failed to confront the complainants with evidence that undermined their allegations, and lacked fundamental knowledge as to certain investigative procedures regularly employed by prosecutors.  Compl. ¶¶ 86–87, 110, 122, 128, 138, 141, 162, 166.

As with the BPD Doe defendants, plaintiff has failed to allege that any individual BCDA Doe defendant was personally involved in any constitutional violation. Accordingly, all Doe defendants that are "employees, agents, [] [or] officers" of the BCDA are dismissed.

## 2. False Arrest

The Court begins its assessment of the merits of plaintiff's § 1983 claims with plaintiff's "First Cause of Action," which he characterizes as a claim for "Fourth and Fourteenth Amendment False Arrest and Malicious Prosecution." Compl. at 52.

"Although they often accompany one another, false arrest and malicious prosecution are distinct causes of action." *Spearman v. Dutchess Cnty.*, 2008 WL 2945991, at *3 (N.D.N.Y. July 25, 2008) (citing *Heck v. Humphrey,* 512 U.S. 477 (1994)). Accordingly, the Court will address them separately, beginning with false arrest. Of the remaining defendants, plaintiff asserts his false arrest claim against Investigator Miller and ADA Congdon. Compl. ¶¶ 191–97. Both moved to dismiss. *See* Dkt. Nos. 40, 65.

Defendants primarily argue that (1) none of the named defendants arrested plaintiff; (2) there was probable cause to arrest plaintiff based on the complainants' statements; and (3) plaintiff has not otherwise alleged sufficient facts to rebut the presumption of probable cause that arose when he was indicted by a grand jury. BPD Mem. at 22, 27–28; Congdon Mem. at 21–22. In opposition, plaintiff argues that (1) the defendants played a significant role in the investigation and decision to arrest plaintiff; (2) the complainants were not reasonably trustworthy, and probable cause based on their statements dissipated by the time of his arrest; (3) the indictment could not establish a presumption of probable cause because defendants deliberately withheld exculpatory evidence; and (4) regardless, plaintiff's allegations rebut the presumption of probable cause created by his indictment. Pl.'s Opp. at 32–45.

"A § 1983 claim for false arrest, resting on the Fourth Amendment right of an individual to be free from unreasonable seizures, including arrest without probable cause . . . is substantially the same as a claim for false arrest under New York law." *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996) (citing *Lennon v. Miller*, 66 F.3d 416, 423 (2d Cir. 1995)).

"Under New York law, the elements of a false arrest . . . claim are: '(1) the defendant intended to confine the plaintiff, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged.'" *Hernandez v. United States*, 939 F.3d 191, 199 (2d Cir. 2019) (quoting *McGowan v. United States*, 825 F.3d 118, 126 (2d Cir. 2016)).

### a.  Intent to Confine

Investigator Miller argues that plaintiff has not plausibly alleged the first element, *i.e.*, intent to confine, against her. *See* BPD Mem. at 11–12. According to Investigator Miller, plaintiff does not allege that she, or any other individual BPD defendant, arrested him. *See* Compl. ¶ 130 ("The arrest was effectuated and processed by members of BPD."). Plaintiff acknowledges that it was the John Doe BPD officers who "were directly involved in unlawfully arresting Plaintiff," but maintains that Investigator Miller played a substantial role in the investigative decision-making that prompted his arrest. Pl.'s Opp. at 22, 24–25.

"[A] defendant who is not an arresting officer may be liable for false arrest if the defendant instigated an arrest . . . . " *Lopez v. City of N.Y.*, 901 F. Supp. 684, 688 (S.D.N.Y. 1995) (citing *Rosario v. Amalgamated Ladies Garment, Etc.*, 605 F.2d 1228, 1248 (2d Cir.1979)), *cert. denied*, 446 U.S. 919 (1980)). However, "a police officer can only be liable for a false arrest that occurs outside of his presence if he 'had reason to know' that such a false arrest

was likely to occur." *Escalera v. Lunn*, 361 F.3d 737, 748 n.4 (2d Cir. 2004) (citing *Anderson v. Branen,* 17 F.3d 552, 557 (2d Cir.1994)).

Plaintiff alleges that Investigator Miller was assigned to investigate the sexual assault allegations against him. Compl. ¶ 70. According to the complaint, BPD and the BCDA "worked closely during the investigatory period prior to the decision to charge [p]laintiff." *Id.* ¶ 122. Plaintiff further alleges various instances where Investigator Miller worked directly with ADA Congdon on the investigation. *Id.* at ¶¶ 106–07, 111, 122. Ultimately, he alleges, ADA Congdon "decided with BPD to file criminal charges against [p]laintiff." *Id.* ¶ 133.

Still, taken together, these allegations do not permit an inference that Investigator Miller personally instigated plaintiff's arrest. And whether plaintiff has plausibly alleged that Investigator Miller "had reason to know" plaintiff's false arrest was likely to occur will depend on whether plaintiff has plausibly alleged that Investigator Miller was aware that the arresting officers lacked probable cause.

### b. Probable Cause

The next "question for [the Court] to consider is whether [plaintiff]'s arrest was 'privileged,' or 'justified.'" *Savino v. City of N.Y.*, 331 F.3d 63, 76 (2d Cir. 2003). "The existence of probable cause to arrest constitutes justification and 'is a complete defense to an action for false arrest.'" *Weyant*, 101 F.3d at 852 (quoting *Bernard v. United States,* 25 F.3d 98, 102 (2d Cir. 1994)).

Both Investigator Miller and ADA Congdon argue that, based on the information the complainants' provided during the investigation, probable cause supported plaintiff's arrest, thereby defeating his false arrest claim as a matter of law. Congdon Mem. at 21–22; BPD Reply at 13. Plaintiff maintains that his arrest was predicated not on probable cause, but on defendants'

mistaken belief that his arrest would permit them to collect more evidence.  Pl.'s Opp. at 32–33.

He also argues that defendants were aware of evidence or information at the time of his arrest

that undermined the complainants' veracity, vitiating any probable cause based on their

allegations.  Pl.'s Opp. at 33–41.

Generally, for purposes of a false arrest claim, "[p]robable cause exists when an officer

has 'knowledge or reasonably trustworthy information sufficient to warrant a person of

reasonable caution in the belief that an offense has been committed by the person to be

arrested.'"  *Savino*, 331 F.3d at 76 (quoting *Martinez v. Simonetti,* 202 F.3d 625, 634 (2d Cir.

2000)).  "As the Supreme Court has famously observed, probable cause is 'a fluid concept,"

*Walczyk v. Rio*, 496 F.3d 139, 156 (2d Cir. 2007) (quoting *Illinois v. Gates,* 462 U.S. 213, 232

(1983)), and "whether probable cause exists 'depends on the totality of the circumstances' of

each case," *Dufort v. City of N.Y.*, 874 F.3d 338, 348 (2d Cir. 2017) (quoting *Maryland v.

Pringle*, 540 U.S. 366, 371 (2003)).

As relevant here, "[w]hen information is received from a putative victim or an

eyewitness, probable cause exists, [*Martinez*, 202 F.3d at 634]*, unless the circumstances raise

doubt as to the person's veracity."  *Curley v. Vill. of Suffern*, 268 F.3d 65, 70 (2d Cir. 2001)

(citing *Singer v. Fulton Cnty. Sheriff,* 63 F.3d 110, 119 (2d Cir.1995)).

Defendants point to several allegations in support of their contention that there was

"ample, constitutionally adequate probable cause" to arrest plaintiff.  Congdon Mem. at 21–22;

*see also* BPD Reply at 13.  These include that the complainants (1) filed a police report, Compl.

¶¶ 60, 69; (2) offered sworn testimony that plaintiff, Leor, and Rindgen sexually assaulted them,

*id.* ¶ 139; (3) underwent forensic rape exams, *id.* ¶ 68(bb); (4) and provided evidence

corroborating that they were with plaintiff, Leor, and Rindgen on the night of the alleged assault, *id.* ¶ 72.

In opposition, plaintiff argues that defendants never had probable cause to arrest him because they possessed exculpatory information prior to his arrest, Compl. ¶¶ 140, including a statement from Demkovich expressing uncertainty about whether she had been raped and surveillance footage depicting the complainants cognizant and walking unassisted on the night of the alleged rape.  Pl.'s Opp. at 33–41.

Because probable cause to arrest is determined by looking at the information each defendant possessed at the time of the arrest, the Court will address Investigator Miller and ADA Congdon separately.

As an initial matter, Investigator Miller erroneously argues that plaintiff's false arrest claim fails because he has not pleaded sufficient facts to rebut the presumption of probable cause that arose from his grand jury indictment.  BPD Mem. at 28.

"Because liability for . . . false arrest . . . under New York law give[s] rise to liability under 42 U.S.C. § 1983 . . . [courts] look to New York law to determine whether a presumption of probable cause arising from a grand jury indictment can be a defense to these claims." *McClellan v. Smith*, 439 F.3d 137, 145 (2d Cir. 2006) (internal citation omitted).

It cannot.  "[T]he New York Court of Appeals has expressly held that the presumption of probable cause arising from an indictment 'applies only in causes of action for malicious prosecution and is totally misplaced when applied in false [arrest] actions.'"  *Savino*, 331 F.3d at 75 (quoting *Broughton v. State*, 335 N.E.2d 310, 313 (N.Y. 1975).

Investigator Miller argues that (1) other evidence she obtained before plaintiff's arrest corroborated the complainants' statements; and (2) she received no exculpatory evidence or information that vitiated probable cause prior to plaintiff's arrest.  BPD Mem. at 23–24.

Plaintiff alleges that Demkovich told members of BPD, including Investigator Miller, that she "was questioning whether she was, in fact, raped, or if the physical or sexual contact was consensual."  Compl. ¶ 75.  Plaintiff also avers that the BCDA report, obtained seven months after his arrest, "made clear that the information that Defendant Demkovich was 'questioning it' was in the possession of [d]efendants" prior to plaintiff's arrest.  *Id.* ¶ 173.[8]

 "[W]hile vastly inconsistent statements by a victim might undermine the victim's reliability, minor inconsistent statements do not automatically vitiate probable cause based solely on a victim's statements if the totality of the circumstances support probable cause."  *Davenport v. City of N.Y.*, 2017 WL 4356883, at *11 (E.D.N.Y. Sept. 28, 2017) (citing *Crawford v. City of N.Y.*, 477 F. App'x. 777, 779 (2d Cir. 2012) (summary order)).

Here, the pleading establishes that probable cause was based on *both* complainants' allegations, as well as other corroborating information and evidence.  *See* Compl. ¶¶ 60, 68(bb), 69, 72, 172.  Moreover, and as plaintiff acknowledges, Demkovich had been served alcohol on the night of the alleged assault.  *Id.* ¶ 37.

---

[8] At first glance this allegation seems to suggest that, prior to plaintiff's arrest, defendants "failed to obtain the very text messages [that plaintiff] now relies on to show probable cause was lacking for his arrest."  Congdon Reply at 9 (citing Compl. ¶¶ 119, 144, 159, 164–166).  Absent an allegation of clairvoyance, defendants could not plausibly be expected to have knowledge of information contained in evidence not yet obtained.

Alternatively, plaintiff may be implying that the electronic data obtained by the BCDA in November 2022 contained a message sent by the complainant a year earlier documenting that she informed BPD that she "was questioning whether she was, in fact, raped, or if the physical or sexual contact was consensual."  Compl. ¶¶ 75, 173, 66(w).  In any event, for the reasons stated herein, a single intimation of uncertainty by one putative victim did not vitiate probable cause.

Even assuming Demkovich told Investigator Miller that she was questioning whether the alleged assault could be classified as rape, this statement, absent more, is not so "vastly inconsistent" that the remainder of her allegations must be discredited. Plaintiff does not contend, for example, that Demkovich told Investigator Miller that she and plaintiff did not engage in sexual activity, or that she was a willing participant in sexual activity, *id.* ¶ 68(w); rather, it appears that Demkovich told police that she was questioning whether she had given plaintiff sufficient indication that she did not want to engage in sexual activity, such that the encounter could be legally classified as "rape." *Id.* ¶ 68(o).

The Second Circuit addressed a similar argument in *Koester v. Lanfranchi*, 288 F. App'x 764, 766 (2d Cir. 2008) (summary order). The plaintiff in that case, who had been falsely accused of sexual abuse, similarly argued that "various circumstances cast doubt as to whether the victim provided a credible account of a forced, rather than consensual, sexual encounter." *Id.* The Second Circuit rejected that argument, holding that plaintiff was "wrong to suggest that defendants had to eliminate these doubts before reasonably relying on the victim's statement to arrest him." *Id.* The same logic applies here.

Further, and contrary to plaintiff's contentions, Compl. ¶¶ 136–38, it is immaterial whether Demkovich's statement vitiated probable cause as to the charge of arrest, Rape in the Third Degree, because "a claim for false arrest turns only on whether probable cause existed to arrest a defendant, and . . . it is not relevant whether probable cause existed with respect to each individual charge, or, indeed, any charge actually invoked by the arresting officer at the time of arrest." *Jaegly v. Couch*, 439 F.3d 149, 154 (2d Cir. 2006).

In any case, defendants had no duty to resolve all doubts as to Demkovich's statement before reasonably relying on it, particularly as she provided text messages and photos that corroborated other aspects of her account.  Compl. ¶ 72.

In an attempt to avoid this conclusion, plaintiff also alleges that, at the time of his arrest, Investigator Miller possessed surveillance footage that contradicted the complainants' allegations.  Compl. ¶¶ 81–84.  The footage does not depict the time or location where the alleged assault occurred, but, according to plaintiff, it portrays the complainants "cognizant, in control of their actions, initiating and engaging in consensual sexual contact with . . . plaintiff . . . and smiling and appearing in good spirits" earlier that night at the Colonial.  *Id.* ¶ 81.

Plaintiff seems to imply that surveillance footage depicting the complainants freely associating with plaintiff, Leor, and Rindgen earlier in the night necessarily undermines any subsequent allegations of rape.  However, the Court rejects the proposition that a putative victim's demeanor *prior* to an alleged sexual assault precludes them from credibly alleging that they were *subsequently* sexually assaulted.[9]

Finally, plaintiff alleges that other surveillance footage depicting the complainants walking to a parking garage after the alleged assault materially contradicts their claims that they were "scared, coerced, abused, or physically overpowered by [p]laintiff."  Compl. ¶¶ 83–84.  Absent an allegation that the complainants claimed to be unconscious or otherwise unable to walk after the alleged assault, the footage of the complainants walking to a parking garage does not contradict their statements.

---

[9] In his opposition, plaintiff describes the footage as "showing complainants acting freely and consensually, walking independently, and exhibiting no distress both before *and after* the alleged crime."  Pl.'s Opp. at 40 (emphasis added).  The Court again rejects the notion that probable cause is vitiated by videos of a putative victim, either before *or* after an alleged sexual assault, "acting freely and consensually" and "exhibiting no distress."

In sum, the Court agrees with defendants that the surveillance footage described in the complaint did not exculpate plaintiff such that probable cause was vitiated.

Ordinarily, "[o]nce a police officer has a reasonable basis for believing there is probable cause, he is not required to explore and eliminate every theoretically plausible claim of innocence before making an arrest." *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 128 (2d Cir. 1997) (citing *Baker v. McCollan,* 443 U.S. 137, 145–46 (1979)).

Plaintiff alleges that, throughout the investigation, he "pressed the BPD and BCDA[] to retrieve the texts, messages, images, and other electronic data from [the complainants'] phones, knowing that it would likely contain exculpatory evidence," but defendants failed to obtain any of the complainants' electronic data beyond the "selected, non-continuous" messages provided by the complainants themselves. Compl. ¶¶ 73, 142.

Information or evidence that officers did not possess at the time of arrest is irrelevant, because probable cause to arrest "is established 'when the arresting officer *has* knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested.'" *Singer*, 63 F.3d at 119 (quoting *O'Neill v. Town of Babylon,* 986 F.2d 646, 650 (2d Cir. 1993)) (emphasis added).

Further, "probable cause does not require an officer to be certain that subsequent prosecution of the arrestee will be successful [and] . . . '[i]t is . . .of no consequence that a more thorough or more probing investigation might have cast doubt upon' the situation." *Krause v. Bennett*, 887 F.2d 362, 371 (2d Cir. 1989) (citing *United States v. Manley,* 632 F.2d 978, 984 (2d Cir. 1980), *cert. denied,* 449 U.S. 1112 (1981)).

Once probable cause was established, Investigator Miller had no duty to obtain additional text messages.  In sum, Plaintiff failed to plausibly allege that Investigator Miller lacked probable cause to arrest him, and his false arrest claim against her must be dismissed.

Next, the Court turns to ADA Congdon's alleged knowledge at the time of plaintiff's arrest.  ADA Congdon argues that plaintiff has not plausibly alleged that she was working in an investigative capacity when she allegedly instructed Herceg to destroy evidence.  Congdon Mem. at 17.  According to plaintiff, Herceg testified at trial that ADA Congdon instructed her to "destroy electronic data relating to the night in question . . . and that she did in fact destroy that evidence."  Compl. ¶ 66.

While "[p]robable cause does not necessarily disappear simply because 'an innocent explanation may be consistent with' facts that an officer views as suspicious," *Figueroa v. Mazza*, 825 F.3d 89, 102 (2d Cir. 2016) (quoting *Panetta v. Crowley*, 460 F.3d 388, 395 (2d Cir. 2006)), "under some circumstances . . . awareness of the facts supporting a defense can eliminate probable cause," *Jocks v. Tavernier*, 316 F.3d 128, 135 (2d Cir. 2003).

And, while there is no duty "to investigate exculpatory defenses offered by the person being arrested or to assess the credibility of unverified claims of justification before making an arrest," an investigating official is not permitted "to deliberately disregard facts known to him which establish justification."  *Jocks*, 316 F.3d at 136.

As previously discussed, *see supra* Point IV.B.3.c, plaintiff plausibly alleged that, prior to his arrest, ADA Congdon directed Herceg to delete electronic data relating to the night of the alleged assault.  Taken exactly as alleged in the complaint, Herceg's communications from the relevant period cast serious doubt on the veracity of the complainants' allegations.  *Id.* ¶ 68(e)–(h), (p)–(r), (u).  Because plaintiff alleges that ADA Congdon directed Herceg to delete

exculpatory electronic data prior to his arrest, plaintiff has plausibly alleged a lack of probable cause as to ADA Congdon only.[10]   Accordingly, ADA Congdon's motion to dismiss plaintiff's false arrest claim is denied.

### 3.  Malicious Prosecution

Of the remaining individual defendants, plaintiff asserts § 1983 malicious prosecution claims against ADA Congdon and Investigator Miller.  Compl. ¶¶ 191–97.  Both moved to dismiss, arguing that (1) plaintiff cannot establish that either defendant initiated or continued a proceeding against plaintiff on the facts alleged; (2) plaintiff has failed to rebut the presumption of probable cause established by his grand jury indictment; and (3) the complaint lacks any allegation of actual malice.  BPD Mem. at 28–31; Congdon Mem. at 24.  Plaintiff disputes each point.  Pl.'s Opp. at 20 (initiation), 45 (probable cause), 61 (malice).

"To state a 42 U.S.C. § 1983 claim for malicious prosecution, a plaintiff must plead both 'a violation of his rights under the Fourth Amendment' and 'the elements of a malicious prosecution claim under state law.'" *Dettelis v. Sharbaugh*, 919 F.3d 161, 163 (2d Cir. 2019) (quoting *Manganiello v. City of N.Y.*, 612 F.3d 149, 160–61 (2d Cir. 2010)).  "Under New York law, a malicious-prosecution claim requires a plaintiff to show '(1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for the defendant's actions.'"  *Dettelis*, 919 F.3d at 163–64 (quoting *Murphy v. Lynn*, 118 F.3d 938, 947 (2d Cir. 1997)).

---

[10] Plaintiff does not allege that Investigator Miller was aware of ADA Congdon's directive to Herceg.  Compl. ¶¶ 66, 112.

### a. Initiation

"The first element of a malicious prosecution cause of action, under state law or § 1983, is . . . 'that the defendant initiated a prosecution against the plaintiff.'" *Rohman v. N.Y. City Trans. Auth. (NYCTA)*, 215 F.3d 208, 217 (2d Cir. 2000) (quoting *Posr v. Ct. Officer Shield # 207*, 180 F.3d 409, 417 (2d Cir. 1999)). Both defendants contend that the complaint fails to establish initiation, but their arguments are premised on different theories.

Investigator Miller argues that plaintiff has not plausibly alleged that she, or any of the BPD defendants, commenced or continued the prosecution against plaintiff. BPD Mem. at 29–30. Plaintiff does not directly address this argument, but claims generally that Investigator Miller made "deliberate and active decisions . . . as part of the investigative team to suppress exculpatory material and further an unfounded prosecution." Pl.'s Opp. at 22.

"To initiate a prosecution, a defendant must do more than report the crime or give testimony. [Sh]e must 'play[ ] an active role in the prosecution, such as giving advice and encouragement or importuning the authorities to act.'" *Manganiello*, 612 F.3d at 163 (quoting *Rohman,* 215 F.3d at 217). "[P]olice officers can 'initiate' prosecution by filing charges or other accusatory instruments." *Cameron v. City of N.Y.*, 598 F.3d 50, 63 (2d Cir. 2010). "This element might be satisfied by, for example, showing that an officer generated witness statements or was regularly in touch with the prosecutor regarding the case." *Bermudez v. City of N.Y.*, 790 F.3d 368, 377 (2d Cir. 2015) (citing *Manganiello* 612 F.3d at 163).

Plaintiff satisfies these requirements. He alleges that: (1) Investigator Miller was the BPD officer assigned to investigate the complainants' allegations, Compl. ¶ 70; (2) she met with members of the BCDA and BPD on December 8, 2021, to discuss the investigation, *id.* ¶¶ 106–08; (3) she and members of the BCDA met with the complainants on December 14, 2021, *id.* ¶

111; (4) BPD worked closely with the BCDA throughout the investigation, *id.* ¶ 122; (5) BPD officers met with ADA Congdon and decided to file criminal charges against plaintiff, *id.* ¶ 133; and (6) at some point during the investigation, ADA Congdon and Investigator Miller worked together to draft a search warrant to obtain plaintiff's DNA, *id.* ¶ 122.

Collectively and taken as true, plaintiff plausibly alleged that Investigator Miller was considerably involved in investigating him, alongside the BCDA. Specifically, Investigator Miller took statements from the complainants, gathered evidence, and was consistently in touch with ADA Congdon. Further, allegations that a police officer "forwarded statements to a prosecutor without sharing that the statements were suspect," can also satisfy the initiation requirement of a malicious prosecution claim. *Dufort,* 874 F.3d at 353 (citing *Manganiello*, 612 F.3d at 163).

Here, plaintiff alleges that:

Demkovich told Miller, Congdon, and others at BPD and BCDA[ ] that she thought any sexual contact was consensual since she did not say no and never provided any example of words or conduct that would have placed a reasonable person on notice that she did not consent. BPD and BCDA[ ] never documented Defendant Demkovich's statement that she did not say no or that she thought the sexual contact was consensual . . .

Compl. ¶ 138.

Investigator Miller responds that plaintiff has not plausibly alleged that Demkovich told her, specifically, that the sexual contact was consensual, or that she failed to document it. BPD Mem. at 22.

The Court disagrees. According to plaintiff, (1) his encounter with the complainants took place in the early morning hours of November 27, 2021; (2) Demkovich texted her mother "'I told them [BPD] the next day I was questioning if what happened to me was actually rape . . .'"; and (3) "[o]n November 28, 2021, Defendant Miller separately interviewed Defendant Herceg

and Defendant Demkovich." Compl. ¶¶ 23–52, 68(w), 71. From these facts, it can be inferred that Demkovich told Investigator Miller *the next day* that she questioned whether she had sufficiently denied consent.

Because plaintiff plausibly alleged that Investigator Miller met and worked with ADA Congdon throughout the investigation and failed to make a full and complete statement of the facts, he has plausibly alleged the initiation element of his malicious prosecution claim against Investigator Miller.

ADA Congdon makes a different claim. She argues that, as a prosecutor, she has absolute immunity for the initiation and continuation of a criminal proceeding. Congdon Mem. at 8–9. In opposition, plaintiff argues that "Congdon's role in personally instructing a witness to destroy exculpatory electronic evidence is quintessential investigative misconduct," falling outside the scope of absolute immunity. Pl.'s Opp. at 51.

As discussed *supra*, ADA Congdon is entitled to absolute immunity for any conduct undertaken as an advocate, in preparation for and while prosecuting the criminal case against plaintiff. Therefore, the Court considers only whether ADA Congdon's investigative conduct violated plaintiff's constitutional rights. *See supra* Point IV.B.3.c. As for her purportedly investigative conduct, plaintiff alleges that ADA Congdon (1) participated in meetings; (2) worked closely with BPD; (3) met with the complainants; (4) directed BPD to arrest plaintiff; and (5) instructed Herceg to delete electronic data. Compl. ¶¶ 106–08, 111, 122, 133.

It is ordinarily "impossible to satisfy the 'initiation' element of a malicious prosecution claim against the prosecutor. After all, 'a prosecutor unquestionably acts as an advocate—and therefore receives absolute immunity—when she initiates and pursues a criminal prosecution.'"

*Harris*, 663 F. Supp. 3d at 241 (quoting *D'Alessandro v. City of N.Y.*, 713 F. App'x 1, 5 (2d Cir. 2017) (summary order)).

In fact, as ADA Congdon correctly notes, absolute prosecutorial immunity extends to "the professional evaluation of the evidence assembled by the police and appropriate preparation for its presentation at trial or before a grand jury after a decision to seek an indictment has been made." *Buckley*, 509 U.S. at 273; Congdon Mem. at 9.

But this protection ends "[w]hen a prosecutor performs the investigative functions normally performed by a detective or police officer[.]" *Buckley*, 509 U.S. at 273. Thus, "the 'initiation' element of a malicious prosecution claim may be satisfied if a defendant fabricates evidence that is material to the probable cause determination." *Harris*, 663 F. Supp. 3d at 241 (citing *McDaniel v. City of N.Y.*, 585 F. Supp. 3d 503, 516–17 (S.D.N.Y. 2022) (collecting cases)). As relevant here "government officials may be held liable for fabricating evidence through false statements *or omissions*." *Morse v. Fusto*, 804 F.3d 538, 547 (2d Cir. 2015) (emphasis added).

Here, plaintiff alleges that ADA Congdon directed Herceg to delete electronic data prior to plaintiff's arrest. Compl. ¶¶ 66, 112. Herceg's text messages from the relevant period undoubtedly undermine the veracity of her and Demkovich's allegations. Compl. ¶ 66. At this stage, plaintiff has plausibly alleged that the omission of Herceg's text messages was material to the probable cause determination. Accordingly, plaintiff's allegations satisfy the initiation element as to ADA Congdon.

**b. Probable Cause**

Defendants also seek dismissal of plaintiff's malicious prosecution claim, because they claim plaintiff has failed to rebut the presumption of probable cause established by his grand jury

indictment.  BPD Mem. 28–30; Congdon Mem. at 24.  Plaintiff argues that the presumption of probable cause has been rebutted by his "detailed allegations of misconduct in securing the indictment."  Pl.'s Opp. at 45.

"[T]he existence of probable cause is a complete defense to a claim of malicious prosecution in New York."  *Savino*, 331 F.3d at 72 (citing *Colon v. City of N.Y.*, 455 N.E.2d 1248, 1250 (N.Y. 1983)).  "'Probable cause, in the context of malicious prosecution, has . . . been described as such facts and circumstances as would lead a reasonably prudent person to believe the plaintiff guilty.'"  *Kee v. City of N.Y.*, 12 F.4th 150, 166 (2d Cir. 2021) (quoting *Boyd v. City of N.Y.*, 336 F.3d 72, 76 (2d Cir. 2003)).

"[U]nder New York law, indictment by a grand jury creates a presumption of probable cause."  *Savino*, 331 F.3d at 72.  "[I]t is the plaintiff who bears the burden of proof in rebutting the presumption of probable cause that arises from the indictment."  *Id.* at 73.  The presumption of probable cause "may *only* be rebutted by evidence that the indictment was procured by 'fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith.'"  *Id.* at 72 (quoting *Colon*, 455 N.E.2d at 1250–51) (emphasis in original).

Because plaintiff admits that "[t]he Grand Jury returned an indictment as to [him]," Compl. ¶ 157, the remaining inquiry is whether plaintiff has plausibly alleged sufficient facts to overcome the presumption of probable cause.

Plaintiff argues that he has rebutted the presumption by alleging that "[p]rosecutors and investigators presented the case to the grand jury while omitting—and sometimes actively concealing—key exculpatory information," including the surveillance footage, DNA evidence, and electronic data that contradicted the complainants' allegations.  Pl.'s Opp. at 42–43.  Defendants maintain that plaintiff has failed to meet his burden because (1) "the claims against

the BPD [d]efendants allege only negligence and poor police work"; and (2) plaintiff's "claim

that . . . [ADA Congdon] kept exculpatory information from the grand jury does not overcome

the presumption of probable cause."  BPD Mem. at 31; Congdon Mem. at 24.

Under New York law, a plaintiff cannot "rebut the presumption of probable cause with

mere 'conjecture' and 'surmise' that his indictment was procured as a result of conduct

undertaken by the defendants in bad faith."  *Savino*, 331 F.3d at 73 (quoting *Bryant v. Maffucci*,

923 F.2d 979, 982 (2d Cir.1991)).  "The rule in New York differs in this respect from that in

some jurisdictions which permit the presumption to be overcome by any evidence tending to

show the absence of probable cause."  *Colon*, 455 N.E.2d at 1251.

"Where there is some indication in the police records that, as to a fact crucial to the

existence of probable cause, the arresting officers may have 'lied in order to secure an

indictment,' and 'a jury could reasonably find that the indictment was secured through bad faith

or perjury,' the presumption of probable cause created by the indictment may be overcome."

*Manganiello*, 612 F.3d at 162 (quoting *Boyd*, 336 F.3d at 77).

First, plaintiff argues he has rebutted the presumption of probable because he has

plausibly alleged that Investigator Miller suppressed surveillance footage which "clearly

contradicted [the] complainants' claims of intoxication, helplessness, or lack of consent."  Pl.'s

Opp. at 42.

Plaintiff's attorney allegedly provided Investigator Miller with security camera footage,

and BPD obtained other footage depicting the complainants "smiling and appearing in good

spirits throughout the evening," and "walking through the basement area of their own free will."

Compl. ¶¶ 80–83.  Crucially, however, plaintiff does not allege that Investigator Miller hid, lied

about, or otherwise suppressed any surveillance footage from the prosecution.  *See generally, id.*

¶¶ 80–87, 156(b). Plaintiff also does not allege that Investigator Miller fabricated or suppressed the surveillance footage to paint an incomplete picture of the facts in the hopes of securing an indictment. Rather, plaintiff alleges only that Miller did not confront the *complainants* with the allegedly contradictory footage. *Id.* ¶¶ 86–87, 145.

This does not rebut the presumption of probable cause. Even had plaintiff alleged that Investigator Miller concealed the surveillance footage from the prosecution, surveillance footage depicting the complainants "smiling and appearing in good spirits throughout the evening," and "walking through the basement area of their own free will," Compl. ¶ 81, does not plausibly vitiate the existence of probable cause as to alleged offenses occurring later in the night and outside the view of surveillance cameras. *See supra* Point IV.C.2.b.

Plaintiff's remaining arguments fare no better. For instance, plaintiff alleges that, early in the investigation, the complainants provided Investigator Miller "with photographs and text messages from the night in question." Compl. ¶ 72. "The provided messages represented selected, non-continuous accounts of the night in question and did not provide a complete record of the relevant period." *Id.* ¶ 73. "The excluded text messages . . . included messages stating that the sexual contact between [the complainants] and [p]laintiff . . . had been consensual . . ." *Id.* ¶ 74.

The Court rejects plaintiff's contention that Investigator Miller's failure to obtain or otherwise preserve the complainants' cell phone data rebuts the presumption of probable cause. Given that plaintiff specifically alleges that the exculpatory text messages were *excluded* from those provided to Investigator Miller, and plaintiff has not otherwise alleged that Investigator Miller *knew* there were exculpatory messages among those not turned over by the complainants. Accordingly, she could not plausibly have suppressed them.

Next, plaintiff contends that Investigator Miller failed to document Demkovich's statement that she was questioning whether the alleged assault would be "classified" as consensual.  Compl. ¶ 75.  "In order for probable cause to dissipate, the groundless nature of the charges must be made apparent by the discovery of some intervening fact."  *Lowth v. Town of Cheektowaga*, 82 F.3d 563, 571 (2d Cir. 1996), *as amended* (May 21, 1996).  Demkovich's alleged expression of uncertainty did not render the charges against plaintiff "groundless," particularly in light of the other evidence Investigator Miller possessed.  Compl. ¶¶ 60, 68(bb), 69, 72, 139.

Plaintiff also maintains that, according to his allegations, "[d]efendants knew before Plaintiff's arrest that the rape kit results contradicted Demkovich and Herceg's account."  Pl.'s Opp. at 52 (citing Compl. ¶¶ 104–127).  However, the complaint alleges no such thing.  In fact, it states the exact opposite: ". . . nor did the Grand Jury learn of the exculpatory DNA results that were learned *after* the Grand Jury returned a voted indictment."  *Id.* ¶ 155 (emphasis added).

To be sure, plaintiff also alleges that "[n]o search warrant or motion to compel a buccal swab or a DNA sample was ever completed because [ADA] Congdon and [Investigator] Miller erroneously believed that they could not obtain a criminal defendant's DNA pre-arrest." *Id.* ¶ 123; *see also id.* ¶ 128 ("In or about February 2022, because neither ADA Congdon, nor anyone else at BCDAO or BPD seemingly knew how to gain access to . . . the DNA of any of the accused . . .").

Investigator Miller could not have been aware of, let alone suppressed, DNA test results that were not obtained until after plaintiff's indictment.  Accordingly, plaintiff has not plausibly alleged that Investigator Miller suppressed or deliberately withheld any allegedly exculpatory DNA evidence.  And, in any case, the DNA test results, as alleged, are not exculpatory.  Only

Herceg's rape kit was tested, and plaintiff was accused of sexually assaulting Demkovich. Compl. ¶¶ 47–49, 161.

In sum, plaintiff has failed to plausibly allege sufficient facts against Investigator Miller to rebut the presumption of probable cause established by his indictment, warranting dismissal of his malicious prosecution claim against her.

As for ADA Congdon, plaintiff alleges that she (1) failed to present exculpatory evidence, including surveillance footage and DNA test results, to the grand jury; and (2) directed Herceg to destroy exculpatory evidence. Compl. ¶¶ 66, 155, 156(b).

To reiterate, the Court considers only ADA Congdon's alleged *investigative* conduct in evaluating plaintiff's § 1983 claims against her. ADA Congdon is absolutely immune for any actions taken in connection with prosecutorial functions, such as deciding which evidence to present to the grand jury. This is true even where, as here, she allegedly withheld exculpatory evidence from the grand jury. *See Imbler*, 424 U.S. at 431 n.34; *see also Hill*, 45 F.3d at 661 (finding "the trial court erred in refusing to dismiss plaintiff's claims" based on allegations that prosecutors "conspir[ed] to present falsified evidence to, and to withhold exculpatory evidence from, a grand jury," as "[s]uch conduct on the prosecutor's part is clearly protected by the doctrine of absolute immunity").

Thus, the Court rejects plaintiff's arguments that ADA Congdon's failure to present surveillance footage or DNA evidence to the grand jury rebuts the presumption of probable cause. Further, as discussed above, ADA Congdon could not have suppressed the not-yet-obtained DNA test results. *See supra*, Point.IV.C.2.b (citing Compl. ¶¶ 155, 123, 128).

Plaintiff also argues that he has rebutted the presumption of probable cause because ADA Congdon allegedly "instructed a complainant to delete electronic data, thereby actively

destroying exculpatory material before the indictment."  Pl.'s Opp. at 43; Compl. ¶¶ 66, 112.

ADA Congdon responds that plaintiff has not plausibly alleged that the challenged conduct

occurred before his indictment.  Dkt. No. 98 ("Congdon Reply") at 6–7.

But again, drawing all reasonable inferences in plaintiff's favor, the complaint plausibly

alleges that ADA Congdon told Herceg to delete her social media accounts *before* the

indictment.  *See supra* Point IV.B.3.c.

ADA Congdon also notes that "there is no allegation that the allegedly destroyed

evidence was actually exculpatory," because, according to plaintiff, Herceg testified that ADA

Congdon directed her to delete social media accounts, which plaintiff did not allege contained

exculpatory information.  Congdon Reply at 7.

While the Court agrees that Herceg's *text messages*, rather than social media accounts,

are alleged to be exculpatory, Congdon Reply at 9; *see also* Compl. ¶¶ 75, 119(e), 180, plaintiff

also alleges that, "Herceg ultimately testified at the criminal trial in this matter that she was

instructed to destroy *electronic data* relating to the night in question by [ADA] Congdon."

Compl. ¶ 66 (emphasis added).  Under the Federal Rules of Civil Procedure, "[a] party may set

out two or more statements of a claim . . . alternatively or hypothetically." Fed. R. Civ. P.

8(d)(2).  Where "a party makes alternative statements, the pleading is sufficient if any one of

them is sufficient." *Id.*

At this stage, plaintiff has plausibly alleged that ADA Congdon instructed Herceg to

delete exculpatory electronic data prior to plaintiff's indictment.  Accordingly, plaintiff has

pleaded sufficient facts to rebut the presumption of probable cause as to ADA Congdon.

### c. **Actual Malice**

As to the fourth and final element of plaintiff's malicious prosecution claim, ADA

Congdon argues that plaintiff asserts only conclusory allegations of malice against her.  Congdon

Mem. at 24.  Plaintiff argues that ADA Congdon's "destruction and suppression of exculpatory

evidence, initiation of charges to obtain evidence, and refusal to investigate known

contradictions in the complainant-defendants accounts and allegations" together constitute actual

malice.  Pl.'s Opp. at 61.

> Under New York law:
>
> The "actual malice" element of a malicious prosecution action . . . means that the
> defendant must have commenced the prior criminal proceeding due to a wrong or
> improper motive, something other than a desire to see the ends of justice served.

*Nardelli v. Stamberg*, 377 N.E.2d 975, 976 (N.Y. 1978).  "A lack of probable cause generally

creates an inference of malice."  *Boyd*, 336 F.3d at 78 (citing *Ricciuti,* 124 F.3d at 131).

Plaintiff has plausibly alleged facts that rebut the presumption of probable cause as to

ADA Congdon, thereby creating an inference of malice.  *See supra* Point IV.C.3.b.

Therefore, at this stage, plaintiff has sufficiently stated that ADA Congdon participated in

initiating charges against him, he was acquitted of those charges, the charges lacked probable

cause, and ADA Congdon was motivated by actual malice.  Accordingly, plaintiff has plausibly

alleged a § 1983 malicious prosecution claim against ADA Congdon, and her motion to dismiss

this claim must be denied.

### 4. **Fourteenth Amendment Due Process and Denial of a Fair Trial**

Plaintiff's "Second Cause of Action" remains only as to ADA Congdon and Investigator

Miller and is identified as: "Fourteenth Amendment Deprivation of Liberty Without Due Process

of Law and Denial of a Fair Trial by Fabricating Evidence, Withholding Material Exculpatory

and Impeachment Evidence, and Deliberately Failing to Conduct a Constitutionally Adequate Investigation." Compl. at p. 54.

Plaintiff's fair trial claim is based, in part, on defendants' alleged failure to "conduct a constitutionally adequate investigation." Though, "[a]s Defendants correctly argue, 'there is no constitutional right to an adequate investigation.'" *Buari v. City of N.Y.*, 530 F. Supp. 3d 356, 389 (S.D.N.Y. 2021) (quoting *Newton v. City of N.Y.*, 566 F. Supp. 2d 256, 278 (S.D.N.Y. 2008)); *see also Hicks v. Marchman*, 719 F. App'x 61, 64 (2d Cir. 2018) (summary order) (affirming district court's dismissal of plaintiff's fair trial claim where plaintiff "cite[d] no authority for the proposition that there is a stand-alone fair trial claim based on officers' failure to conduct an adequate investigation."). Accordingly, plaintiff's fair trial claim based on defendants' "failure to investigate" must be dismissed.

The remainder of plaintiff's claim can reasonably be understood as a claim for denial of the right to a fair trial premised on two theories: (1) fabrication of evidence; and (2) withholding of exculpatory and impeachment evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). "A fair trial claim is a civil claim for violations of a criminal defendant's Fourteenth Amendment due process rights." *Fappiano v. City of N.Y.*, 640 F. App'x 115, 118 (2d Cir. 2016) (summary order) (citing *Ramchair v. Conway,* 601 F.3d 66, 73 (2d Cir. 2010)).

Defendants argue that plaintiff has failed to state a plausible claim for denial of the right to a fair trial under either theory. Congdon Mem. at 25; BPD Mem. at 32–35. According to plaintiff, he has plausibly alleged that Investigator Miller and ADA Congdon "[1] deliberately ignored exculpatory evidence, [2] participated in suppressing or destroying crucial evidence favorable to Plaintiff, and [3] pursued investigative tactics specifically designed to fabricate probable cause." Pl.'s Opp. at 56.

### a. Fabrication of Evidence

"When a police officer creates false information likely to influence a jury's decision and forwards that information to prosecutors, he violates the accused's constitutional right to a fair trial, and the harm occasioned by such an unconscionable action is redressable in an action for damages under 42 U.S.C. § 1983." *Ricciuti*, 124 F.3d at 130.

To state a fair trial claim premised on the fabrication of evidence, a plaintiff must allege that "'an (1) investigating official (2) fabricate[d] information (3) that is likely to influence a jury's verdict, (4) forward[ed] that information to prosecutors, and (5) the plaintiff suffer[ed] a deprivation of life, liberty, or property as a result.'" *Garnett v. Undercover Officer C0039*, 838 F.3d 265, 279 (2d Cir. 2016) (quoting *Ricciuti*, 124 F.3d at 130).

### i. Investigator Miller

Investigator Miller argues that plaintiff has not plausibly alleged each element of his fabrication claim against her with the requisite specificity. BPD Mem. at 32–33. Plaintiff responds that, "'such specificity as to each . . . Defendant's individual actions is not required where, as here, the complaint give[s] each defendant fair notice of what the plaintiff's claim is and the ground upon which it rests.'" Pl.'s Opp. at 28 n. 4 (quoting *Buari*, 530 F. Supp. 3d at 390–91) (internal quotations omitted). According to plaintiff, Investigator Miller "deprived [him] of his right to a fair trial by fabricating inculpatory evidence including false witness statements inculpating [him]." Compl. ¶ 201.

The Second Circuit has consistently held that "the second element of a fair trial claim based on fabricated evidence requires a plaintiff to prove that a defendant's use of inaccurate information was 'knowing, as opposed to mistaken.'" *Davis-Guider v. City of Troy*, 2024 WL 5199294, at *3 (2d Cir. Dec. 23, 2024) (summary order) (quoting *Barnes v. City of N.Y.*, 68 F.4th 123, 129 (2d Cir. 2023)); *see also Ashley v. City of N.Y.*, 992 F.3d 128, 143 (2d Cir. 2021) ("The

fabrication element requires only that the defendant knowingly make a false statement or omission.").

Plaintiff does not allege that Investigator Miller personally testified falsely before any jury or affirmatively fabricated any evidence.  Instead, plaintiff alleges that "Demkovich told members of BPD that she was questioning whether she was, in fact, raped, or if the physical or sexual contact was consensual" and, because that statement "was not recorded by Defendant Miller," "the Grand Jury did not learn that . . . Demkovich had reported that she was questioning whether a rape had occurred."  Compl. ¶¶ 75, 155.

"[T]he requirements that the information be both false and likely to influence a jury's decision constrain the types of information that can serve as the basis for a denial of the right to a fair trial claim."  *Garnett*, 838 F.3d at 280.  "Information may be 'false' if material omissions render an otherwise true statement false."  *Morse*, 804 F.3d at 548.

Investigator Miller's omission of that portion of Demkovich's statement did not render the rest of her statement "false."  Even if it did, plaintiff has not plausibly alleged that Miller had reason to know that Demkovich's allegations were false.  *See Davis-Guider*, 2024 WL 5199294, at *3 ("[Plaintiff]'s argument relies on the speculation that because Defendants provided prosecutors with inaccurate information, they must have fabricated evidence . . .  however, that assumption is not a reasonable inference. The mere fact that the parties present conflicting evidence does not mean that one side's evidence was fabricated.").

Moreover, when Investigator Miller interviewed the complainants, Herceg's allegations, the complainants' communications and photos, and the surveillance footage all corroborated Demkovich's allegations.  *See supra* Point IV.C.2.b; *see also Brown v. Vill. of Endicott*, 2025 WL 863105, at *30 (N.D.N.Y. Mar. 19, 2025) ("Insofar as the parties agree that [the

complainant] provided inconsistent statements during one of her interviews . . . the failure to present this inconsistency to the grand jury does not make the testimony 'false.' This is particularly true when [the complainant] made numerous other, consistent, statements concerning the alleged abuse.").

In sum, plaintiff has failed to state factual allegations that could support a reasonable inference that Investigator Miller knowingly fabricated evidence, either affirmatively or by omission. Therefore, plaintiff's fabrication claim against her must be dismissed.

### ii. ADA Congdon

ADA Congdon argues that absolute prosecutorial immunity bars plaintiff's fabrication-of-evidence claim against her, as her allegedly violative conduct falls within the scope of her role as an advocate. Congdon Mem. at 11. Plaintiff disagrees, insisting that his "allegations detail a pattern of exculpatory evidence being deliberately destroyed or withheld by both police and prosecutors, well before any formal prosecution commenced." Pl.'s Opp. at 62.

In *Zahrey v. Coffey*, the Second Circuit explicitly recognized a constitutional "right not to be deprived of liberty as a result of the fabrication of evidence by a government officer acting in an investigating capacity." 221 F.3d 342, 349 (2d Cir. 2000). This includes prosecutors, as "a subsequent immunized act of a single official does not break the chain of causation traceable to his initial misconduct occurring in another capacity." *Id.* at 353 (citing *White v. Frank*, 855 F.2d 956, 961 (2d Cir. 1988)).

Thus, a prosecutor, acting in their investigative capacity, deprives a criminal defendant of the constitutional right to a fair trial where they deliberately omit material information from evidence that would be likely to influence a jury's decision. *See Morse*, 804 F.3d at 547–549 (finding prosecutor and investigator, acting in investigative capacities, deprived dentist of his

constitutional right to a fair criminal trial through deliberate material omissions in billing summaries that were material to grand jury's decision to indict).

In November 2022, the BCDA allegedly "received a hard drive with the extractions of the cell phones of [the complainants]." Compl. ¶ 165. Three months later, the BCDA turned this information over to plaintiff's attorney, but "none of Herceg's communications from November 27, 2021[,] through March 2022 were present" in the BCDA report, because Herceg obtained a new phone and iCloud account in March 2022. *Id.* ¶ 171. Herceg later testified that ADA Congdon instructed her to "destroy electronic data relating to the night in question . . . and that she did in fact destroy that evidence." *Id.* ¶ 66. In July 2023, Plaintiff obtained the Saitta folder, which contained Herceg's messages from that period, including "numerous new exculpatory records not contained" in the BCDA report. *Id.* ¶¶ 174, 182. Saitta also informed plaintiff that ADA Congdon had been aware of the Saitta folder at least two months prior to his indictment (and Herceg's alleged destruction of evidence), but she never retrieved it. *Id.* ¶¶ 175–76.

Collectively, plaintiff has plausibly alleged that ADA Congdon (1) instructed Herceg to delete material electronic data prior to plaintiff's arrest and indictment; (2) failed to retrieve existing copies of that material electronic data, despite knowing of its availability before plaintiff's arrest and indictment; and (3) subsequently produced a hard drive of the complainants' electronic data that necessarily omitted the data Herceg destroyed at her request. Compl. ¶¶ 66, 165, 171, 174–76, 182.

Thus, plaintiff has plausibly alleged that ADA Congdon fabricated or otherwise omitted material evidence. Accordingly, plaintiff's fabrication claim survives as to ADA Congdon.

**b. *Brady* Violation**

Plaintiff also alleges that defendants deprived him "of his right to a fair trial by withholding material exculpatory and impeachment evidence."  Compl. ¶ 201.  This "theory of liability is essentially a civil claim seeking damages for a *Brady* violation."  *Fappiano*, 640 F. App'x at 118 (citing *Bermudez*, 790 F.3d at 376 n.4).  "A classic *Brady* violation contains three elements: 'The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued.'"  *Fappiano*, 640 F. App'x at 118 (quoting *United States v. Rivas,* 377 F.3d 195, 199 (2d Cir. 2004)).

"To prevail on such a claim, a plaintiff must show the materiality of the nondisclosed evidence."  *Bellamy v. City of N.Y.*, 914 F.3d 727, 751 (2d Cir. 2019).  To determine materiality, "[t]he question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence."  *Kyles v. Whitley*, 514 U.S. 419, 434 (1995).

The Second Circuit has repeatedly acknowledged the "longstanding constitutional principle that as long as a defendant possesses *Brady* evidence in time for its effective use, the government has not deprived the defendant of due process of law simply because it did not produce the evidence sooner."  *United States v. Coppa*, 267 F.3d 132, 144 (2d Cir. 2001).  Therefore, "[t]here is no *Brady* violation unless there is a reasonable probability that earlier disclosure of the evidence would have produced a different result at trial."  *Id.*

"Most courts that have directly considered the question have held that an acquittal extinguishes a § 1983 plaintiff's due process claim for nondisclosure of *Brady* material."  *Ambrose v. City of N.Y.*, 623 F. Supp. 2d 454, 469 (S.D.N.Y. 2009) (collecting cases); *see also*

*McClean v. Cnty. of Westchester*, 2018 WL 6329420, at *18 (S.D.N.Y. Dec. 3, 2018) (holding the same, following failure to convict at trial), *aff'd sub nom. McClean v. City of Mount Vernon*, 776 F. App'x 725 (2d Cir. 2019) (summary order).

Here, the parties acknowledge that plaintiff was acquitted.  Compl. ¶¶ 4, 180, 184, 196, 204, 209, 216, 279, 288.  While plaintiff alleges that the Saitta folder was exculpatory *Brady* evidence, Compl. ¶ 180, he admits that he obtained the Saitta folder before trial, and, evidently, was able to make effective use of it.  *Id.* ¶¶ 182, 184.  ("The trial court issued a subpoena for the records on July 5, 2023, and the records . . . were provided to Counsel for Plaintiff . . . On October 31, 2023, Plaintiff and Mr. Rindgen were acquitted of all charges after the jury deliberated for only two hours before returning a not guilty verdict.").

Consequently, plaintiff cannot sustain a fair trial claim for an alleged *Brady* violation on these facts.

### 5. Failure to Intervene

Plaintiff's "Third Cause of Action" is identified as a "failure to intervene" claim.  Compl. ¶¶ 206–10.  As a threshold matter, failure to intervene is not a standalone cause of action, but rather a form of individual "bystander" liability imposed where a government official could have, but did not, intervene in a constitutional violation committed by another government official in his or her presence.  *See Ellis v. City of Elmira*, 2018 WL 6047070, at *8 n.1 (W.D.N.Y. Nov. 19, 2018) (noting that "federal courts uniformly have recognized a theory of 'bystander liability' based on a defendant's failure to intervene in § 1983 actions.") (citing *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994)).  In that regard, it may be asserted even where a defendant did not directly participate in an alleged constitutional violation.

Accordingly, this claim remains as to the individual BPD defendants, DA Korchak, Chief ADA Loughran, and ADA Congdon. Plaintiff also asserts this claim against the City and the County.

As for the municipal defendants, the County argues that plaintiff fails to allege how the County, as a municipal entity, "was positioned to prevent or remedy those violations in real time." County Mem. at 12. Plaintiff concedes this point in his opposition papers and voluntarily "withdraws the failure to [intervene] claim against the County only." Pl.'s Opp. at 69. But the City of Binghamton is also a municipal entity. Compl. ¶ 12. To the extent plaintiff attempts to impose individual liability for failure to intervene against the City, that claim must be dismissed for substantially the same reasons.

Turning to the individual defendants, liability for failure to intervene may attach "if '(1) the officer had a realistic opportunity to intervene and prevent the harm; (2) a reasonable person in the officer's position would know that the victim's constitutional rights were being violated; and (3) the officer does not take reasonable steps to intervene.'" *Jackson v. City of N.Y.*, 939 F. Supp. 2d 219, 231–32 (E.D.N.Y. 2013) (quoting *Jean–Laurent v. Wilkinson,* 540 F.Supp.2d 501, 512 (S.D.N.Y. 2008).

The individual defendants argue that (1) plaintiff has not alleged an underlying constitutional violation; or (2) alternatively, plaintiff has not plausibly alleged that defendants had a realistic opportunity to intervene in any constitutional violations. BPD Mem. at 36; Korchak & Loughran Mem. at 19–20. Additionally, ADA Congdon argues that she "could never have had a reasonable opportunity to intervene in her own actions." Congdon Mem. at 26.

A failure to intervene claim "is predicated on there being an underlying violation of [plaintiff]'s constitutional rights that the defendants could have prevented." *McIntosh v. City of*

*N.Y.*, 722 F. App'x. 42, 46 (2d Cir. 2018) (summary order) (citing *Terebesi v. Torreso*, 764 F.3d 217, 243 (2d Cir. 2014)).

Here, plaintiff has plausibly alleged constitutional violations against ADA Congdon. His surviving § 1983 claims against her are for false arrest, malicious prosecution, and denial of the right to a fair trial premised on the fabrication of evidence.

"It is widely recognized that all law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence." *Anderson*, 17 F.3d at 557 (citing *O'Neill v. Krzeminski,* 839 F.2d 9, 11 (2d Cir. 1988)).[11] But, "[o]bviously, a person who is held liable under a theory of direct participation in the constitutional violation cannot also be held liable for a failure to intervene." *Rizk v. City of N.Y.*, 462 F. Supp. 3d 203, 226 (E.D.N.Y. 2020) (citing *Jackson*, 939 F. Supp. 2d at 231–32). Because plaintiff has only stated § 1983 claims against ADA Congdon, she cannot also be liable for failure to intervene in her own conduct.

DA Korchak and Chief ADA Loughran argue that plaintiff's failure to intervene claim against them must be dismissed, because "[a] cause of action for failure to intervene is more appropriately asserted against law enforcement officers, not prosecutors." Korchak & Loughran Mem. at 19. They cite *Breton v. City of N.Y.*, 404 F. Supp. 3d 799, 814 (S.D.N.Y. 2019) for the proposition that "a claim for failure to intervene cannot be brought against those actively involved in the prosecution itself." Korchak & Loughran Mem. at 20.

---

[11] While the Second Circuit has not addressed whether law enforcement officials or prosecutors have a duty to intercede in a *prosecutor's* alleged misconduct, plaintiff's surviving claims against ADA Congdon concern actions taken in her investigatory capacity, for which she, like a law enforcement officer, is entitled to qualified immunity at most. *See Buckley*, 509 U.S. at 273 ("When a prosecutor performs the investigative functions normally performed by a detective or police officer, it is 'neither appropriate nor justifiable that, for the same act, immunity should protect the one and not the other.'" (quoting *Hampton,* 484 F.2d at 608)). Thus, for purposes of assessing defendants' failure to intervene in ADA Congdon's alleged constitutional violations, she will be treated as a law enforcement officer.

Their reliance is misplaced.  The defendants in *Breton* did not argue that those involved in a prosecution could never be liable for failure to intervene, but rather that, those who directly participated in a violation cannot be held liable for failure to intervene in their own violative conduct.  Because DA Korchak or Chief ADA Loughran do not contend that they directly participated in any violation of plaintiff's rights, *Breton* is inapposite.[12]

Defendants also contend that plaintiff has failed to plausibly allege the other circumstances necessary to impose liability for failure to intervene, BPD Mem. at 36; County Mem. at 11–12; Korchak & Loughran Mem. at 19–20, *i.e.*, "a realistic opportunity to intervene to prevent the harm from occurring."  *Anderson*, 17 F.3d at 557.

All three of plaintiff's surviving § 1983 claims are premised on plaintiff's allegation that, prior to his arrest and indictment, ADA Congdon instructed Herceg to destroy electronic data related to the night of the alleged assault.  Compl. ¶¶ 66, 112.  Yet, plaintiff does not allege that any defendant was present for, aware of, or had any realistic opportunity to intervene in or prevent ADA Congdon from instructing or directing Herceg to destroy the allegedly exculpatory electronic data.  *See generally* Compl.

Accordingly, he fails to state a plausible § 1983 claim under a failure to intervene theory as to any defendant.

### 6.  Civil Rights Conspiracy

Plaintiff's seventh cause of action is identified as a "Civil Rights Conspiracy" claim against all defendants.  Compl. ¶¶ 263–66.

---

[12] Further, for failure to intervene liability to attach, the alleged violation must occur in the defendant's presence. *O'Neill v. Krzeminski*, 839 F.2d 9, 11 (2d Cir. 1988).  If no one involved in a prosecution could ever be liable for failing to intervene, liability would be superfluous, as neither the direct participant nor the tacit bystander could be held liable.

Broadly, plaintiff asserts that defendants, "acting within the scope of their employment and under color of state law, and [the complainants], agreed among themselves and with other individuals to act in concert in order to deprive Plaintiff of his clearly established" constitutional rights, by arresting and prosecuting him based on the complainants' allegations, despite knowing that those allegations were false.  Compl. ¶¶ 263–66.

Defendants argue that (1) plaintiff has failed to state a § 1983 civil conspiracy claim because he does not plausibly allege the existence of an agreement between defendants; and (2) insofar as plaintiff alleges conspiracies between actors wholly within BPD or wholly within the BCDA, the intra-corporate conspiracy doctrine bars those claims.  BPD Mem. at 37–39; County Mem. at 15–18; Congdon Mem. at 26–28; Korchak & Loughran Mem. at 23–24.  Plaintiff maintains that he has plausibly alleged defendants conspired to violate his rights and that his conspiracy claims are not barred by the intra-corporate conspiracy doctrine because he does not allege a conspiracy between purely BPD defendants or purely BCDA defendants.  Pl.'s Opp. at 81–84.

"To survive a motion to dismiss, a conspiracy claim under 42 U.S.C. § 1983 must allege facts plausibly suggesting that (1) an agreement existed between two or more state actors to act in concert to inflict an unconstitutional injury on plaintiff, and (2) an overt act was committed in furtherance of that goal."  *Vega v. Artus*, 610 F. Supp. 2d 185, 202 (N.D.N.Y. 2009) (citing *Ciambriello v. Cnty. of Nassau*, 292 F.3d 307, 324–25 (2d Cir. 2002).  "A complaint containing only conclusory, vague, or general allegations of conspiracy to deprive a person of constitutional rights cannot withstand a motion to dismiss."  *Sommer v. Dixon*, 709 F.2d 173, 175 (2d Cir. 1983).

Here, plaintiff alleges that either or both the BPD defendants and the BCDA defendants conspired with the complainants to fabricate the complainants' allegations against plaintiff. The Second Circuit addressed similar allegations in *Betts v. Shearman*, 751 F.3d 78 (2d Cir. 2014). There, the §1983 plaintiff alleged that two police officers conspired with a private actor to arrest him based on a false allegation that plaintiff assaulted the private actor. *Id.* at 86. The Second Circuit affirmed the lower court's pre-answer dismissal of plaintiff's conspiracy claim, finding plaintiff's "allegation that [the private actor] was coached by the Officers into making false accusations is not plausible given that [the private actor] first called the police and reported that she was assaulted *prior to* her interaction with the officers." *Betts*, 751 F.3d at 86 (emphasis added).

The logic of *Betts* applies with equal force to these facts. To the extent plaintiff's conspiracy claim depends on the alleged fabrication of the complainants' allegations, it, too, must fail. Plaintiff alleges that the complainants initially reported the alleged sexual assault to the New York State Police, who directed them to contact BPD. Compl. ¶ 69. Accordingly, he has not plausibly alleged that the complainants conspired with either BPD or the BCDA to generate the false allegations.

Plaintiff also alleges that defendants conspired with one another and the complainants to disregard and suppress exculpatory evidence in order to arrest and prosecute him without probable cause and deny him the right to a fair trial. Compl. ¶ 264.

As with failure to intervene, a plaintiff bringing "a § 1983 conspiracy claim must [plead and] prove an actual violation of constitutional rights." *Singer*, 63 F.3d at 119. Plaintiff has plausibly alleged that ADA Congdon violated his rights by instructing Herceg to delete

electronic data relating to the night of the alleged assault. *See supra* Point IV.C.2–4. But he does not allege that any other defendants were aware of or involved in any violative conduct.

While plaintiff does allege that ADA Congdon worked closely with BPD officers and other BCDA employees during the investigation, Compl. ¶ 122, these allegations do not permit an inference that defendants entered an agreement with ADA Congdon to violate his rights. At most, they describe interactions customary of the criminal justice system, including meetings between police and prosecutors to discuss an ongoing criminal investigation or plan for the arrest of a suspect. *Id.* ¶¶ 106–07, 133.

At this stage, plaintiff has plausibly alleged a civil conspiracy claim against ADA Congdon and Herceg only, warranting dismissal of his conspiracy claims against all other moving defendants.

### 7. *Monell* Liability

Plaintiff's fifth and sixth causes of action are identified as "*Monell* Claim" and "*Monell* Claim for the Unconstitutional BPD Custom or Policy," respectively. Compl. ¶¶ 218–262. His first *Monell* claim is asserted against the County and his second, against the City, Chief Zikuski, and Captain Minor.

Both the City and the County seek dismissal of plaintiff's *Monell* claims against them. BPD Mem. at 17–20; County Mem. at 13–15.

As the Second Circuit has explained:

> In *Monell v. Department of Social Services,* 436 U.S. 658, 98 S. Ct. 2018, 56 L.Ed.2d 611 (1978), the Supreme Court established that "[l]ocal governing bodies . . . can be sued directly under [42 U.S.C.] § 1983 for monetary, declaratory, or injunctive relief where, as here, the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers."

*Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 124–25 (2d Cir. 2004) (quoting *Monell*, 436 U.S. at 690).

Plaintiffs proceeding under a *Monell* theory must "'plead and prove three elements: (1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right.'" *Lucente v. Cnty. of Suffolk*, 980 F.3d 284, 297 (2d Cir. 2020) (quoting *Wray v. City of N.Y.*, 490 F.3d 189, 195 (2d Cir. 2007)). "In other words, municipalities may not be held liable 'unless action pursuant to official municipal policy of some nature caused a constitutional tort.'" *Friend v. Gasparino*, 61 F.4th 77, 93 (2d Cir. 2023) (quoting *Monell*, 436 U.S. at 691).

The Court addresses plaintiff's *Monell* claims in turn.

### a. Broome County

Broadly, plaintiff alleges that the BCDA "had unconstitutionally infirm policies and procedures that led to assistant district attorneys not knowing their obligations under *Brady, Giglio,* and discovery; or knowing the law as to obtaining critical evidence that went to the heart of an ongoing investigation." Compl. ¶ 235. Plaintiff also contends that the BCDA "failed to implement policies and procedures including training and supervision to ensure that criminal defendants . . . would not have their constitutional rights violated." *Id.* ¶ 234.

The County argues that this claim must be dismissed. According to the County, "[t]he closest Plaintiff comes to identifying a specific policy is the assertion that the County assigned ADA [ ] Congdon to lead the prosecution of his case. However, this decision does not support the inference of an actionable municipal policy or custom." County Mem. at 10.

"'Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law.'" *Friend*, 61 F.4th at 93 (quoting *Connick v. Thompson*, 563 U.S. 51, 61 (2011)).

A plaintiff can satisfy the official policy element by alleging, *inter alia*, that (1) "a municipal policy or ordinance is itself unconstitutional," *Amnesty Am.*, 361 F.3d at 125; (2) a municipality's persistent and widespread "practice, as opposed to its formal policy, is to engage in the constitutional violation at issue," *Green v. City of N.Y.*, 465 F.3d 65, 80 (2d Cir. 2006) (citing *Amnesty Am.*, 361 F.3d at 125–26); or (3) "the municipality is aware that its policy for handling a given situation, although not unconstitutional in itself, may be applied unconstitutionally, but nevertheless consciously chooses not to train its employees in proper application of the policy," *Green*, 465 F.3d at 80.

First, plaintiff alleges that DA Korchak and Chief ADA Loughran assigned plaintiff's case to ADA Congdon, "whom they knew lacked the necessary prosecutorial experience, knowledge, and training to handle a serious felony investigation, and who repeatedly expressed concern to them . . . that she was being given more responsibility than she could handle." Compl. ¶ 127.

This is not enough to plausibly allege a *Monell* claim. "The fact that inadequate scrutiny of an applicant's background would make a violation of rights more *likely* cannot alone give rise to an inference that a policymaker's failure to scrutinize the record of a particular applicant produced a specific constitutional violation." *Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 410–11 (1997) (emphasis in original). Instead, "[a] plaintiff must demonstrate that a municipal decision reflects deliberate indifference to the risk that a violation of a particular constitutional or statutory right will follow the decision." *Id.* at 411.

Plaintiff alleges that ADA Congdon, who had no prosecutorial experience, was hired by the BCDA less than a month before she was assigned to plaintiff's case.  Compl. ¶ 105(a). According to plaintiff, ADA Congdon was quickly promoted to Bureau Chief of the Special Victims Bureau, even though she had expressed to DA Korchak and Chief ADA Loughran "that she believed she lacked sufficient prosecutorial experience for the role." *Id.* ¶ 105(c).  Plaintiff further contends that, "[d]espite having been a member of the Bar of the State of New York from 2012, and despite having practiced criminal defense for nearly a decade, Congdon did not understand her legal obligations as a prosecutor." *Id.* ¶ 105(f).

Still, taken as true, these allegations could not plausibly amount to an inference that defendants were deliberately indifferent in hiring and assigning ADA Congdon to plaintiff's case.  "Only where adequate scrutiny of an applicant's background would lead a reasonable policymaker to conclude that the plainly obvious consequence of the decision to hire . . . would be the deprivation of a third party's federally protected right can the official's failure to adequately scrutinize the applicant's background constitute 'deliberate indifference.'" *Bd. of Cnty. Comm'rs of Bryan Cnty., Okl.*, 520 U.S. at 411.  Such is not the case here.

As plaintiff points out, ADA Congdon had nearly ten years of experience as a criminal defense attorney.  Compl. ¶ 105(f).  The fact that she had never been a prosecutor and had expressed some reluctance about taking on a leadership role, without more, could not plausibly lead a policymaker "to conclude that the plainly obvious consequence of the decision to hire . . . would be the deprivation of [plaintiff]'s federally protected right." *Bd. of Cnty. Comm'rs of Bryan Cnty., Okl.*, 520 U.S. at 411.

Plaintiff also contends that ADA Congdon's failure to recognize and disclose exculpatory information "reflects the lack of training, supervision, policies and procedures within BCDA[ ]."

Compl. ¶ 150.  "[A] *Monell* claim cannot succeed without an independent constitutional violation," *Anilao*, 27 F.4th at 874, and there must be "a direct causal link between a municipal policy or custom and the alleged constitutional deprivation," *City of Canton, Ohio v. Harris*, 489 U.S. 378, 385 (1989).  Because plaintiff has not plausibly alleged a *Brady* violation, *see supra* Point IV.C.4.b, he cannot impose *Monell* liability on the County based on a custom or policy that allegedly caused a *Brady* violation.

Further, plaintiff alleges that there where errors in the grand jury instructions due to the "improper practices and procedures" of the BCDA.  Compl. ¶ 179.  Plaintiff's surviving § 1983 claims rest on his allegation that ADA Congdon violated his constitutional rights by directing Herceg to delete or otherwise destroy exculpatory electronic data.  *Id.* ¶¶ 66, 112.  Accordingly, plaintiff has failed to plausibly allege a causal connection between the erroneous grand jury instructions and ADA Congdon's allegedly violative conduct.

In sum, plaintiff has failed to state plausible factual allegations that would permit the imposition of *Monell* liability against the County, so its motion to dismiss this claim must be granted.

### b.  City of Binghamton

Plaintiff's second *Monell* claim is asserted against "Defendants City of Binghamton, Zikuski, and Minor."

In *Monell*, the Supreme Court noted that:

> Since official-capacity suits generally represent only another way of pleading an action against an entity of which an officer is an agent . . . local government officials sued in their official capacities are "persons" under § 1983 in those cases in which, as here, a local government would be suable in its own name.

436 U.S. at 691 n.55.

Conversely, "a suit against a government official in his or her personal capacity cannot lead to . . . liability upon the governmental entity," because "a municipality cannot be made liable under 42 U.S.C. § 1983 on a *respondeat superior* basis." *Graham*, 473 U.S. at 167–68. In other words, a municipal official, sued only in their personal or individual capacity, is not a proper defendant to a claim premised on *Monell* liability.

Plaintiff appears to be suing the individual BPD defendants only in their personal capacities, *see* Compl. ¶¶ 18–19, warranting dismissal of his "*Monell* claim[s]" against them.

To the extent his claims are brought against either Chief Zikuski or Captain Minor in their official capacities, "they are redundant to the claims against the [City]," and are therefore dismissed. *Booker v. Bd. of Educ., Baldwinsville Cent. Sch. Dist.*, 238 F. Supp. 2d 469, 475 (N.D.N.Y. 2002).

As to the City's liability, the Second Circuit has held that:

> Where the plaintiff does proceed against both the municipal actors alleged to have inflicted the tort and the municipality that promulgated the offensive policy, the plaintiff's failure to secure a judgment against the individual actors would, indeed, preclude a judgment against the municipality if the ruling in favor of the individual defendants resulted from the plaintiff's failure to show that they committed the alleged tort.

*Askins v. Doe No. 1*, 727 F.3d 248, 253–54 (2d Cir. 2013).

Plaintiff's *Monell* claim against the City are necessarily dependent on his allegations against the individual BPD defendants. Compl. ¶¶ 243–262. Fatally, plaintiff has not plausibly alleged that any BPD defendant violated his constitutional rights. *See supra* Points IV.C.1–6. Thus, plaintiff's *Monell* claim against the City must be dismissed.

## 8. Qualified Immunity

ADA Congdon argues that she is entitled to qualified immunity for any of her alleged actions not protected by absolute immunity. Congdon Mem. 17–20. In opposition, plaintiff

contends that courts generally deny qualified immunity where prosecutors allegedly fabricated evidence while acting in an investigative capacity.  Pl.'s Opp. 51–53.

"Qualified immunity is available to officials so long as their actions do not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *Chamberlain Est. of Chamberlain v. City of White Plains*, 960 F.3d 100, 110 (2d Cir. 2020) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

"[A]s a general rule, 'the defense of qualified immunity cannot support the grant of a [Rule] 12(b)(6) motion.'"  *Chamberlain Est. of Chamberlain*, 960 F.3d at 110 (quoting *Green v. Maraio*, 722 F.2d 1013, 1018 (2d Cir. 1983)).  "Not only must the facts supporting the defense appear on the face of the complaint, but, as with all Rule 12(b)(6) motions, the motion may be granted only where it appears [that the alleged facts, if true, plausibly state a claim] that would entitle him to relief.'"  *Id.* (quoting *McKenna v. Wright*, 386 F.3d 432, 436 (2d Cir. 2004)).

"Thus, a qualified immunity defense presented on a Rule 12(b)(6) motion 'faces a formidable hurdle . . . and is usually not successful.'"  *Chamberlain Est. of Chamberlain*, 960 F.3d at 111 (quoting *Field Day, LLC v. County of Suffolk*, 463 F.3d 167, 191–92 (2d Cir. 2006)).

As noted *supra*, plaintiff's surviving § 1983 claims against ADA Congdon for false arrest, malicious prosecution, fabrication of evidence, and civil rights conspiracy are all premised on his allegation that ADA Congdon instructed complainant Herceg to delete exculpatory electronic data.  "Government officials may be held liable for fabricating evidence through false statements *or omissions*," *Morse*, 804 F.3d at 547 (emphasis added), and the Second Circuit has explicitly held that the "right not to be deprived of liberty as a result of *any government officer's* fabrication of evidence . . . was clearly established in 1996." *Zahrey*, 221 F.3d at 357 (emphasis in original).

According to plaintiff, ADA Congdon allegedly violated this clearly established right sometime during or after December 2021.  Compl. ¶¶ 66, 112.  Therefore, at this stage, ADA Congdon is not entitled to qualified immunity.

## D.  State Law Claims

Defendants seek dismissal of all state law causes of action.  *See* BPD Mem. at 26–31, 35–36, 39–45; County Mem. at 18–25; Congdon Mem. 20–24, 28–29; Korchak & Loughran Mem. at 14–17, 24–26; Cronin at 12–14, 17–18.

Plaintiff identifies his state law causes of action as: (1) false arrest and malicious prosecution; (2) intentional, reckless, or negligent infliction of emotional distress; (3) violation of Sections 6 and 12 of Article I of the New York State Constitution; (4) *respondeat superior*; and (5) abuse of process.  Compl. ¶¶ 267–302.

"It is well-established . . . that *respondeat superior* 'is not a cause of action at all, but a theory of liability that must attach to a separate claim.'"  *Lederman v. Benepe*, 2016 WL 11588628, at *5 (S.D.N.Y. Mar. 11, 2016) (quoting *Alexander v. Westbury Union Free Sch. Dist.*, 829 F. Supp. 2d 89, 110 n.6 (E.D.N.Y. 2011)).  Accordingly, the Court addresses *respondeat superior* liability in tandem with the underlying cause(s) of action for which it is asserted.

### 1.  False Arrest

Plaintiff's eighth cause of action is identified as "false arrest and malicious prosecution" and is asserted against "all defendants."  Compl. ¶¶ 267–80.

False arrest and malicious prosecution are distinct causes of action under state law.  *See Broughton*, 335 N.E.2d at 313 ("Although [false imprisonment and malicious prosecution] are

kindred actions, each protects a different personal interest and is composed of different elements."). Accordingly, they will be addressed separately.

"'A § 1983 claim for false arrest, resting on the Fourth Amendment right of an individual to be free from unreasonable seizures . . . is substantially the same as a claim for false arrest under New York law.'" *Kee*, 12 F.4th at 158 (quoting *Weyant*, 101 F.3d at 852).

Because the elements of a false arrest claim brought pursuant to § 1983 are derived from the elements of a false arrest claim under state law, defendants' motions to dismiss plaintiff's state law false arrest claims must be granted as to all moving individual BPD and BCDA defendants, except ADA Congdon, for the reasons detailed above. *See supra* Point.IV.C.2.

Plaintiff also brings his state law claim for false arrest against the City and the County, under a theory of *respondeat superior*. "[T]he doctrine of [*r*]*espondeat superior* renders a[n] [employer] vicariously liable for a tort committed by his [employee] while acting within the scope of his employment." *Riviello v. Waldron*, 391 N.E.2d 1278, 1280–81 (N.Y. 1979).

Plaintiff has not plausibly alleged false arrest against any City employees, warranting dismissal of his false arrest claim against the City.

Contrary to the County's contentions, County Mem. at 25, plaintiff has plausibly alleged a false arrest claim against ADA Congdon, an employee of the County. *See supra* Point IV.C.2.

Rather than addressing whether ADA Congdon was acting within the scope of employment to determine the applicability of *respondeat superior* liability, the County reframes plaintiff's "*respondeat superior*" claim as a state law claim for negligent hiring, supervision, or retention. County Mem. at 24–25. The Court finds no indication in the complaint that plaintiff intends to bring such a claim. *See* Compl. ¶¶ 290–94.

Unlike *respondeat superior*, which imposes liability on an employer only where an employee commits a tort while acting within the scope of their employment, an employer cannot be liable for negligent hiring, supervision, or retention where an employee allegedly acted within the scope of their employment. *Taylor v. City of Buffalo*, 229 A.D.3d 1125, 1128 (N.Y. App. Div. 4th Dep't 2024) ("It is well settled . . . that 'where an employee is acting within the scope of [their] employment, the employer is liable for the employee's negligence under a theory of *respondeat superior* and no claim may proceed against the employer for negligent hiring, retention, supervision, or training.'" (quoting *Moll v. Griffith*, 208 A.D.3d 1032, 1033 (N.Y. App. Div 4th Dep't 2022)).

By reframing plaintiff's *respondeat superior* claim as a negligent hiring, supervision, or retention claim and moving to dismiss that claim, the County, at least impliedly, conceded that plaintiff plausibly alleged that ADA Congdon was acting within the scope of her employment. *See* County Mem. at 25 ("'[W]here an employee acts within the scope of his or her employment, the employer cannot be held liable for a claim of negligent hiring, retention, or training.'" (quoting *Barnville v. Mimosa Cafe*, 2014 WL 3582878, at *2 (S.D.N.Y. 2014) (internal citation omitted)).

In any event, plaintiff's factual allegations plausibly establish that ADA Congdon was acting within the scope of her employment during the relevant events, Compl. ¶¶ 15, 108, subjecting the County to liability for her misconduct under a *respondeat superior* theory.

Accordingly, plaintiff's state law false arrest claim survives against ADA Congdon, directly, and the County, under a theory of *respondeat superior* liability.

### 2. Malicious Prosecution

Plaintiff asserts a state law malicious prosecution claim against all defendants.  Compl.

¶¶ 267–280.  As with false arrest, "[c]laims for malicious prosecution brought under § 1983 are

substantially the same as claims for malicious prosecution brought under state law."  *Ortiz v.*

*Stambach*, 137 F.4th 48, 61 (2d Cir. 2025).  Accordingly, plaintiff's state law malicious

prosecution claim may proceed against ADA Congdon, but must be dismissed as to the other

individual BCDA defendants and the individual BPD defendants.  *See supra* Point IV.C.3.

Plaintiff's state law malicious prosecution claims premised on *respondeat superior*

liability must be dismissed against City, but may proceed against the County, for the same

reasons cited with respect to his state law false arrest claims against those defendants.  *See supra*

Point IV.D.1.

### 3. Intentional, Reckless, or Negligent Infliction of Emotional Distress

Plaintiff's "Ninth Cause of Action" is identified as "intentional, reckless, or negligent

infliction of emotional distress" against all defendants.  Compl.  ¶¶ 281–85.

All defendants seek dismissal of this cause of action.  BPD Mem. at 39–40; County Mem.

at 21–23; Congdon Mem. at 28–29; Korchak & Loughran Mem. at 24–25.

As a threshold matter, "reckless conduct is encompassed within the tort of intentional

infliction of emotional distress and does not constitute a separate and distinct cause of action."

*James v. Flynn*, 132 A.D.3d 1214, 1216 (N.Y. App. Div. 3d Dep't 2015).

### a. Intentional (or Reckless) Infliction of Emotional Distress

Defendants argue that plaintiff's intentional infliction of emotional distress claim must be

dismissed because (1) an intentional infliction of emotional distress claim cannot be brought

under New York law where, as here, plaintiff brought traditional tort claims based on the same

challenged conduct; and (2) regardless, plaintiff has not plausibly alleged that defendants

engaged in extreme and outrageous conduct.  BPD Mem. at 39; County Mem. at 22; Congdon

Mem. at 28; Korchak & Loughran Mem. at 24.

"[U]nder New York law, an intentional infliction tort may 'be invoked only as a last

resort.'"  *Salmon v. Blesser*, 802 F.3d 249, 256 (2d Cir. 2015) (quoting *Turley v. ISG

Lackawanna, Inc.,* 774 F.3d 140, 158 (2d Cir. 2014)).  "[T]he New York Court of Appeals has

questioned whether an intentional infliction claim can ever be brought where the challenged

conduct 'falls well within the ambit of other traditional tort liability.'"  *Salmon*, 802 F.3d at 256

(quoting *Fischer v. Maloney*, 373 N.E.2d 1215, 1217 (N.Y. 1978).  "All four Appellate Division

courts have answered the question and held that it cannot."  *Salmon*, 802 F.3d at 256 (collecting

cases).

Plaintiff's intentional infliction of emotional distressed is premised on the same alleged

conduct as his malicious prosecution and false arrest claims.  Compl. ¶ 282 ("The . . . conduct of

the Defendants in deliberately and knowingly causing, or recklessly disregarding the risk of

causing, the wrongful arrest, prosecution, and concomitant severe emotional distress . . .").

Because plaintiff seeks to impose traditional tort liability based on the same conduct, the

"last resort" claim of intentional infliction of emotional distress is duplicative, unnecessary, and,

consequently, dismissed.[13]

Plaintiff's allegations that defendants failed to intervene to prevent members of the public

from retaliating against him fare no better.  Compl. ¶¶ 88–91, 93–103.  "[U]nder New York law,

---

[13] Plaintiff suggests that defendants are estopped from arguing his claim of intentional infliction of emotional distress is unavailable for this reason, simply because defendants have moved to dismiss those traditional tort claims on the merits.  Pl.'s Opp. at 86.  The Court rejects this contention because it implies that defendants would be required to admit liability for traditional tort claims in order to raise the state law rule that a claim for intentional infliction of emotional distress based on the same conduct is precluded.

a cause of action alleging intentional infliction of emotion distress 'has four elements: (i) extreme and outrageous conduct; (ii) intent to cause, or disregard of a substantial probability of causing, severe emotional distress; (iii) a causal connection between the conduct and injury; and (iv) severe emotional distress.'" *Taggart v. Costabile*, 131 A.D.3d 243, 249 (N.Y. App. Div. 2d Dept. 2015) (quoting *Howell v. New York Post Co.,* 612 N.E.2d 699, 702 (N.Y. 1993)).

The causation element requires a plaintiff to allege that a defendant's *own* extreme and outrageous conduct caused severe emotional distress. A defendant is not liable for failing to prevent or mitigate third parties' extreme outrageous conduct. *See Taggart*, 131 A.D.3d at 250–51.

In *Taggart*, the court dismissed the plaintiffs' intention infliction of emotional distress claim where the complaint "alleged . . . that the defendants 'exhibited outrageous and extreme conduct in renting to tenants who posed a clear and present danger to the neighborhood,' and 'refused to control the dangerous behaviors of those tenants.'" 131 A.D.3d at 250. On one occasion, two armed men, later determined to be visitors of the defendants' tenants, broke into the plaintiffs' home and threatened them after the plaintiffs contacted the police about a large gathering the day before. *Id.* at 246. The plaintiffs blamed this incident on the landlord's "failure to rein in their tenants." *Id.* at 250.

In dismissing this claim, the Appellate Division noted that:

> Although the individuals who broke into the plaintiffs' home may have engaged in extreme and outrageous conduct, the complaint alleges no basis upon which the intruders' conduct may be imputed to the defendants. The defendants' intentional conduct, as alleged in the complaint, amounts to nothing more than a failure to ensure that their tenants and their friends refrained from committing the acts described in the complaint.

*Taggart*, 131 A.D.3d at 250.

Here, too, plaintiff's allegations concern not the defendants' actions, but third parties' extreme and outrageous conduct.  The complaint therefore cannot support a claim against the individual defendants based on their alleged failure to prevent that conduct.

Lastly, plaintiff cannot maintain a claim against either the City or the County, because, as a matter of public policy, New York law does not permit claims for intentional infliction of emotional distress against governmental entities.  *See Boyle v. Caledonia-Mumford Cent. Sch.*, 140 A.D.3d 1619, 1620–21 (N.Y. App. Div. 4th Dept. 2016) ("The cause of action asserting 'outrageous conduct causing emotional distress' was properly dismissed inasmuch as '[p]ublic policy bars claims sounding in intentional infliction of emotional distress against a government entity.'"), *lv denied*, 68 N.E.3d 102 (N.Y. 2016); *Taylor*, 229 A.D.3d at 1129 ("[P]ublic policy bars claims for intentional infliction of emotional distress against a governmental entity."); *Liranzo v. New York City Health and Hosps. Corp.*, 300 A.D.2d 548, 548 (N.Y. App. Div. 2d Dept. 2002) ("Public policy bars claims for intentional infliction of emotional distress against a governmental entity.").

In sum, plaintiff's claim for intentional infliction of emotional distress is dismissed as to all moving defendants.

### b.  Negligent Infliction of Emotional Distress

Defendants argue that plaintiff's negligent infliction of emotional distress claim must be dismissed because he has failed to allege that either (1) defendants owed him a special duty beyond that owed to the public; or (2) defendants' conduct unreasonably caused him to fear for his own physical safety.  County Mem. at 22–23; Korchak & Loughran Mem. at 24–25; Congdon Mem. at 28–29.  Plaintiff maintains that defendants established a special relationship, and that there was "an 'affirmative undertaking' by the police, *i.e.*, that they would investigate

the case and obtain the evidence Plaintiff told them would completely exonerate him."  Pl.'s

Opp. at 87.

"A cause of action to recover damages for negligent infliction of emotional distress

generally requires a plaintiff to show a breach of a duty owed to him which unreasonably

endangered his physical safety, or caused him to fear for his own safety."  *Sacino v. Warwick*

*Valley Cent. Sch. Dist.*, 138 A.D.3d 717, 719 (N.Y. App. Div. 2d Dep't 2016).  To recover for

negligent infliction of emotional distress, "the damaged plaintiff [must] be able to point the

finger of responsibility at a defendant owing, not a general duty to society, but a specific duty to

him."  *Johnson v. Jamaica Hosp.*, 467 N.E.2d 502, 503 (N.Y. 1984); *see also Valdez v. City of*

*N.Y.*, 960 N.E.2d 356, 361 (N.Y. 2011).

Plaintiff alleges that defendants were "acting under color of law and . . . within the scope

of employment."  Compl. ¶¶ 13–16, 18–19.  Accordingly, he must allege a special relationship

between defendants and himself.  *Marino v. City of N.Y.*, 223 A.D.3d 888, 890 (N.Y. App. Div.

2d Dept. 2024) ("Since the defendants were acting in a governmental capacity, the plaintiff was

required to prove that the defendants owed him a special duty.").

A special relationship exists only where the following circumstances are alleged:

> (1) an assumption by the municipality, through promises or actions, of an
> affirmative duty to act on behalf of the party who was injured; (2) knowledge on
> the part of the municipality's agents that inaction could lead to harm; (3) some form
> of direct contact between the municipality's agents and the injured party; and (4)
> that party's justifiable reliance on the municipality's affirmative undertaking

*Cuffy v. City of N.Y.*, 505 N.E.2d 937, 940 (N.Y. 1987).

Here, the complaint is devoid of allegations that any defendant affirmatively indicated

any intent to act on plaintiff's behalf.  *See generally* Compl.  To be sure, plaintiff alleges that:

> The conduct by which the Individual Defendants committed the torts of malicious
> prosecution, intentional, reckless, or negligent infliction of emotional distress, and
> negligence was not undertaken for the Individual Defendants' personal motives,

but rather was undertaken while the Individual Defendants were on duty, carrying
out their routine prosecutorial and investigative functions as police officers and
assistant district attorneys.

Compl. ¶ 293.

Taken in a light most favorable to plaintiff, the complaint does not plausibly allege a

special relationship between plaintiff and defendants. *See Lauer v. City of N.Y.*, 733 N.E.2d 184,

189 (N.Y. 2000) (refusing to "impose a new duty on the Office of the Chief Medical Examiner,

which for the future would run to members of the public who may become subjects of a criminal

investigation").

Nevertheless, even had plaintiff plausibly alleged that defendants assumed an affirmative

duty or undertaking, he failed to allege justifiable reliance. "[A]t the heart of . . . 'special duty'

cases is the unfairness . . . in precluding recovery when a municipality's voluntary undertaking

has lulled the injured party into a false sense of security and has thereby induced him either to

relax his own vigilance or to forego other available avenues of protection." *Cuffy*, 505 N.E.2d at

940.

The complaint, here, acknowledges that, early in the investigation, BPD and BCDA

defendants publicly expressed that they were "investigating a November 28, 2021[,] incident

involving the owners of the Colonial," and encouraging "those with knowledge to contact" the

BCDA or BPD.  Compl. ¶¶ 94–95.  Accordingly, plaintiff could not have justifiably relied on

any defendant's affirmative undertaking to act on his behalf.

Although the municipal defendants also urge dismissal of plaintiff's negligent infliction

of emotional distress claims based on governmental function immunity, BPD Mem. at 43–45;

County Mem. at 18, the Court need not reach this issue. *See Valdez*, 960 N.E.2d at 365 ("If

plaintiff[ ] cannot overcome the threshold burden of demonstrating that defendant owed the

- 86 -

requisite duty of care, there will be no occasion to address whether defendant can avoid liability by relying on the governmental function immunity defense.").

Plaintiff has failed to plausibly state a claim for negligent infliction of emotional distress against any of the moving defendants, mandating dismissal of this claim against them.

### 4. New York State Constitutional Violations

Plaintiff's "Tenth Cause of Action," asserted against all defendants, alleges violations of Article I, sections 6 and 12 of the New York State Constitution. Compl. ¶¶ 286–89.

All moving defendants seek dismissal of this cause of action because (1) it is precluded by the availability of traditional tort remedies and adequate alternative remedies under federal law; and (2) regardless, it is not plausibly alleged. BPD Mem. at 35–36; County Mem. at 23–24; Congdon Mem. at 24–25; Korchak & Loughran Mem. at 14; Cronin Mem. at 17–18.

Plaintiff argues that federal law does not provide an adequate alternative remedy because it does not permit *respondeat superior* liability, and he further claims that his New York State constitutional claims have been plausibly alleged. Pl.'s Opp. at 87–88.

The Court of Appeals has "recognized a private right of action to recover damages against the State for violations of the Equal Protection and Search and Seizure Clauses . . . Finding neither injunctive, declaratory, nor exclusionary relief adequate to protect against the invasion of personal liberty interests suffered by the claimants." *Martinez v. City of Schenectady*, 276 A.D.2d 993, 996 (N.Y. App. Div. 3d Dep't 2000) (citing *Brown v. State*, 674 N.E.2d 1129, 1140–41 (N.Y. 1996)), *aff'd*s 761 N.E.2d 560 (N.Y. 2001). "[H]owever, the Court of Appeals made it clear that th[is] 'narrow remedy'. . . was not 'boundless.'" *Lyles v. State*, 2 A.D.3d 694, 695 (N.Y. App. Div. 2d Dep't 2003) (quoting *Martinez v. City of Schenectady*, 761 N.E.2d 560, 563 (N.Y. 2001)), *aff'd*, 820 N.E.2d 860 (N.Y. 2004).

In *Lyles*, the Appellate Division for the Second Department held that:

recognition of the claimant's State constitutional claims was neither necessary nor appropriate to ensure the full realization of his rights, because the alleged wrongs could have been redressed by an alternative remedy, namely, timely interposed common-law tort claims for assault and battery, false imprisonment, and the intentional and negligent injury to his property.

*Lyles*, 2 A.D.3d at 695.

Similarly, here, plaintiff alleges that his rights under the New York State Constitution were violated when he was "wrongly arrested and maliciously prosecuted." Compl. ¶ 289. Thus, recognizing a state constitutional claim is not necessary, as plaintiff has timely interposed common-law tort claims for false arrest and malicious prosecution, both of which permit a damages remedy.[14] *See* Compl. ¶¶ 267–280.

Accordingly, plaintiff's tenth cause of action for violations of the New York State Constitution is dismissed as to the moving defendants.

### 5. Abuse of Process

Plaintiff's twelfth cause of action, for "abuse of process," is asserted against the City, DA Korchak, and Chief Zikuski. Compl. ¶¶ 295–302. Plaintiff alleges that DA Korchak and Chief Zikuski arrested and prosecuted him in response to public pressure, rather than "to serve the interests of justice." *Id.* ¶¶ 297–99.

Defendants argue that plaintiff has failed to allege a collateral objective, and that neither DA Korchak, nor Chief Zikuski, made the decision to arrest or prosecute plaintiff. BPD Mem. at

---

[14] The Court acknowledges plaintiff's point, *see* Pl.'s Opp. at 87–88, that "'[t]he case law in this Circuit is split on the issue of whether [§] 1983 provides an adequate alternative remedy for state constitutional claims predicated on a theory of *respondeat superior*,' because a § 1983 claim cannot be based upon *respondeat superior*, while a New York Constitution claim may be." *Forrest v. Cnty. of Greene*, 676 F. Supp. 3d 69, 79–80 (N.D.N.Y. 2023) (quoting *Isaac v. City of N.Y.*, 2018 WL 5020173, at *20 n. 25 (E.D.N.Y. Aug. 6, 2018)), *reconsideration denied*, 2023 WL 5097970 (N.D.N.Y. Aug. 9, 2023).

But the Court need not reach that issue, as plaintiff has brought state law tort claims based on the challenged conduct, for which *respondeat superior* liability and damages are available.

40–41; Korchak & Loughran Mem. at 25–26.  In opposition, plaintiff argues that the "extraordinary level of public outcry" alleged creates an inference that defendants *must* have utilized regularly issued process to appease the public.  Pl.'s Opp. at 89–90.

"Abuse of process has three essential elements: (1) regularly issued process, either civil or criminal, (2) an intent to do harm without excuse or justification, and (3) use of the process in a perverted manner to obtain a collateral objective." *Curiano v. Suozzi*, 469 N.E.2d 1324, 1326 (N.Y. 1984).  "The mere commencement of an action, even with malicious intent, does not give rise to a cause of action for abuse of process." *Dixon v. City of Rochester*, 234 A.D.3d 1301, 1302 (N.Y. App. Div. 4th Dept. 2025).

Plaintiff alleges no facts that could support an inference that either DA Korchak or Chief Zikuski perverted the process brought against him.  *See supra* Point IV.C.1; *see generally* Compl.  Instead, he claims alleges only that DA Korchak "was facing a re-election in the upcoming year," and there was "public outcry for the arrest and prosecution of Plaintiff." Compl. ¶¶ 301–02.

However, "[i]t is not enough that the actor ha[s] an ulterior motive in using the process of the court. It must further appear that he did something in the use of the process outside of the purpose for which it was intended . . .[t]here must be a further act done outside the use of the process—a perversion of the process." *Hauser v. Bartow*, 7 N.E.2d 268, 269 (N.Y. 1937).

As discussed above, plaintiff has not plausibly alleged that either DA Korchak or Chief Zikuski were personally involved in any of the challenged conduct.  *See supra*, Point IV.C.1. Without more, the fact that DA Korchak or Chief Zikuski had reason to benefit from the perversion of the process against plaintiff cannot permit the inference, absent any other allegations, that they committed any acts to distort the process.

Accordingly, plaintiff has failed to state an abuse of process claim against either DA Korchak or Chief Zikuski.  Further, because plaintiff has not plausibly alleged abuse of process against Chief Zikuski, his claim against the City must also be dismissed, as it is necessarily based on *respondeat superior* liability.

### 6.  Qualified Immunity

ADA Congdon again argues that "to the extent any of [her] alleged conduct is not encompassed by absolute immunity[,] qualified immunity bars any and all remaining claims by plaintiff."  Congdon Mem. 17.  In opposition, plaintiff contends that qualified immunity does not bar his claims "because the complaint alleges . . . objectively unreasonable conduct."  Pl.'s Opp. at 54.

Courts look to state law to determine whether a government official is entitled to qualified immunity from state law claims.  *Napolitano v. Flynn*, 949 F.2d 617, 621 (2d Cir. 1991).  "New York law . . . grant[s] government officials qualified immunity on state-law claims except where the officials' actions are undertaken in bad faith or without a reasonable basis." *Jones v. Parmley*, 465 F.3d 46, 63 (2d Cir. 2006); *see also Arteaga v. State*, 527 N.E.2d 1194, 1196 (N.Y. 1988) (holding that a state official's action is entitled to qualified immunity from state law claims "except when there is bad faith or the action taken is without a reasonable basis").

The surviving state law claims against ADA Congdon are premised on plaintiff's allegation that she directed Herceg to delete electronic data prior to plaintiff's arrest.  *See supra* Point IV.D.1–2.  The qualified immunity defense is precluded at the pre-answer motion to dismiss where, as here, the plaintiff alleges that a defendant's conduct was undertaken in bad faith.  *See Kirchner*, 107 A.D.3d at 1624 ("Here, plaintiff alleged that Caldwell's actions were

made in bad faith, thus precluding application of the defense of qualified immunity at this stage of the litigation.").

While plaintiff's allegation that ADA Congdon directed Herceg to destroy allegedly exculpatory evidence, Compl. ¶ 66, is likely enough to establish bad faith on its own, his claim that ADA Congdon subsequently failed to retrieve the Saitta folder, which included copies of the material she directed Herceg to destroy, for over a year and a half, despite being aware of its existence even before plaintiff's arrest, further supports an inference of bad faith.

Accordingly, at this stage, ADA Congdon has not established entitlement to qualified immunity from plaintiff's state law claims.

### E. Leave to Amend

Finally, the Court must address plaintiff's request for leave to amend his complaint. Apart from the "Conclusion" paragraph and one sentence of the "Introduction" section, plaintiff offers nothing in support of this request.  Pl.'s Opp. at 12, 90–91.

Under this District's Local Rules of Practice, "[a] party moving to amend a pleading . . . must attach an unsigned copy of the proposed amended pleading to its motion papers."  L.R. 15.1(a).  "[T]he proposed amended pleading must be a complete pleading, which will supersede the pleading sought to be amended in all respects."  *Id.*  A motion to amend "must set forth specifically the proposed insertions and deletions of language and identify the amendments in the proposed pleading."  *Id.*

Plaintiff has not complied with this Local Rule.  His failure to attach a proposed amended pleading is particularly frustrating, "as it precludes the Court from 'examin[ing] the exact amendment that it is being asked to permit[;] ... ensur[ing] that all of the allegations asserted . . . are contained in a single document[;] ... [and] eliminat[ing] the confusing nature of piecemeal

amended pleadings.'"  *Wynn v. Lee*, 2019 WL 13546213, at *1 (N.D.N.Y. May 1, 2019) (quoting *Cusamano v. Sobek*, 604 F. Supp. 2d 416, 508 (N.D.N.Y. 2009)).

Plaintiff's obvious non-compliance with the Local Rules is a sufficient basis on which to deny his motion to amend.  *Reynolds-Sitzer v. EISAI, Inc.*, 586 F. Supp. 3d 123 (N.D.N.Y. 2022) (denying motion for leave to amend where plaintiffs requested leave in a brief paragraph of their opposition papers and failed to comply with the Local Rules); *Webb v. Mentor Worldwide LLC*, 453 F. Supp. 3d 550 (N.D.N.Y. 2020) (denying plaintiff's motion for leave to amend, in part, for noncompliance with the Local Rules); *Braxton v. Bell*, 2020 WL 13908846, at *1 (N.D.N.Y. July 7, 2020) (denying "motion to amend for failure to comply with the Local Rules for the Northern District of New York and Federal Rules of Civil Procedure.").

While plaintiff is correct that leave to amend should be freely given when justice so requires, Pl.'s Opp. at 90 (citing Fed. R. Civ. P. 15(a)(2)), "a court need not always allow a party to replead simply because it asked.  In particular, denial of leave to amend is proper where the request gives no clue as to how the complaint's defects would be cured."  *Noto v. 22nd Century Grp., Inc.*, 35 F.4th 95, 107 (2d Cir. 2022) (internal quotation omitted); *Murphy Med. Assocs., LLC v. Yale Univ.*, 120 F.4th 1107, 1114 (2d Cir. 2024) (affirming district court's denial of plaintiff's request for leave to amend the pleading where plaintiff failed to make formal motion to amend or to offer proposed amended complaint); *Solomon v. Flipps Media, Inc.*, 136 F.4th 41, 55 (2d Cir. 2025) (affirming district court's denial of plaintiff's request for leave to amend the pleading where "she waited until her opposition to the motion to dismiss to request leave, and she did so only in a single footnote on the final page of her brief, stating that '[i]f the Court grants Defendant's motion in any respect, Solomon should be granted leave to amend the Complaint to remedy any perceived deficiencies.'").

Plaintiff was given extra time, Dkt. No. 71, and eighty pages, Dkt. No. 82, in which to respond to defendants' motions—most of which raise identical or substantially overlapping legal issues—but the Court finds no indication anywhere in plaintiff's briefing of what new or additional, non-conclusory factual allegations he would raise to cure the deficiencies in his complaint. *See generally* Pl.'s Opp.

Accordingly, plaintiff's request for leave to amend his complaint is denied.

## V.    CONCLUSION

Therefore, it is

ORDERED that

1. Chief Zikuski, Captain Minor, Investigator Miller, and the City are dismissed;

2. DA Korchak, Chief ADA Loughran, ADA Cronin, and the Broome County District Attorney's Office are dismissed;

3. Does 1–10 are dismissed;

4. Plaintiff's Third, Fifth, Seventh, Ninth, Tenth, and Eleventh Causes of Action are dismissed against the County; and

5. Plaintiff's Third, Ninth, and Tenth Causes of Action are dismissed against ADA Congdon.

6. Plaintiff's surviving claims against ADA Congdon are:

    -Section 1983 False Arrest;

    -Section 1983 Malicious Prosecution;

    -Section 1983 Denial of the Right to a Fair Trial based on Fabrication of Evidence.

    -Section 1983 Civil Rights Conspiracy;

-Related state law claims of False Arrest and Malicious Prosecution.

7.   Plaintiff's surviving claims against the County are:

-State law False Arrest and Malicious Prosecution under a theory of

*respondeat superior* liability.

The Clerk of the Court is directed to:

a.   Terminate the dismissed defendants from the docket report; and

b.   Terminate moving defendants' pending motions (Dkt. Nos. 40, 57, 65, 67,

74).

**IT IS SO ORDERED.**

Dated:  September 24, 2025
        Utica, New York.

Anthony J. Brindisi
U.S. District Judge